

**DORRIS AND ASSOCIATES INTERNATIONAL, LLC**

1360 Peachtree Street, NE   Suite 1150   Atlanta, GA 30309   P 770.487.2138   F 770.487.0106   W www.dorrisassociates.com

January 29, 2021

Michael R. Boorman
Watson Spence, LLP
999 Peachtree Street NE
Atlanta, GA 30309

<u>Richardson v. FCA US LLC</u>

Dear Mr. Boorman:

As requested, the following is a report pertaining to opinions that I will offer in the litigation referenced above.

<u>*QUALIFICATIONS*</u>

My background and qualifications are provided on my attached curriculum vitae. Briefly, my area of experience and expertise, pertinent to this litigation, is warnings and communications pertaining to product safety.  I hold a Ph.D. in Industrial and Systems Engineering from Auburn University and my area of specialization was Human Factors Engineering (HFE), including advanced courses in Human Factors, Safety Engineering, and Ergonomics.   My graduate studies were funded by the National Institute for Occupational Safety and Health (NIOSH) Deep South Education and Research Center (ERC).  Also, I have been certified by the Board of Certification in Professional Ergonomics (BCPE).

During my professional work experience, I have routinely performed evaluations of the design and development of warnings and similar precautionary information. Dorris and Associates International, LLC provides product safety services to a wide variety of entities.   Clients include corporations, non-profit organizations, trade associations, state and federal governmental agencies, as well as defense and plaintiff's attorneys.   Client services have been performed in the U.S., Canada, U.K., France, Germany, Spain, Belgium, Australia and Japan.

For many years, I have served on the American National Standards Institute (ANSI) Z535 Committee that promulgates voluntary, consensus warning standards and currently I serve as the chairman of the ANSI Z535.5 standard subcommittee.

Additionally, I am an Affiliate Professor at Auburn University, where I have taught the graduate course in Human Factors Engineering (HFE).  I have given numerous

Exhibit A

1

presentations and authored various articles, technical reports, and a book chapter on the design of warnings and behavioral responses to safety messages. A listing of my publications is included on the attached curriculum vitae. The charge for my services in this litigation is $385.00 per hour plus expenses. Attached is a list of trial and deposition testimony I have given over the past four years as well as my most recent curriculum vitae.

*MATERIALS REVIEWED*

In my analysis of this matter, I have reviewed the following materials specific to this case:

- Complaint for Damages
- Entered Scheduling and Discovery Order
- Plaintiffs' Memorandum in Support of Motion for Protective Order
- Entered Protective Order
- FCA US LLC's Initial Disclosures
- FCA US LLC's First Set of Interrogatories and Requests for Production
- FCA US LLC's Supplemental Response to Plaintiffs' First Set of Interrogatories
- Entered Order Granting Motion to Amend Scheduling Order
- Plaintiff Seanesee Richardson's Answers to Interrogatories and Requests for Production
- Plaintiff William Richardson's Answers to Interrogatories and Requests for Production
- Entered Order Extending Discovery Deadlines
- Entered Order to Stay Scheduling Order
- FCA US LLC's First Supplemental Response to Plaintiffs' First Set of Interrogatories
- FCA US LLC's Reponses to Plaintiffs' Second Set of Interrogatories and Requests for Production

- FCA US LLC's Supplemental Responses to Plaintiffs' First Set of Requests for Production
- Amended Scheduling Order
- Entered Protective Order
- Correspondence to Plaintiffs
- Entered Amended Scheduling Order
- Amended Scheduling Order, 12/04/20
- Plaintiff's Expert Witness Disclosure
- Lakeland Police Department Records/Incident Report
- 911 Emergency Call Recording
- Tri-County E911 CAD Report
- Sutherland Physical Therapy Records
- Speech and Swallowing Solutions Medical Records
- Valdosta Gastroenterology Associates and Endoscopy Center Medical Records
- Dr. Loeffler Medical Records, 04/17/19
- Baptist Health Letter Regarding HIPAA
- Children's Hospital of Atlanta Invoice

- Hospital Photographs of Seanesee Richardson
- Dr. Loeffler Medical Records, 05/29/19
- SGMC Records
- SGMC Patient Care Reports
- SGMC Patient Form, Report and Notes
- SGMC Radiology Records
- Sutherland Physical Therapy Records
- UF Health Shands Hospital – Medical Records
- UF Health Shands Hospital – Radiology Records
- Valdosta Gastroenterology Records
- Children's Healthcare of Atlanta Billing and Medical Records
- Valdosta Pediatric Therapy Records
- Accident Scene Photographs and Video from Dr. Vogler Inspection, 11/15/19
- Wolfson Childrens Hospital Records
- Neurology and Spine Clinic of South Georgia Records
- AmeriMed Equipment Records
- Brooks Rehabilitation Records
- Lanier County Board of Education Records
- SGMC Billing Records
- SGMC Medical Records
- 2006 Dodge Caravan Owner's Manual
- Earl Bibb Subject Vehicle Inspection Photos, 06/10/19
- Georgia Department of Revenue Title Records for Subject Vehicle

- Florida Department of Highway Safety and Motor Vehicles Title Records for Subject Vehicle
- Carfax Vehicle History Report
- 2006 Dodge Caravan Advertisement Pamphlet
- Technical Service Bulletins for 06' Dodge Grand Caravan
- 2006 Dodge Caravan Vehicle Information Detail Report
- 2006 Warranty Information for Dodge/Chrysler/Jeep Car and Truck
- FCA Vehicle Inquiry – Sales/Special Equipment Codes
- Dr. Lisa Gwin Vehicle Inspection Photos, 10/30/19
- Warranty Claim List Report and Summary Report
- Walmart Vehicle Records
- Picture of Title
- Subject Vehicle Photos from Dr. Vogler Inspection, 11/15/19
- FCA Documents Produced
- Similar Lawsuits Regarding Retrieving Spare Tire in 2005-2007 Dodge Grand Caravan/Chrysler Town and Country (FCA-Richardson-009508-009537)
- CAIRs Received for 2005-2007 Dodge Caravan/Chrysler Town and Country Regarding Alleged Tool/Winch/Jack Defect (FCA-Richardson-009381-009507)
- FCA Document Related to Placement of Exhaust System (FCA-Richardson-009601-009608 & 009609-009670)
- Change Notices Related to Exhaust System in 2005-2006 Dodge Grand Caravan and Chrysler Town & Country Minivans with Stow N'

Go Seating (FCA Richardson-010886-013741)

- Change Notices Referenced in Change Notice 50621-M03 (FCA Richardson-010875-010880)

- CAIRs Produced in Response to Entered Protective Order (FCA Richardson-010832-010840 & Redactions Removed-000001-000170)

- Unredacted Backup Materials, Such as Communications Sent to Customers, for the CAIRs Referenced in Larry Brookes' Deposition (FCA Richardson-010841-010874)

- Exemplar Inspection Photos Taken by Dr. Nathan Dorris, 10/01/20

- Scanned 2006 Dodge Caravan Owner's Manual (FCA-Richardson-000004 – 000499)

- Deposition of Kimberly Richardson, with Exhibits, 01/15/20

- Deposition of William Richardson with Exhibits, 01/15/20

- Deposition of Gary Yeomans with Exhibits, 01/24/20

- Deposition of Chris Lott with Exhibits, 01/24/20

- Deposition of Phil Clarke with Exhibits, 01/24/20

- Released AMPS Process Sheets (Part Schematics)

- Daimler Chrysler Corporation CATIA Comment Pages with Part Diagrams/Schematics

- Daimler Chrysler FMEA Master, 01/30/05

- US Patent Application, Rhodes et al., Pub. No. US 2003/0100114 A1

- Daimler Chrysler Requirements for Designated Appearance Items

- Daimler Chrysler V4 CAD Standards Manual, February 2006

- CEP-0101 Supplier Product Design Information Security Requirement

- Chrysler Corporation Engineering Standard No. CS-8891

- Daimler Chrysler Characteristic Standards

- Daimler Chrysler Material Standards

- Daimler Chrysler Performance Standards

- Daimler Chrysler Process Standards

- 2D4GP44L16R843681 2006 RS Part Diagrams

- Released Engineering Graphics System Part Diagrams/Schematics

- Douglas Quigley Design & Process Physical Mockup and Plastic Shops, Concept Engineering

- 2006 RSKH53 Grand Caravan SXT KPT Database Excel Sheet

- Potential Failure Mode and Effect Analysis (Design FMEA) Global Jack Design Specifications Fill-In Excel Sheet

- Daimler Chrysler 2006 RS/RG/CS FWD Vehicle Platform Pilot and Launch Timing and Change Log

- 2006 RS & RG Programs Radar Screen

- 2006 RS/RG RS Series Card

- 2005 RS/RG 05 RS V2 Series Card

- 2005 RS/RG Program Description Action Letters & Series Cards

- WAP "RS" 2004.5 M.Y. TCF S0 Installation Status

- WAP "RS" 2004.5 BIW S0 Equipment Installation

- 2005 Vehicle and Test Specifications
- Confidential Product Plan Documents for 2005 RS Chrysler/Dodge
- Daimler Chrysler 2005 RS/RG/CS FWD Vehicle Platform Pilot and Launch Timing
- 2004 CY RS/CS WAP/SLSP Pilot Timing and Change Log
- 2005 RS & RG Programs Radar Screen
- 2005 RS Stow n Go @ St. Louis Revised Timing
- Major Weight Reports RG Vehicle Family
- Major Weight Reports RS Vehicle Family
- 2005 RS FIF Weight Status
- 2005 RS Weight Estimates
- 2006 Risks and Opportunities
- 2005 RS Weight Status
- FCA Produced Photos of Dodge Caravans
- 2005 RS/RG RS/CS QTS Competitive Benchmarking Event Pictures
- PALS Reference Sheet
- FVPT Build Plan Process
- RS 2005 BIW Pre-S0/S0 Recovery Plan
- RS SLAP 2005 V2 Stow-N-Go-Summary by Overlay
- Global Vehicle Functional Objectives 2005 RS 2.4 LWB (RSHM53) Hybrid
- 2005 MY Program RS Functional Objectives and Vehicle Dimensions
- 2005 RS Rev. 1 S0 Seat Element Impact Build Plan & 2005 RS Seat

- Element Impact Restrike Build Plan with Revision Log
- 2005 Build Plan Leadership Organizational Chart
- 2005 Build Plan Support Team Organizational Chart
- RS 2005 NextGen Seating Timing Documents
- RS 2005 Seat Program WBVP/Calendar Date Conversion Table
- RS SnG Probe 3 Open CN Log
- 2001, 2002, 2004 RS/RG and 2005 RS/RG 2P Spring Selection Timing Plan
- ER&D Vehicle Counts for each Program by Phase, Price of Each Type of Vehicle Phase, and Price for each Program by Phase
- RG 2005 V2 Stow-N-Go- Summary by Overlay
- Change Notice Worksheets
- WebCN Part Number Searches
- Daimler Chrysler Corporation Corporate/Corporate Long/Long/Body/Body Long/Interior Long CATIA Comment Pages with Part Diagrams/Schematics
- Chrysler Source Package 4697 Component Definition Form
- CATIA V4 / V5 CAD Standard, 10/0/07 (CEP-040)
- Mandatory and Discretionary Engineering Standards, 12/20/07 (CEP-045)
- Chrysler Group Corporate Trademark Identification on Parts, 08/2005 (CS-11000)
- Chrysler Corporation Engineering Standard No. CS-9002, Safety/Emissions Characteristics –

For Primary Wiring and Cable Assemblies

- Chrysler Vehicle Engineering Office Engineering/Material Standards

- SAEJ200, Surface Vehicle Recommended Practice – Classification System for Rubber Materials

- Daimler Chrysler Corporation Powertrain CATIA Comment Pages with Part Diagrams/Schematics

- Daimler Chrysler Corporation Electrical Long CATIA Comment Pages with Part Diagrams/Schematics

- 2006 RS (KH53) Richardson Exhaust System Bid Date: 04/11/06, with Excel Sheet

- William Richardson Driver's License

- Supplemental Production of Richardson Family Photographs and Videos

- Deposition of Doug Quigley with Exhibits, 12/04/19

- Deposition of Earl Bibb Volume I, with Exhibits and Executed Errata, 12/04/19

- Deposition of Earl Bibb Volume II, with Exhibits, 12/05/19

- Deposition of Robert Feldmaier with Exhibits and Errata, 08/03/20

- Deposition of Namir Konja with Errata, 08/04/20

- Deposition of Lawrence (Larry) Brookes with Exhibits and Errata, 08/04/20

- Deposition of Robert Mason with Exhibits and Errata, 08/17/20

- Deposition of Brandon Singletary with Exhibits and Errata, 08/17/20

- Documents Produced by FCA in Response to Plaintiff's Fourth Set of Request for Production

- Deposition of Patrick Richardson with Exhibits, 08/27/20

- Deposition of Kevin Gunckle, 09/01/20

- Deposition of Joseph Salani , 09/01/20

- Deposition of Aakash Barooa, 09/02/20

- Deposition of Rick Lewandowski, 09/02/20

- Deposition of Lance Bradford with Exhibits, 10/12/20

- Report Authored by Jerry Householder, 12/04/20

- Report Authored by Dr. Shael Wolfson Regarding Economic Loss Analysis, 12/07/20

- Report Authored by Dr. Shael Wolfson Regarding Medical Care Cost Analysis, 12/07/20

- Life Care Plan Report Authored by Dr. Aaron Wolfson, 12/07/20

- Report Authored by Pete Sullivan, 12/14/20

- Householder CV, Testimony List and Fees

- Dr. Shael Wolfson CV, Testimony List and Retainer Agreement

- Dr. Aaron Wolfson CV, Testimony List and Rates

- Pete Sullivan CV, Testimony List and Rates

- Householder Inspection Videos

- Householder File Materials

- Deposition of Jerry Householder with Exhibits, 01/18/21

In addition to the above materials, my opinions are based upon my education and training in the fields of Human Factors Engineering (HFE) and product safety, as well as familiarity with the safety aspects of the published scientific literature and standards in these fields.

## HUMAN FACTORS ENGINEERING

Particularly in the past half-century, there has developed a sizable literature in the academic field of Human Factors Engineering (HFE). HFE is the scientific discipline concerned with the understanding of interactions among humans and other elements of a system, including written communications. One of the most well-known researchers in this multi-disciplinary field defined HFE as follows:

> "Human Factors is a body of information about human abilities, human limitations, and other human characteristics that are relevant to design. Human Factors Engineering is the application of HF information to the design of tools, machines, systems, tasks, jobs, and environments for safe, comfortable and effective human use" (Chapanis, 1996).

## HUMAN ERROR RESEARCH

Human beings are able to (a) receive information from their environment, (b) process or transform that information, and (c) respond to the information. The stages of information processing are constrained by a limited pool of attention resources. The availability of our limited attention resources can constrain the ability of an individual to engage in multiple tasks, particularly without experiencing a decrease in performance (Wickens et al., 2004).

Human error can fall into a variety of categories (e.g., knowing violations, lapses of attention, failure to act as intended or "action-not-as-planned," or mistakes in judgment or perception). In his treatise on human error, Reason (1990) has defined an omission as "the failure to carry out some of the actions necessary to achieve a desired goal" (pg. 184). He also states:

> "Common among the acts of humans are moments of absent-mindedness when we become aware that our actions have strayed from their intended path. Two conditions appear to be necessary for the occurrence of these slips of action: the performance of some largely automatic task in familiar surroundings and a marked degree of attentional 'capture' by something other than the job in hand (pg. 8).

Given the diversity of potential error types, it is unreasonable to simply assume all errors (i.e., deviations from prescribed actions) result from confusion or a misunderstanding of available warnings and instructions, even if one believes the information is difficult to understand.

*WARNINGS RESEARCH*

Over the past quarter of a century there has developed a sizable body of literature on behavioral responses to warnings.  Since the design of safety communications and the systematic analysis of responses to those communications is an aspect of HFE, many of the studies are reported in the HFE literature.  Significant reviews of this literature can be found in DeJoy (1989) and Rogers et al. (2000).

As a general proposition, more is not always better with respect to warnings.  Aside from practical issues associated with warning about all potential risks, there is no evidence to suggest that users would be willing or able to process all of this information.  Horst et al. (1986) suggested:

> "A key concept is that humans are not passive receivers who absorb all information directed toward them.  On the contrary, unless a person is in an 'information seeking' mode, the message may not be received at all."

For instance, the National Highway Traffic Safety Administration has recognized the need to avoid what it refers to as "information overload" in developing automotive warning regulations (Dorris & Dorris, 2001a, 2001b).  This concern is supported by the available scientific literature, which has identified several deleterious effects associated with "over-warning" (see Frantz, Rhoades, Young & Schiller, 1999).  A well-known Human Factors textbook (Kantowitz and Sorkin, 1983) states:

> "People become accustomed to the warnings and tend to ignore them. Warnings should be reserved for high-probability events.  Even then, it is difficult to get people to pay attention to them."

Receivers that are not seeking safety information about a product are unlikely to attend to warnings they observe.  Ayres et al, reported:

> "Results of recent warnings studies are consistent with the communication theory principle that people who are not looking for a particular type of information (be it instructions or warnings) are unlikely to notice and use that information if they encounter it" (Ayres et al., 1989).

For a warning to change an individual's behavior, that person must not only notice and read (or hear) the warning, but also agree with the message or believe that it should be followed.  For example, an individual may decide not to follow a warning because they believe they will be successful without following the safety message (i.e., affordance perception, see Ayres et. al, 2000) or that following the warning may require more time or effort than they are willing to expend (i.e., cost of compliance, see Rogers et al. (2000).  For example, Rogers et al. (2000) concluded:

> "Even a perfectly designed warning that has been noticed, encoded, and comprehended might not be complied with. Several of the person variables that influence compliance are unique to that component of the warning process. For example, individuals' perception of their control over the process, their analyses of the costs of compliance, and their risk-taking style have all been shown to influence compliance" (pg. 130).

*FACTS AND OPINIONS*

On the basis of my education and experience as outlined above and on the attached curriculum vitae, the literature on warnings including but not limited to those referenced in this report, as well as my inspection of an exemplar vehicle and my review of the materials in this case as listed above, I have reached the following opinions that I hold to a reasonable degree of scientific certainty:

1. *Obvious Risk and Means of Avoidance*

It is widely known, and intuitively obvious to anticipated vehicle owners, that a vehicle slipping off a jack and landing on a person (or part of their body) can result in serious injury or death.  The nature of the hazard and consequences of being struck by a vehicle falling from a raised jack are not technical and do not require specialized training or knowledge to recognize.  Similarly, it is reasonable to expect that individuals will also readily appreciate the means of avoiding this risk include staying out from under a vehicle raised on a jack as well as following the manufacturer's warnings and instructions.

The basic precautions (e.g., setting the parking brake, chocking wheels, and only jacking on hard level surfaces) are common across (various sources of safety information, such as other vehicle manufacturers, news articles, and other jacks (e.g., see floor jack from Richardson vehicle inspection, Gwin Photo 71).

As it relates to this matter, Kimberly Richardson (Seanesee's mother) was aware of the potential for the subject vehicle to fall off the jack as she described the family would ordinarily use a concrete cinderblock to secure or prevent the vehicle from falling (pg. 131-36).  For example, she testified:

"Q. Well, let me ask it this way: If you had found the cinderblock, what were your plan- -- what were your plans to do with it?

A. I would've put it underneath to support the frame.

Q. Okay. In case the van fell off the jack?

A. Uh-huh.

Q. Is says, "Mother stated they did not see the brick in its usual place and decided to go forward with repairing the tire." I know you didn't recall this conversation happening, but is that an accurate statement, you didn't see the cinderblock, and so you decided to proceed with re- -- with changing the tire anyways?

MR. EVANS:  Object to form.

THE WITNESS: I didn't see the block -- brick, and Sean said, to go to Scouts, we've got to change the tire, it's not safe to drive it like this" (pg. 134-35).

William (father) and Patrick (brother) Richardson also testified that it was "dangerous" to get under a vehicle that is raised on a jack (see W. Richardson,

Exhibit A

pg. 43-4; P. Richardson, pg. 52).

As discussed earlier in this report, it is widely accepted that product users may not follow even "a perfectly designed warning" (Rogers et al., 2000) for a variety of reasons, including not agreeing with a message. Similarly, users may accept a known risk (or decide not to follow a precaution) because they believe they will be successful without following the safety message (i.e., affordance perception, see Ayres et al., 2000) or that following the warning may require more time or effort than they are willing to expend (i.e., cost of compliance, see Rogers et al., 2000). For example, users may be willing to get under under a raised vehicle, in a posture they recognize as unsafe or increasing their risk of injury, because of an optimistic bias about their risk of an incident occurring. That is, they do not expect the vehicle to fall off the jack on this occasion. In describing this bias, one Human Factors textbook (Sanders and McCormick, 1993) explains:

> "People tend to adopt an 'It can't happen to me' bias when assessing risks and are often overconfident of their ability to avert injury. For example, various surveys have revealed that from 75 to 90 percent of automobile drivers believe that they are above average in their driving skill (Christensen, 1987)."

Similarly, familiarity and benign experience with a product are also recognized as factors decreasing an individual's hazard perception (DeJoy, 1989, and Rogers et al., 2000). That is, as people use a product without a safety problem they are apt to become more confident in their interactions and less concerned about potential dangers.

2. *NHTSA's Knowledge of Jack-Related Incidents and No Required Warnings*

While I am not aware of any published data or estimates of exposure (i.e., how frequently jacks are used), NHTSA collects and publishes data on non-traffic crashes and incidents, including injuries associated with vehicle jacks. The data shows that while relatively rare compared to traffic-related incidents, the agency is aware that injuries from raising vehicles with jacks occur each year with some degree of frequency. The agency has also occasionally published reports concerning these incidents. For example, in a Research Note the agency defined "jack failures" intentionally broad to include a wide range of interactions and incidents. Although the report does not investigate the individual's knowledge, precautions, or the actions that may have caused the incident, it does provide some analysis of the injury data. For example, the agency concluded that most injuries were not severe, stating: "the majority, about 85 percent, sustained minor (45%) to moderate injuries (40%)" (NHTSA, 1998).

Obviously, as the agency has already developed and requires warnings and safety information about various issues (e.g., rollover risk and airbags), NHTSA could mandate warnings and instructions related to raising vehicles with a jack, if the agency thought it was necessary or appropriate. I have authored several articles addressing the development and evolution of various NHTSA mandated warnings (Dorris & Dorris 2001a; 2001b; Dorris & Burke 2011).

NHTSA is aware of instances of jack-related injuries occurring across many different manufacturers and models of vehicles.  Even with this knowledge, the agency has apparently not concluded that it is necessary to mandate any jack-related warnings and instructions or to require specific designs for jacks or engagement points on vehicles.  Additionally, I am not aware of any other regulations, voluntary standard, industry guideline, or safety organization suggesting any different or additional warnings or instructions related to using a vehicle's jack or changing tires.

3. *Appropriate Warnings and Instructions for the 2006 Dodge Grand Caravan*

From a human factors perspective, the warning system associated with the subject 2006 Dodge Grand Caravan is reasonable and appropriate in terms of methods of dissemination, presentation, and content.  The warning system includes safety messages provided via a label affixed to the jack itself as well as in the associated owner's manual.  These are customary and expected locations for safety messages from a consumer's perspective.

*(a) Methods of Dissemination*

On-product warning labels are a customary and accepted method of communicating brief safety messages.  As seen in figure 1 below, in addition to identifying precautions (e.g., never get beneath raised vehicle, park on hard level surface, set parking brake, and block the wheel diagonal to the flat tire) to avoid the risk of "serious injury or death," the label explicitly directs readers to the owner's manual for more information.  Within the field of safety communications, it is an accepted practice to refer readers of on-product warnings to the associated manual.

Exhibit A



*Figure 1.  Composite of photograph of Jack Warning Label, and annotated screen capture of Householder video (Cam3V2 07:34) depicting label location.*

Owner's manuals have been used for decades to provide information about the use, care and safety of all types of products and machinery.  This is the appropriate location for the bulk of the instructions and warnings regarding safe operation and maintenance of a passenger vehicle.  Research suggests that many consumers not only expect product manuals to contain safety information, but they prefer safety messages to be communicated in this medium over on-product labels (Mehlenbacher et al., 2002).  Safety standards and agencies, including NHTSA, often require specific safety information in owner's manuals.

*(b) Format and Presentation of Safety Information*

Based upon design and placement, the warning label can be readily observed and noticed during reasonably expected interaction (e.g., removing, handling, and positioning the jack, as well as placing the handle on the jack), as depicted in figure 1.  The precautionary information (both on the label and in the manual) as provided is consistent with customary and accepted practice for

safety communications, and formatted appropriately, such that observers can readily identify that the messages are communicating safety-related information.

With respect to the owner's manual, in addition to highlighting some safety messages with customary formatting conventions (e.g., border, signal word, shaded background, and message panels), precautionary information is also embedded within the instructions.  For example, the first step of the procedure (under *Preparations for Jacking*) directs readers to select a "firm level surface," place the vehicle in Park, and "**set the parking brake**" (see manual, pg. 376, *emphasis original*, figure 2).  Not only is embedding safety information an accepted practice in safety communications, research has suggested it is at least, and in some circumstances more, effective to grouping all safety messages.  For example, one study concluded:

> "The results suggest further that in some circumstances, clear and direct instructions may be more effective than a warning in eliciting the desired behavior" (McCarthy, et al., 1987).

To facilitate the transfer of information and increase the potential recall (memory) of readers, the owner's manual employs accepted formatting and technical writing conventions, such as layout (e.g., spacing and indentation) and structure (e.g., section headings).  The information is presented in a clear and easy-to-use manner, including organizing information by topic (e.g., "JACKING AND TIRE CHANGING"), which facilitates reading and comprehension.

*(c) Content of Safety Information*

As it relates to this matter, safety information related to using the jack and changing tires was provided using both written warnings and instructions as well as illustrations depicting equipment and actions.  The relevant precautionary information is direct, clear, and can be easily followed by ordinary consumers, as it does not require any additional technical knowledge or training.

The procedure, descriptions and other safety messages are verified by simply attempting the process on a vehicle while following the instructions.  In performing this simple task analysis, I found the instructions are practical and accurate in prescribing actions as well as describing and illustrating the process and interaction.  As it relates to this matter, witnesses have described similar validation steps at Chrysler in the normal business process through engineering evaluations or potentially "customer clinics" (see Quigley, pg. 50-51, 57-59, 137-38; Feldmaier, pg. 185-86; and Gunckle, pg. 39-40).

The safety messages clearly alert anticipated users to the potential risk of serious injury or death and the means to avoid this risk when using the vehicle's jack to raise the car.  For example, the warning label affixed to the jack directs users to follow precautions "to avoid serious injury or death," and the owner's manual warns: "Getting under a jacked-up vehicle is dangerous.  The vehicle could slip off the jack and fall on you. You could be crushed."

Additionally, the jack warning label appropriately reminds users to never get beneath a raised vehicle, park on hard level surface, set the parking brake, block the wheel diagonal to the flat tire and to read the owner's manual (see figure 1). While clearly a summary of safety information, these precautions are consistent with the warnings and instructions detailed in the manual.

As an example, the first warning, both on the jack label and in the owner's manual, explicitly warns to "never get any part of your body under a vehicle that is on a jack" (see pg. 376, figure 2; repeated pg. 381, figure 5). This strategy eliminates the risk of injury. The warning continues by directing users who perceive a need to get under the vehicle to "take it to a service center where it can be raised on a lift." In addition to reinforcing the risk of being under a vehicle raised by a jack, this message explicitly addresses the circumstance that a user may believe they are unable to follow the warning to never get any part of their body beneath a vehicle raised on a jack.



*Figure 2.  Page 376 of subject owner's manual (excerpt of K. Richardson Exhibit 3)*

In addition to being described and depicted in the manual, the jack and handle are stored separately from the "Stow 'n Go Tools" or handle extensions (i.e., three pieces inside the tool pouch). The manual clearly explains (in writing and illustrations) that the same three pieces from the pouch are put together to form either the "Winch 'T' Handle" or "Spare Tire Hook" (see pg. 378-9; figure 3).



*Figure 3.  Page 379 of subject owner's manual (excerpt of K. Richardson Exhibit 3)*

The instructions further inform readers that the same three pieces used to form the winch handle are also used to form the Spare Tire Hook.  The next step of the sequence explicitly instructs readers that after they lower the spare tire by using the "T" handle to rotate the drive nut for the "winch mechanism," they should "assemble the winch handle extensions to form the Spare Tire Hook and pull the compact spare tire/cover assembly from under the vehicle" (pg. 380).

As seen in figure 5, the illustration depicting retrieval of the spare specifically refers to the Spare Tire Hook by name, not the jack handle (see manual pg. 381).

In addition to the clear instructions (in writing and illustrations), physical cues from the design would also make it apparent that the jack handle (or wrench) is not the Spare Tire Hook.  For example, aside from storing the handle with the jack (not in the pouch with the tool parts), it is obvious that the jack handle is not long enough (i.e., to reach under the spare tire without getting underneath the vehicle) nor does it form a sufficient "hook."  Note in figure 4 that the end of the Spare Tire Hook forms approximately a right angle (90°) to permit "hooking" and pulling the spare tire, compared to the relatively open end of the jack handle (approx. 45° angle) which would be expected to slip off when pulling (as demonstrated in the Householder videos).  Given the information in the manual and physical cues of the tools, I am not aware of any basis to suggest that users in general would mistakenly perceive the jack handle was the Spare Tire Hook.

As it relates to this matter, Mrs. Richardson specifically testified she did not know "whether Seanesee had any kind of tools or equipment with him when he went under the van" (see K. Richardson, pg. 146).  Other individuals onsite after the incident also testified they did not see any tools around him (see G. Yeomans, pg. 32; C. Lott, pg. 21).



*Figure 4.  Annotated screen capture from Householder video (Cam1V2 12:56).*

Importantly, the procedure is provided in a logical and appropriate sequence, such that when followed users interaction with the raised vehicle is minimized. For example, the manual first outlines *Preparations for Jacking,* followed by the *Jacking Instructions*.  The instructions provide an ordered (numbered) sequence of steps.  Relevant portions include:

1. "loosen (but do not remove) the wheel lug nuts";

2. lower the spare tire/cover assembly by rotating the drive nut "until the winch mechanism stops turning freely" (and similar message embossed on tool);

3. "assemble the winch handle extensions to form the Spare Tire Hook" and pull the assembly from under the vehicle

After directing users to pull the tire, the manual notes that it may be necessary, if a front tire is flat, to raise the vehicle (just enough for clearance as described in that section) to remove the compact spare. The manual again warns: "Getting under a jacked-up vehicle is dangerous.  The vehicle could slip off the jack and fall on you. You could be crushed.  Never get any part of your body under a vehicle that is on a jack" (see figure 5), then directs the reader to the appropriate "jack engagement locations" for raising the vehicle.

4.  "When the compact spare tire/cover assembly is clear of the vehicle" stand it up and remove the wheel spacer;

5.  identify the jack engagement locations (using the illustration, descriptions and physical affordances (tabs on vehicle));

6.  describes how to position and locate the jack relative to the vehicle (in addition to the illustration) and the importance of confirming the jack engages the vehicle securely, stating;  "**Do not raise the vehicle until you are sure the jack is securely engaged**" (emphasis in original);

7.  raise the vehicle just enough for clearance, stating: "Raise the vehicle only until the tire just clears the surface and enough clearance is obtained to install the spare tire. Minimum tire lift provides maximum stability";

At this point, the manual explicitly warns: "Raising the vehicle higher than necessary can make the vehicle less stable.  It could slip off the jack and hurt someone near it.  Raise the vehicle only enough to remove the tire"

8.  remove the lug nuts and pull the wheel off hub; and

9.  install the compact spare tire and warning against "forcing the vehicle off the jack"

Additional steps are provided (unrelated to this incident), including describing how to finish the tire change and secure the components.



*Figure 5.  Page 381 of subject owner's manual (excerpt of K. Richardson Exhibit 3)*

With respect to proper engagement of the jack, the manual provides reasonable and appropriate instructions in writing and through illustration.  For example, the "Jack Engagement Locations" illustration depicts the "downstanding tabs" as well as an exploded view of a raising jack "engaging the flange" with the head almost contacting the flat surface (rocker sill) of the vehicle's body (see manual, pg. 383, figure 6).



*Figure 6.  Page 383 of subject owner's manual (excerpt of K. Richardson Exhibit 3)*

While users may not be familiar with the term "sill flange" before reading the manual, the available information appropriately describes and depicts the flange so that users can follow the directions.  For example, in describing the "Jack Engagement Locations" the manual explicitly states:

> "These locations are on the sill flange of the body and consist of a pair of downstanding tabs.  The jack is to be located, engaging the flange, between the pair of tabs closest to the wheel to be changed" (pg. 384).

While this is an illustration only, not a photograph, the image is consistent with the written descriptions (see step #6 in owner's manual) as well as what users can directly observe during their interaction with the vehicle.  The point of view in the illustration is clearly from the left-hand side (when facing the vehicle's passenger side) looking up towards the underbody of the vehicle where the jack is engaging the flange.  This illustration is a reasonable depiction of what one can see in real life, based on my own observations as well as depicted in various photographs (see figure 7).



*Figure 7. Composite of excerpt from manual (pg. 383) and exemplar inspection photograph (DAI photo, DSCN6059.jpg).*

It is alleged in this matter that users might mistakenly perceive that it is proper to place the flat, horizontal jack head in contact only with the thin, downward pointing (vertical) seam (sill flange). As depicted (on the left-hand side) in figure 8 below, the perpendicular arrangement of the vertical sill flange resting on the horizontal jack head would be similar to attempting to raise the vehicle using a "knife's edge" of contact between the jack and vehicle (point A), and obviously no contact with the body of the vehicle (point B). I am not aware of any basis to support the allegation that users would perceive the "knife's edge scenario" as proper or consistent with the available safety messages.



*Figure 8. Annotated composite screen captures from Householder videos: "Knife's Edge" scenario on left (Cam2V2 00:40), and jack engaging flange on right (Cam2V2 02:34).*

In contrast to this alleged "knife's edge scenario," as depicted (on the right-hand side) in figure 8, as a user raises the jack towards the vehicle, the engagement of the flange into the channel on the jack's head (point C) allows the user to see the head raise and contact the vehicle's body (point D). Inserting (engaging) the flange into the channel of the jack head allows the flat, horizontal part of the jack head to meet the flat, horizontal surface of the vehicle's body (rocker sill), and this arrangement would obviously allow for more surface area contact between the jack and vehicle.

As it relates to the safety communications, I am not aware of any basis that would suggest additional warnings or instructions explicitly prohibiting the "knife's edge scenario" were necessary, and none has been identified by Dr. Householder or others in this matter. For example, I am not aware of any basis in the general human factors research or literature, from NHTSA data or publications concerning jack-related incidents, or from feedback during evaluations performed by Chrysler. Additionally, it is not clear to me that a user could raise the vehicle to lift a tire off the ground in the "knife's edge scenario." Since the jack head pivots, this would appear like attempting to lift a car using a "knife's edge" balanced on a see-saw. As seen in his videos, when Dr. Householder attempted to raise the vehicle in that configuration, the jack slipped out before the tire was lifted off the ground. Regardless of how the jack was positioned at the time of this incident, the available safety information explicitly warns against putting "any part of your body under a vehicle that is on a jack."

With respect to the available guidance for warning designers, there is broad agreement that warnings should endeavor to communicate: (1) the nature of the hazard, (2) the means of avoiding the hazard, and (3) the consequences of failing to avoid the hazard. The warnings and instructions associated with the subject vehicle are reasonable and adequate to achieve these goals. The relevant safety information explicitly alerts readers to: (1) the nature of the hazard (i.e., "getting under a jacked-up vehicle is dangerous"), (2) the means of avoiding this risk (i.e., "never get any part of your body under a vehicle that is on a jack"), and (3) the potential consequences (i.e., "you could be crushed" causing "serious injury or death"), which apply whether the jack is properly or improperly used.

To the extent it is alleged that users could be confused or misled by the instructions, even under that hypothetical situation the user can always contact Chrysler, a local dealer, or simply search the internet for additional instructions or guidance. As noted earlier, the warning against being under the vehicle in the manual (e.g., pg. 376 and 381) also admonishes users that may perceive they need to get under the vehicle to "take it to a service center where it can be raised on a lift." In addition to reinforcing the risk of being under a vehicle raised by a jack, this message explicitly addresses the circumstance that a user may believe they are unable to follow the warnings to never put any part of their body under a vehicle raised on a jack.

4. *Different or Additional Warnings*

There is insufficient evidence for one to conclude to a reasonable degree of certainty that any different or additional warnings or instructions provided by Chrysler would have altered the behavior of Seanesee Richardson, or anyone else, and prevented this incident from occurring. Neither the general literature on responses to warnings nor the evidence in this matter support a conclusion.

As mentioned earlier in this report, there is broad recognition within the field of safety communications that receivers may not read and follow warnings and instructions for various reasons. Individuals may filter out warnings or instructions, or only avail themselves of portions of instructions, if they feel confident in their ability. Ayres et al, reported:

> "Results of recent warnings studies are consistent with the communication theory principle that people who are not looking for a particular type of information (be it instructions or warnings) are unlikely to notice and use that information if they encounter it" (Ayres et al., 1989).

Familiarity and benign experience also decrease hazard perception as well as the increase the potential for optimistic bias. Additionally, users may decide not to follow a warning because they believe they will be successful without following the safety message (i.e., affordance perception, see Ayres et al., 2000) or that following the warning may require more time or effort than they are willing to expend (i.e., cost of compliance, see Rogers et al., 2000).

Reasons for not following warnings may not be related to deficiencies in the warnings but rather intrinsic to the individual receiver. For example, Rogers et al. (2000) reported:

> "Even a perfectly designed warning that has been noticed, encoded, and comprehended might not be complied with. Several of the person variables that influence compliance are unique to that component of the warning process. For example, individuals' perception of their control over the process, their analyses of the costs of compliance, and their risk-taking style have all been shown to influence compliance" (pg. 130).

In this matter, we do not have any testimony from Seanesee Richardson about his knowledge, intentions, actions, or his beliefs and perceptions at the time of this incident. According to his mother, Seanesee had prior benign experience by participating in changing tires on the subject vehicle on two other occasions without injury or concern before this incident (K. Richardson, pg. 42-48; and P. Richardson, pg. 36-62), including her sons watching a helpful stranger that retrieved the spare tire and raised the vehicle with the jack himself while assisting the Richardsons.

Similarly, we do not have any testimony about the extent to which, if any, Seanesee Richardson read and relied upon the jack warning label or the owner's manual in performing the subject tire change, or relied upon his memory of

instructions or actions learned from watching the helpful stranger with a prior tire change.   For example, Mrs. Richardson testified that "I know that he [Seanesee] put the jack where he was supposed to put the jack. He had been shown where to put the jack for each tire" (pg. 184).   Mrs. Richardson did not testify that she observed him reading and attempting to follow the step-by-step procedures in the manual.   Although she believes Seanesee got the manual out, she did not see him review it.   Mrs. Richardson testified:

> "Q. Okay. Do you know when during the process of jacking up the vehicle and unscrewing the drive nut for the spare tire Seanesee reviewed the owner's manual?
>
> A. No, I do not.
>
> Q. Okay. Do you know if he did, in fact, review the owner's manual at any point that day?
>
> A. I know the book was out when I stepped in the house to get -- to put my phone on the charger" (pg. 125); and
>
> "Q. Okay. Did you ever observe Seanesee reading or reviewing the owner's manual?
>
> A. No.
>
> Q. Okay. So as you sit here today, you cannot be for certain one way or another whether Seanesee reviewed the owner's manual on December 12th of 2016; is that accurate?
>
> A. That's accurate" (see K. Richardson, pg. 127).

Patrick Richardson, who participated in the two prior tire changes with Seanesee, testified that he does not recall reading the owner's manual (pg. 62), but agreed, "it is dangerous to crawl under a vehicle while it is jacked up on a scissor jack" (pg. 52).   When asked about warnings in the owner's manual (i.e., pages 376 and 381), he testified that they were clear (pg. 64-65).   He also testified that he had read the warning label affixed to the jack (pg. 65).   When asked about the prior instructions for locating the jack, he testified:

> "Q. You recall being told anything specifically as to what component on the underbody of the van the jack was supposed to engage with?
>
> MR. WOODS: Object to form.
>
> THE WITNESS: Honestly, no. I was just pointed towards the base and said that that would support the weight without damaging the vehicle" (pg. 47-48).

Patrick also testified that he believed it was necessary to raise the vehicle to get underneath "to get near the spare" to retrieve it.   He testified:

> "In order to retrieve the spare tire, the car has to be jacked or at least for me or any of the others to get near it, to get near the spare,

it would have to be jacked up. You're not going to reach it under the car or be able to drag it out otherwise" (pg. 104)

Patrick testified that they had called their father (William) to ask for advice about the tire change on one of the prior occasions (pg. 106).

William Richardson testified that he had attempted to teach Patrick to change a tire but had not taught Seanesee (pg. 41-42). He agreed that it is "dangerous" to get under a vehicle raised by a jack. William Richardson also testified that despite any differences in appearance of the illustration in the manual (pg. 383) to the actual jack or considering it "not clear cut" (pg. 67-71), he can "figure out" the instructions and agreed that the illustration depicts "a channel that lines up with the sill flange" (pg. 52-53, 71).

As discussed earlier, it is clear that Mrs. Richardson was also aware of the risk of serious injury from the vehicle falling off the jack, and despite not finding the cinderblock normally used to protect against this risk they proceeded with changing the tire (pg. 131-35).

Additionally, contrary to the sequence of steps outlined in the manual, it appears that Seanesee may have been attempting to separate the spare tire from the end of winch cable (wheel spacer) while underneath the raised vehicle immediately before the incident. Mrs. Richardson testified:

"Q. Do you know if Seanesee ever made contact with the spare tire and the -- the cover that goes on the spare tire? Do you know if he ever touched it at any point while he was under the van?

A. He said that he was loosening the – I believe he called it a wing nut.

Q. Okay. When did he tell you that?

A. When he was loosening the tire from the -- the little carriage well thing that it sits in.

Q. So this was before he jacked it up?

A. No" (pg. 147); and

"Q. Okay. So at what point did Seanesee tell you that he had loosened the wing nut on the -- I'm guessing it's the -- the cover to the spare tire; is that correct? Is that what he told you? I'm sorry.

A. I don't know which wing nut he was talking about.

Q. Okay. When did he tell you that, though? Before or after you had loosened the drive nut on the floorboard?

A. After.

Q. Okay. And was the vehicle jacked up at that point? Do you know?

A. Yes.

Q. It was jacked up?

A.  Yes.

Q.   Okay.  Do you know what Seanesee was doing at the time that the vehicle fell on top of him?  I mean, obviously he was under the vehicle, but do you know exactly what he was doing at that time?

A.   I don't know exactly what he was doing, just what he had told me he was doing.

Q.   And that was loosening the wing nut?

A.   Yes" (pg. 148-49).

Based upon the available evidence, there appears to be several actions occurring during this incident that are inconsistent with the *Jacking and Tire Changing* procedures in the owner's manual and would suggest there was not an attempt to strictly follow that information.  For example, to the extent:

- the vehicle was not on a firm level surface (see emergency responders G. Yeomans, pg. 23-26; B. Singletary, pg. 16-17)

  <u>violates</u>:  "park the vehicle on firm level surface" (pg. 376; similar in warning label);

- the wheel was not chocked (see K. Richardson, pg. 128-30)

  <u>violates</u>:  "block both the front and rear of the wheel diagonally opposite the jacking position" (pg. 377; similar in warning label);

- it is alleged the lugs nuts were removed prior to raising the vehicle (see Householder deposition, pg. 133-35)

  <u>violates</u>:  "loosen (but do not remove) the wheel lug nuts" (pg. 379);

- it is alleged the vehicle was raised in the "knife's edge" scenario (see Householder report, pg. 2-3)

  <u>violates</u>:  illustration and instructions, such as: "The jack is to be located, engaging the flange, between the pair of tabs closest to the wheel to be changed" and "**Do not raise the vehicle until you are sure the jack is securely engaged**" (emphasis in original, pg. 383-84);

- Seanesee was underneath the raised vehicle (see K. Richardson, pg. 56-57, 66, 175)

  <u>violates</u>:  Warnings about "never get any part of your body under a raised vehicle that is on a jack" (pg. 376, 381; similar in warning label);

- Kimberly Richardson was inside the vehicle turning the winch with the vehicle raised and her son under the vehicle (see Householder video, Cam1V2 ~08:15, K. Richardson agrees that "when he's under there, he says 'keep cranking it down, mom'")

violates: "passengers should not remain in the vehicle when the vehicle is being jacked" (pg. 377); and Step 2 - rotating the drive nut "until the winch mechanism stops turning freely" before Step 3 retrieving the spare (pg. 380);

- Seanesee was attempting to retrieve the spare tire/cover assembly without the Spare Tire Hook,

    violates: Step 3 - "Assemble the winch handle extensions to form the Spare Tire Hook and pull the compact spare tire/cover assembly from under the vehicle" (pg. 380);

- Seanesee was attempting to release the spare tire assembly from the winch cable (i.e., remove the wheel spacer or "wingnut") while under the van (see Householder video, Cam1V2 ~08:15, and her deposition, pg. 147-9)

    violates: Step 3 - "Assemble the winch handle extensions to form the Spare Tire Hook and pull the compact spare tire/cover assembly from under the vehicle" (pg. 380); and Step 4 – "when the compact spare tire/cover assembly is clear of the vehicle, stand the wheel upright and remove the wheel spacer by squeezing the two retaining tabs together" (pg. 382).

5. *Consideration of Plaintiffs' Opinions*

I have reviewed the reports of Dr. Shael Wolfson, Mr. Peter Sullivan, and Dr. Jerry Householder. It appears only Sullivan and Householder offer opinions about warnings issues in this matter, and I generally disagree with their respective conclusions. Much of my disagreement with the allegations has already been outlined in this report. Additional comments and points of disagreement include, but are not limited to, the following:

- Mr. Sullivan appears to only reference the subject owner's manual as it relates to his design opinions about ground clearance. For example, he states:

    "I can find no evidence that defendants required or even advised owners that the spare tire could not be removed from the passenger's side of the subject vehicle without raising it, even with properly inflated tires installed on the vehicle" (Sullivan report, pg. 26).

    Response: While I am not offering any design-related opinions in this matter, I would note that his statements are inconsistent with my own experience. I successfully slid the spare tire/cover assembly out from under the vehicle from the passenger side using the Spare Tire Hook with an exemplar vehicle (all four tires inflated and parked on a firm level surface).

Additionally, his statements ignore the NOTE on page 381 of the manual that states "if either front tire is flat, it may be necessary to jack up the vehicle to remove the compact spare tire/cover assembly from under the vehicle."  To the extent that Mr. Sullivan is critical of the available warnings and instructions, I disagree for the reasons outlined in this report.

- Dr. Householder's suggestion about potentially confusing the jack handle and Spare Tire Hook, and his criticism of related illustrations in the manual.  For example, he stated:

   "It is my opinion that the warnings and instructions are unclear and ambiguous because if a user sees the drawing and sees a hook on the end of the jack handle, the user does not have to look any further and may assume that the hook at hand is the required hook" (Householder report, pg. 3; similar opinion pg. 8).

Response: For the reasons outlined earlier in this report, I disagree. In summary, the components are stored separately, the relevant instructions (in writing and illustration) clearly identify the tools, and the physical cues would also make it apparent that the jack handle is not the Spare Tire Hook.  It is obvious from observing the handle that it is not long enough (i.e., to reach under the spare tire without getting underneath the vehicle) nor does it form a sufficient "hook." Dr. Householder demonstrated this in his videos.

As it relates to this matter, Mrs. Richardson specifically testified she did not know "whether Seanesee had any kind of tools or equipment with him when he went under the van" (see K. Richardson, pg. 146). Other individuals onsite after the incident also testified they did not see any tools around him (see G. Yeomans, pg. 32; C. Lott, pg. 21).

Finally, Dr. Householder's hypothetical situation describes a user making an error based on only partial information and their own assumptions, not from reading the available procedures.  His report states: "the user does not have to look any further and may assume that the hook at hand is the required hook."  It is unreasonable to characterize warnings and instructions as deficient based on a user viewing only portions of the available information and ignoring other portions.

- Dr. Householder's opinions about reaching under the raised vehicle for the spare tire (Householder report, pg. 3);

Response: To the extent that he is suggesting that reaching under the raised vehicle is not violating the warnings to "never get any part of your body under a vehicle that is on a jack" or "never get beneath vehicle, start or run engine when it is supported by a jack", or that it

only pertains to "getting his whole body under the vehicle," I disagree
for the reasons outlined in this report.  As it relates to this matter,
when asked about this language in the manual, Mrs. Richardson did
not testify that she interpreted the warnings in the manner described
by Dr. Householder.  Rather, she testified that the safety messages
were clear, however, she just believes it is "impossible" to retrieve the
spare tire without getting under the vehicle (pg. 56-57).  It should be
noted that Mrs. Richardson also testified that although she believes
she "had the book out when they [her sons] were changing the tire by
themselves" (on a prior occasion), she did not recall specific
information from the manual, and when shown the manual and asked
what pages she reviewed, she said "it would've been like 3 – Page 378;
it tells where the tire is stored" (see pg. 53-55).  She also testified that
she was not familiar with the Spare Tire Hook (pg. 64, 182-83).  Mrs.
Richardson agreed that her son was under the vehicle as she was
cranking the winch mechanism (see Householder video, Cam1V2
~08:15; K. Richardson deposition, pg. 138, 142, 175).

Apart from the issue of getting under the vehicle, the Richardsons had
the option of attempting to retrieve the spare tire from the driver's
side, away from the jack, given the open area (yard) where the tire
change was occurring.  Neither the instructions nor the design
requires users to retrieve the spare tire from the passenger side (or
the side with the tire to be changed).  According to Mrs. Richardson,
the subject tire was not flat, but rather was being changed because of
a bubble (or blister) near the rim (pg. 83-84).

- Dr. Householder's opinion that the illustration and instructions about
jack engagement are confusing.  For example, he stated:

    "The instructions related to jack placement are defective
    because the jack provided with the car does not resemble the
    jack in the picture" (Householder report, pg. 8).

Response:  For the reasons outlined earlier in this report, I disagree.
In summary, I am not aware of any evidence that Seanesee Richardson
was confused and attempted to raise the vehicle using the "knife's
edge scenario" discussed earlier.  In addition to the reasonable and
appropriate instructions, as a user raises the jack towards the vehicle,
the engagement of the flange into the channel on the jack's head
allows the user to see the head contact the body (i.e., two horizontal
surfaces meeting).  I am not aware of any basis to suggest users would
believe that attempting to lift a heavy vehicle on a "knife's edge" would
be appropriate or consistent with the available instructions.
Additionally, it is not clear to me that a user could raise the vehicle to
lift a tire off the ground in the "knife's edge scenario."  As seen in his
videos, when Dr. Householder attempted to raise the vehicle in that
configuration, the jack slipped out before the tire was lifted off the
ground.

Users that are confused (or feel they cannot follow the precautions, like staying out from under the vehicle) can always contact Chrysler, a local dealer, or simply search the internet for additional instructions or guidance. As noted earlier, the warnings against being under the vehicle in the owner's manual (e.g., pg. 376 and 381) also admonish users that may perceive they need to get under the vehicle to "take it to a service center where it can be raised on a lift."

Regardless of how the jack was positioned, the available safety information explicitly warns against putting "any part of your body under a vehicle that is on a jack."

I have recently received and started reviewing the deposition of Dr. Householder. While I am continuing to review the transcript, at this time I have observed that Dr. Householder testified:

- that when he asked Mrs. Richardson (in November 2020) if Seanesee used the Spare Tire Hook for retrieval, "she said no, he used the hook on the jack handle" (pg. 62-64);

    This statement is contrary to her testimony.  When asked about the Spare Tire Hook in her deposition (January 15, 2020), Mrs. Richardson testified that "I did not know what he did" (pg. 183); she also said she did not "observe him crawl under the van" because she was on the other side (pg. 138-39); and she did not know "whether Seanesee had any kind of tools or equipment with him when he went under the van" (pg. 146).

    I was unable to identify this statement or conversation on the available video recordings made by Dr. Householder. Dr. Householder did not make any notes or document his discussions with Mrs. Richardson and stated "I can guarantee you that I interviewed her on issues that were not on the video" (pg. 62).  Apparently, he did not prepare an interview guide or follow a structured interview process. It is widely accepted that interactions (such as demonstrating actions with a product, discussing the interviewer's thoughts or theories, and the presence and comments of other people) can influence the responses of an interviewee (or witness), and is not an appropriate methodology from a human factors perspective.

- he agrees that the Spare Tire Hook "works" and is an appropriate tool for retrieving the tire (pg. 111);

- he agrees that a person cannot use the jack handle to retrieve the tire (pg. 143);

- he agrees that the manual adequately explains the difference between the Spare Tire Hook and jack handle:

    "Q. If you read the other sections of the owner's manual that talks about the spare tire hook, you would know that the spare tire hook is not the jack handle, correct?

A. You would know that" (pg. 234).

- he agrees that a reader must consider all the available information (i.e., both the written messages as well as any illustrations) (pg. 195-202);

- with respect to raising the vehicle with the misaligned jack (or the "knife's edge" scenario), Dr. Householder describes this as "setting a dime up on its edge" and "it's an unstable situation" (pg. 129-30);

- he suggests that the warning to "never get any part of your body under a vehicle that is on a jack" is ambiguous. He testified:

    "Q. Any part of your body suggests – you don't think that means your arms, your head and your legs?

    A. No. It could, but I don't think it does" (pg. 178-79); and

    "My arms aren't part of my body" (pg. 141).

- he believes that Seanesee Richardson violated the instruction against removing the lug nuts before raising the vehicle (pg. 181-83);

- he agrees that Seanesee violated the warning to "never get beneath vehicle, start or run engine when it is supported by a jack":

    "Q. All right. And so Sean Richardson did violate this warning No. 1 that's on the jack label, correct?

    A. I would believe so" (pg. 305-06).


In summary, the warnings and instructions associated with the subject vehicle are reasonable, appropriate, and adequate for the reasons outlined in this report. The vehicle is neither defective nor unreasonably dangerous for lack of some additional safety message about tire changing or using the supplied jack. Moreover, there is insufficient evidence to support a conclusion that any different or additional safety messages would have been noticed, read, and changed the behavior of Seanesee Richardson in such a fashion as to prevent this accident from occurring.

I reserve the right to supplement or amend my opinions based on my continuing review of materials, including the recently received deposition transcript, as well as in the event that additional information is made available to me.

With respect to potential exhibits for use at trial, I have not fully contemplated or finalized any exhibits. I do anticipate showing the jury a video demonstrating certain aspects of the proper method of changing a tire. I also anticipate showing (at least portions) of the relevant warnings and instructions, as well as various photographs and videos depicting these items or interaction with the vehicle or tools, including potential demonstrative aids such as the composite figures depicted in this report. It may be helpful to have available the subject (or an exemplar) jack and the associated tools.

Sincerely,

Nathan T. Dorris, Ph.D.
Principal Consultant


Attachments

## REFERENCES

Ayres, T., Gross, M., Wood, C., Horst, D., Beyer, R. & Robinson, J. (1989). What is a warning and when will it work? *Proceedings of the Human Factors Society 33rd Annual Meeting*, 426-430.

Ayres, T., Wood, C., Schmidt, R., Young, D., & Murray, J. (2000).  Affordance Perception and Safety Intervention. *Proceedings of the IEA 2000/HFES 2000 Congress*, 6-51 – 6-54.

Chapanis, Alphonse (1996). Human Factors in Systems Engineering. John Wiley & Sons, Inc.  New York, NY.

DeJoy, D.M. (1989). Consumer product warnings: Review and analysis of effectiveness research. *Proceedings of the Human Factors Society 33rd Annual Meeting*, 936-940.

Dorris, N.T. & Burke, K.A. (2011). Mandatory airbag warnings: An updated evaluation. Proceedings of the Society of Automotive Engineers International World Congress, SAE 11B-0026.

Dorris, A.L. & Dorris, N.T. (2001a). Mandatory air bag warnings: A human factors analysis of their development. *Society of Automotive Engineering Technical Paper 2001-010046*.

Dorris, A.L. & Dorris, N.T. (2001b). Supporting the warning designer: An automotive case study. *Proceedings of the Human Factors and Ergonomics Society 45th Annual Meeting*, 865-869.

Frantz, J.P., Rhoades, T.P., Young, S.L. & Schiller, J.A. (1999). Potential problems associated with overusing warnings. *Proceedings of the 7th International Conference on Product Safety Research*, 274-279.

Horst, D.P., McCarthy, G.E., Robinson, J.N., McCarthy, R.L., & Krumm-Scott, S. (1986). Factors influencing the potential for changing behavior. *Proceedings of the Human Factors Society 30th Annual Meeting*, pp. 111-115.

Kantowitz, B.H. & Sorkin, R.D. (1983). Human Factors: Understanding People-System Relationships. John Wiley and Sons, Inc.: New York.

McCarthy, G.E., Horst, D.P., Beyer, R.R., Robinson, J.N., McCarthy, R.L. (1987). Measured Impact of a Mandated Warning on User Behavior. *Proceedings of the Human Factors Society 31st Annual Meeting,* 479-483.

Mehlenbacher, B., Wogalter, M.S. & Laughery, K.R. (2002). On the Reading of Product Owner's Manuals:  Perceptions and Product Complexity. *Proceedings of the Human Factors and Ergonomics Society 46th Annual Meeting*, 730-734.

National Highway Traffic Safety Administration, "Injuries Associated With Hazards Involving Motor Vehicle "Jack Failures", September 1998.

Reason, J. (1990). Human Error. Cambridge University Press.

Rogers, W.A., Lamson, N & Rousseau, G.K. (2000). Warning research: An integrative perspective. *Human Factors, 42,* 102-139.

Sanders, M. & McCormick, E. (1993). Human Factors in Engineering and Design. Seventh Edition. McGraw-Hill, Inc.: New York.

Wickens, C. et al. (2004). An Introduction to Human Factors Engineering. Second Edition. Pearson Education Inc.: Upper Saddle River, New Jersey.



1360 Peachtree Street, NE  Suite 1150  Atlanta, GA 30309  **P**  770.487.2138

## Nathan T. Dorris, PhD, CPE
**President & Principal Consultant**

### Professional Profile:

Nathan Dorris is a human factors specialist (ergonomist) with extensive professional experience in product safety and the evaluation of instructions, warnings and other safety communications. Dr. Dorris is a Principal Consultant for Dorris and Associates International, LLC.  His primary responsibilities include the design and implementation of product safety research, including evaluations of human-machine interfaces as well as the usability and effectiveness of precautionary information.  Dr. Dorris represents Dorris and Associates as a member of the ANSI Z535 main committee and he currently serves as the ANSI Z535.5 subcommittee chairman.  The Z535 series of standards pertain to the design of warning signs, labels and various other safety communications.

Dorris and Associates have a wide variety of clients including private and public corporations, non-profit organizations, trade associations, state and federal governmental agencies, as well as defense and plaintiff's attorneys. Client services have been performed in the U.S., Canada, U.K., France, Germany, Spain, Belgium, Australia and Japan. Products manufactured and/or distributed by these clients range from automobiles and airplanes to everyday consumer products and children's toys.

Dr. Dorris is also an Affiliate Professor in the Industrial and Systems Engineering Department of Auburn University, where he has taught the graduate course in Human Factors Engineering (HFE).

### Education:

B.S., Management, Georgia Institute of Technology; Atlanta, GA  (1997)

M.S., Industrial and Systems Engineering, Auburn University; Auburn, AL  (2004)

Ph.D., Industrial and Systems Engineering, Auburn University; Auburn, AL  (2004)

N.T. Dorris, Ph.D.                                                                 Page 2

## Professional Affiliations & Service:

Certified Professional Ergonomist (CPE)

American National Standards Institute (ANSI) Z535 Main Committee and Z535.5 Chairman

Human Factors and Ergonomics Society (HFES)

American Society of Safety Professionals (ASSP)

Society of Automotive Engineers (SAE)

The Institute of Industrial Engineers (IIE)

National Safety Council (NSC)

## Honors & Awards:

Auburn University Presidential Graduate Research Fellowship

National Institute for Occupational Safety and Health (NIOSH) Graduate Fellowship

Alpha Pi Mu Industrial Engineering Honor Society

2003 INFORMS Doctoral Colloquium Participant

Outstanding Presentation Award, 2003 Auburn University Graduate Research Forum

## Publications & Reports:

Boelhouwer, E. J., Davis, J., Franco-Watkins, A., Dorris, N. T., and Lungu, C.(2013).Comprehension of hazard communication: Effects of pictograms on safety data sheets and labels. *Journal of Safety Research, 46,*September, 145-155.

Dorris, N.T. and Burke, K.A. (2011). Mandatory airbag warnings: An updated evaluation. In *Proceedings of the Society of Automotive Engineers International World Congress*, SAE 11B-0026. Warrendale, PA: Society of Automotive Engineers.

Burke, K.A., Dorris, N.T., and Dorris, J.A. (2010).  Sunscreen Labeling and Warnings: A Human Factors Analysis.  In *Proceedings of the 3ʳᵈ International Conference on Applied Human Factors and Ergonomics*, Miami, FL.

Dorris, N.T., Valimont, R.B, and Boelhouwer, E.J. (2007).   Eye Movements While Reading Degraded On-Product Warnings.  In *Proceedings of the Human Factors and Ergonomics Society 51ˢᵗ Annual Meeting*, Santa Monica, CA: The Human Factors and Ergonomics Society.

Glasscock, N.F. and Dorris, N.T. (2006). Warning Degradation and Durability. Prepared for: *The Handbook of Warnings*, edited by M.S. Wogalter.   A volume in the Human Factors and

N.T. Dorris, Ph.D.                                                                                    Page 3

Ergonomics Series (series editor: Gavriel Salvendy). Mahwah, NJ:  Lawrence Erlbaum Associates (LEA).

Carnahan, B.J., Dorris, N.T., and Kuntz, L.A. (2005).  Designing Anthropomorphic Symbols Using Interactive Evolutionary Design. *Information Design Journal and Document Design*, 13(3), pp. 179-190.

Dorris, N.T., Carnahan, B.J., Orsini, L, and Kuntz, L.A. (2004). Interactive Evolutionary Design of Anthropomorphic Symbols. In *Proceedings of the 2004 IEEE Congress on Evolutionary Computation (CEC)*. New York: The Institute of Electrical and Electronics Engineers.

Carnahan, B.J. and Dorris, N.T. (2004). User-Centered Symbol Design Through Human-Computer Collaboration. In *Proceedings of the Human Factors and Ergonomics Society 48th Annual Meeting*. Santa Monica, CA: The Human Factors and Ergonomics Society.

Dorris, N.T. and Davis, J. (2003). Testing the Effects of Degradation on Comprehension of Warnings. In *Proceedings of the Human Factors and Ergonomics Society 47th Annual Meeting*. Santa Monica, CA: The Human Factors and Ergonomics Society.

Davis, J. and Dorris, N.T. (2003). Current Status of Warning Systems in Forest Harvesting Equipment. USDA Forest Service Research Agreement No. SRS 02-CA-11330132-087.

Flynn, E., Dorris, N.T., Carnahan, B.J. and Holman, T. (2002) Medication Dispensing Errors in Community Pharmacies: A Nationwide Study. In *Proceedings of the Human Factors and Ergonomics Society 46th Annual Meeting*. Santa Monica, CA: The Human Factors and Ergonomics Society.

Dorris, A.L. and Dorris, N.T. (2001) Supporting the Warning Designer:  An Automotive Case Study. In *Proceedings of the Human Factors and Ergonomics Society 45th Annual Meeting*. Santa Monica, CA: The Human Factors and Ergonomics Society.

Dorris, A.L. and Dorris, N.T. (2001). Mandatory Air Bag Warnings: A Human Factors Analysis of Their Development. SAE 2001-01-0046. Warrendale, PA: Society of Automotive Engineers.


## Presentations & Seminars:

"The Future of Product Warnings: Some Questions Answered & Some Answers Questioned." American Equipment Manufacturers Product Safety & Compliance Seminar, St. Louis, MO.  April 2015.

"Twenty-first Century Warnings in a Global World."  Defense Research Institute Product Liability Conference, Washington, D.C.  April 4, 2013.

N.T. Dorris, Ph.D.                                                                                                   Page 4

"The Development of ANSI Z535.6: Presentation of Safety Messages in Collateral Materials." Invited Panel Member for Discussion at the Human Factors and Ergonomics Society 48th Annual Meeting. New Orleans, LA.

"Warning Systems in Logging Equipment." American Society of Safety Professionals (ASSP) Conference 2004, Las Vegas, NV.

"Identifying Relevant Symbol Design Criteria Using Interactive Evolutionary Computation." IEC Workshop at Genetic and Evolutionary Computation Conference (GECCO) 2004. Seattle, WA. June, 2004.

"Developing Safety Symbols for the Workplace through Interactive Evolutionary Design." American Industrial Hygiene Conference & Exposition (AIHce), Atlanta, GA. 2004

"Can Loggers Understand Degraded Warning Labels?" Council on Forest Engineering (COFE) 2004 Annual Meeting. Hot Springs, AR. April, 2004.

"Developing and Evaluating Warnings for Recreational Products." Defense Research Institute (DRI) Product Liability Conference. New Orleans, LA. February 2004.

"Equipment Warning Signs and Symbols." Alabama Cooperative Extension's 2003 Professional Logging Managers (PLM) Continuing Education Satellite Broadcast. Auburn, AL. July 24, 2003.

"The Use of Interactive Evolutionary Design (IED) to Facilitate Workplace Hazard Communication." IEC Workshop at Genetic and Evolutionary Computation Conference (GECCO) 2003. Chicago, IL. July 12, 2003.

"Current Status of Warning-Systems in Forest Harvesting Equipment." National Occupational Research Agenda (NORA) Symposium 2003: "Working Partnerships Research to Practice." Washington, D.C. June 23, 2003.

"How Deteriorated are Warnings Associated with Forest Harvesting Equipment?" Invited Presentation to the Society of Automotive Engineers (SAE) Committee on Forest Harvesting Equipment. Eugene, OR. February 19, 2003.

"Warning Design & Development: A Human Factors Perspective." Key Note Address of the Web Sling and Tie Down Association (WSTDA) Spring 2001 Meeting. San Antonio, TX. March 14, 2001.

PRINTED 1/29/2021

## TESTIMONY OFFERED BY DR. NATHAN DORRIS
## OVER THE PAST FOUR YEARS

THIS INFORMATION MAY NOT BE COMPLETE
AND IS BASED UPON BEST AVAILABLE INFORMATION AND RECOLLECTION

| Style | Court | Cause # | Depo/Trial |
|---|---|---|---|
| **2017** | | | |
| Wright v. Merritt Equipment Co., et al. | Lowndes County, Alabama | 13-900091 | Trial |
| Garcia v. Bridgestone, et al. | 107th Judicial District Court of Cameron County, Texas | 2012-DCL-5269-A | Depo |
| Romans v. Ford Motor Company | U.S. District Court, Southern District of Ohio, Eastern Div. | 2:16-CV-00068 | Depo |
| Thomason v. Toyota Motor Sales, U.S.A., Inc. | U.S. District Court, District of South Carolina, Greenville Div. | 6:14-cv-04895-BHH | Depo |
| Ingram v. Midwest Aerials, et al. v. Grove, et al. | 23rd Judicial Circuit Court, Jefferson Co., MO | 12JE-CC00796 | Depo |
| Chan v. Siemens | Harris County, Texas | 2015-18367 | Depo |
| Graci v. Omega Flex, Inc. | U.S. District Court, District of Connecticut | 3:15-cv-00513 | Depo |
| Ferguson v. Wal-Mart Stores, Inc., et al. | Circuit Court of Sebastian County, Arkansas | CV-15-0398 | Depo |
| Gerard v. Omega Flex, Inc. | U.S. District Court, Eastern District of Michigan | 1:16-cv-12227-TLL-PTM | Depo |
| Menard v. York International Corporation, et al. | 19th Judicial District Court for the Parish of E. Baton Rouge, LA | C649687 | Depo |
| Camarata v. Polaris Industries, Inc. | U.S. District Court, Northern District of New York | 6:14-CV-0975 (GTS/TWD) | Trial |
| Grubbs v. Scepter Canada, Inc., et al. | Barnwell County, South Carolina | 2016-CP-06-00150 | Depo |
| Marmont v. Worthington Cylinder Corporation, et al. | U.S. District Court, Central District of California | CV16-00848-JAK | Depo |
| Dominguez, et al. v. Juan Cruz d/b/a K & J, et al. | Webb County, TX | 2013-CVT-001355-D2 | Depo |
| Colvin v. et al. v. SMAC, et al. | US District Court Eastern District Missouri Southeastern Division | 4:16-cv-1271 | Depo |
| Stockton v. CNH America LLC | U.S. District Court, Northern District of Oklahoma | 16-CV-464-GKF-TLW | Depo |
| Morales v. Tire Country | Court of Common Pleas for the Fourth Judicial Circuit | 2015-CP-13-641, 2016-CP-13-046 | Depo |
| | | | |
| **2018** | | | |
| Ruggierio v. Yamaha | U.S. District Court, New Jersey | 1:15-cv-00049-JBS-KMW | Trial |
| Causey v. Yamaha Motor Corporation, U.S.A., et al. | U.S. District Court, Northern District of Georgia Atlanta Division | 1:16-cv-2105 | Depo |
| Jackson, et al. v. E-Z-Go Division of Textron Inc. | Jefferson, KY Circuit Court | 11-CI-04874 | Depo |
| Parrish v. Bosch Technology Corp | U.S. District Court, Eastern District of Missouri Eastern Division | 4:16-cvs-1271 | Depo |
| Siegel v. Yamaha Golf Car Company | 162nd Judicial District, Dallas County, Texas | DC-16-02698 | Depo |
| Strigel v. Omega Flex, Inc., et al. | Durham County, North Carolina | 16 CVS 4388 | Depo |
| Chan v. Siemens | Harris County, Texas | 2015-18367 | Trial |
| Wearn v. FCA | Middle District of Louisiana | 3:17-cv-4 | Depo |
| Pentz v. New Smyrna Chrysler Dodge Jeep | Seventh Judicial Circuit in and for Volusia, Florida | 2016-11361 CIDL | Depo |
| Tondryk v. Bridgestone Americas Tire Operations | District Court, Sixth Judicial District, Carlton County, Minnesota | 09-CV-77-233 | Depo |
| Jordan, et al. v. Maxfield & Oberton Holdings, LLC, et al. | U.S. District Court, Southern District of Mississippi, North Div. | 3:15-cv-00220-CWR-LRA | Trial |
| Rider v. Kawasaki | U.S. District Court, Central Utah Division | 2:16-cv-0086-DBP | Depo |
| Soulliere v. Suzuki Motor of America, Inc. | Orange County, California | 30-2015-00790644-CU-PL-CJC | Depo |
| Dollar General Motor Oil Litigation | U.S. District Court, Western District of Missouri | 16-02709-MD-W-GAF, MDL # 2709 | Depo |
| Darnell v. Yamaha Motor Corp. | U.S. District Court, Northern District of Alabama Southern Div. | 2:17-CV-202-MHH | Depo |
| Rollins v. Enerco | US District Court Northern AL Eastern Division | 2016-cv-1834-JEO | Depo |
| Turner/Lopez v. Genic Industries, Inc., et al. | Fulton County, Georgia | 12EV016187A | Depo |
| Rose/Hull v. American Optical | Commonwealth of Kentucky, Letcher Circuit Court | 15-CL-269/15-CL-00310 | Depo |
| Amos v. Sunbeam Products, Inc. | In the Circuit Court of Cleburne County, Alabama | CV-15-900082 | Depo |
| Rush v. American Honda Motor Co., Inc., et al. | Los Angeles County, California | BC658021 | Depo |
| Schall v. SMC | U.S. District Court, Western District of Kentucky | 4:14-CV-00074-JHM-HBB | Depo |
| Breaux v. The Goodyear Tire & Rubber Company | 25th Judicial District Court, Plaquemines Parish, Louisiana | 61-964 | Depo |
| Shasteen v. Hyundai Motor America Corporation, et al | 15th Judicial Circuit Court, Palm Beach County, Florida | 50 2016 CA 000479XXXXMB | Depo |
| Leyva v. Honda, et al. | 11th Judicial Circuit, Miami-Dade County, Florida | 2017-017232-CA-01 | Depo |
| | | | |
| **2019** | | | |
| Defries v. Yamaha | Riverside County, CA Superior Court | RIC 1710904 | Depo '19/Trial '19 |
| Breaux v. The Goodyear Tire & Rubber Company | 25th Judicial District Court, Plaquemines Parish, Louisiana | 61-964 | Trial |
| Didier v. FCA US LLC | U.S. District Court, Eastern District of Texas, Sherman Division | 4:18-cv-98 | Depo |
| Gomez, et al. v. Harbor Freight Tools USA, Inc., et al. | U.S. District Court, Middle District of Georgia, Athens Division | 3:17-CV-00041-CDL | Depo |
| Rider v. Kawasaki | U.S. District Court, Central Utah Division | 2:16-cv-0086-DBP | Depo (vol. 2) |
| Cunnison v. Jacuzzi | District Court, Clark County, Nevada | A-16-731244-C | Depo |
| Milburn, et al. v. American Honda Motor Co., Inc., et al. | District Court of Dallas County, Texas | DC-16-16470 | Trial |
| Leyva v. Honda, et al. | 11th Judicial Circuit, Miami-Dade County, Florida | 2017-017232-CA-01 | Trial |
| Slone/Burke v. American Optical | Pike Circuit Court, Commonwealth of Kentucky | 17-CI-846 | Depo |
| Hogan v. Toyota Motor Sales, USA, Inc. | Superior Court of the State California, Orange County | 30-2017-00933647-CU-FR-CJC | Depo |
| Grove v. Omega Flex, Inc. | Jerauld County Circuit Court, South Dakota | 36CIV16-000023 | Depo |
| Adams, Gary v. American Optical Corp., et al. | US District Court for Western District of Virginia | 2:16-cv-00027-JPJ-PMS | Depo |
| Chaides v. Volkswagen | Superior Court of the State of Arizona, Maricopa County | CV2017-001815 | Depo |
| Caudill/Walker v. American Optical Corp., et al. | Commonwealth of Kentucky, Letcher Circuit Court | 16-CI-00220 | Depo |
| Mizrahi v. Yamaha | 11th Judicial Circuit, Miami-Dade County, Florida | 2017-025522-CA-01 | Depo 19'/Trial 19' |
| Winckler v. Suzuki | Circuit Court, Fourth Judicial Circuit, In and For Duval County, Florida | 16-2014-CA-004130 | Depo |
| Schmidt Meyer v. ConAgra | United States District Court for the District of Connecticut | 3:14-cv-01516 (SRU) | Depo |
| Susman, et al. v. Goodyear Tire & Rubber Company | United States District Court for the District of Nebraska | 8:18-cv-00127 | Depo |
| White. v. FCA US LLC | US District Court, Eastern District of Michigan, Southern Division | 2:17-cv-12320 | Depo |
| Gilreath v. FCA US LLC | Court of Common Pleas, Butler County, Ohio | 2018-07-1583 | Depo |

PRINTED 1/29/2021

| Style | Court | Cause # | Depo/Trial |
|---|---|---|---|
| **2020** | | | |
| Salinas v. Nissan Motor Co. | Superior Court of California, Los Angeles County | BC569227 | Depo |
| Scannavino v. FCA US, LLC | Gwinnett County State Court, Georgia | 17C067841 | Depo |
| Barnard v. Toyota | Circuit Court of Cook County, IL | 16 L 001063 | Depo |
| Gonzalez/Alvarez v. Bridgestone, et al. | Superior Court of California, Los Angeles County | BC579368 | Depo |
| Long v. BATO, et al. | Circuit Court of Saline County, AR | 63CV-17-162-3 | Depo |
| Hartwell v. Honda, et al. | Circuit Court of Hinds County, Mississippi | 16-CV-00641-WAG | Depo |
| Meyer v. Cooper Industries | County Court of Dallas County, TX | CC-19-01003-E | Depo |
| Rios v. Volvo | District Court of El Paso County, TX 41st Judicial District | 2012-DCV-07206 | Depo |
| Becker v. Ford | Circuit Court of Hamilton County, TN | 19C173 | Depo |
| Andrus v. Sunbeam | United States District Court for the District of Minnesota | 17-CV-5184 | Depo |
| Trice v. Dorel Juvenile Group | Dekalb County State Court, Georgia | 18A70371 | Depo |
| Gibson v. Scag Power Equipment, et al. | Clark County, Alabama | CV-2017-900052 | Depo |
| Chacon v. Polaris | Clark County, Nevada | A-18-772816-C | Depo |
| Jokerst v. Grove U.S., LLC, et al. | Claire County, Illinois, 20th Judicial Circuit | 2016-L-0132 | Depo |
| Boateng v. BMW & Fields v. BMW | United States District Court for the Eastern District of New York | 2:17-cv-00209 (KAM)(SIL) & 2:18-cv-02889 | Depo |
| **2021** | | | |
| Richardson, William v. FCA | United States District Court for the Southern District of New York | 7:18-CV-06961-KMK-LMS | Depo |