1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF GEORGIA

 3                     VALDOSTA DIVISION

 4

 5  WILLIAM RICHARDSON, INDIVIDUALLY AND ON BEHALF OF
    SEANESEE RICHARDSON AS HIS LEGAL GUARDIAN AND
 6  PARENT, and SEANESEE RICHARDSON

 7                              CIVIL ACTION FILE NO:
                                7:19-CV-00015-HL
 8  VERSUS
                                JURY DEMANDED
 9
    FIAT CHRYSLER AUTOMOBILES (FCA) US, LLC,
10  DAIMLERCHRYSLER AG, CHRYSLER, LLC, CHRYSLER
    GROUP, LLC, KIMBERLY RICHARDSON, and JOHN DOE
11

12

13

14         DEPOSITION OF **NATHAN DORRIS, Ph.D, 1360**

15  **PEACHTREE NORTHEAST, SUITE 1150, ATLANTA, GEORGIA**

16  **30309**, TAKEN VIA ZOOM, ON FRIDAY, THE 26TH DAY OF

17  FEBRUARY, 2021, COMMENCING AT 9:00 A.M. (CST).

18

19

20

21

22

23  REPORTED BY:

24    MICHELLE VIDRINE-CORONA, CCR

25    CERTIFIED COURT REPORTER        Exhibit B
```

1    APPEARANCES:

2

3       DIDRIKSEN, SAUCIER & WOODS, PLC

4       ATTORNEYS AT LAW

5       BY: CALEB H. DIDRIKSEN, ESQ.

6       BY: CARL A. "TREY" WOODS, III, ESQ.

7       3114 CANAL STREET

8       NEW ORLEANS, LOUISIANA 70119

9       (ATTORNEYS FOR WILLIAM RICHARDSON, ET AL)

10

11

12

13      WATSON SPENCE, LLP

14      ATTORNEYS AT LAW

15      BY: MICHAEL R. BOORMAN, ESQ.

16      BY: PHILIP A. HENDERSON, ESQ.

17      999 PEACHTREE STREET, SUITE 1130

18      ATLANTA, GEORGIA 30309

19      (ATTORNEYS FOR FCA US, LLC)

20

21

22

23

24

25

1                    EXAMINATION INDEX

2                                            PAGE

3

EXAMINATION BY MR. DIDRIKSEN...........5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              S T I P U L A T I O N

2

3     IT IS STIPULATED AND AGREED by and between

4   counsel for the parties hereto that the

5   deposition of the aforementioned witness is

6   hereby being taken under the Federal Rules of

7   Civil Procedure, for all purposes, including

8   perpetuation, in accordance with law;

9     That the formalities of reading and signing are

10  specifically NOT waived;

11    That the formalities of sealing, certification

12  and filing are specifically waived;

13    That all objections, save those as to the form

14  of the question and the responsiveness of the

15  answer, are hereby reserved until such time as

16  this deposition, or any part thereof, may be used

17  or sought to be used in evidence.

18

19          *    *    *    *    *    *    *    *

20

21    MICHELLE VIDRINE-CORONA, Certified Court

22  Reporter, in and for the Parish of Orleans, State

23  of Louisiana, officiated in administering the

24  oath to the witness.

25

1          COURT REPORTER:

2               My name is Michelle Corona.  I am a

3     Louisiana certified stenographic court reporter.

4               Before we proceed, will all counsel

5     agree that there is no objection to this reporter

6     administering a binding oath to the witness

7     remotely?

8          MR. BOORMAN:

9               No objection for FCA.

10         MR. DIDRIKSEN:

11              No objection on behalf of

12    plaintiffs.

13              **Dr. Nathan Dorris,**

14    after having been first duly sworn by the

15    above-mentioned court reporter, did testify as

16    follows:

17    EXAMINATION BY MR. DIDRIKSEN:

18         Q.   Mr. Dorris, can you please state your

19    full name and your address, where you are today,

20    for the record?

21         A.   My name is Nathan Dorris, spelled

22    D-O-R-R-I-S.  I am located today in an office in

23    1414 Eastbrook Bend, Peachtree City, Georgia.

24         Q.   Whose office is that?

25         A.   I've rented it.

1      Q.    How long have you rented it?

2      A.    I think it was right before the

3  pandemic.  So I've had it probably a little more

4  than a year, something like that.

5      Q.    How many people occupy the office with

6  you?

7      A.    Just myself.

8      Q.    So it's in an office suite sort of

9  arrangement?

10     A.    Yes, sir.  I was politely told by my

11  wife I was not allowed to work at home.

12     Q.    Ah, okay.  Well, has having the remote

13  office been helpful in that regard?

14     A.    It has, you know.  My main goal is to

15  stay out of trouble at home.  But, yes, it was

16  very fortune timing that somehow we had this

17  arrangement before the pandemic, and it's worked

18  really well given kind of our current

19  circumstances.

20     Q.    Yes.  How many kids do you have?

21     A.    I have two; a stepdaughter who is older,

22  and a boy with my wife.

23     Q.    How old is your son?

24     A.    He is 13, about to be 14.

25     Q.    So that can be an interesting age?

1          A.     Agreed.

2          Q.     I think that -- I have a daughter who is

3     13, and I find this pandemic has been especially

4     challenging for the combination of parents and

5     children of that age bracket?

6          A.     I would be willing to agree with that.

7     I can only imagine, it's probably harder for a

8     13-year-old girl.  My 13-year-old son would be

9     happy to be locked up with an Xbox, but imagine

10    girls, having had a daughter, they're a little

11    more interested in being social perhaps.

12         Q.     Yes.  All right.  So your -- you're not

13    a medical doctor, are you?

14         A.     No, sir.

15         Q.     And you're not an expert in

16    biomechanics, are you?

17         A.     Correct.  I would not offer any opinions

18    from a biomechanical standpoint.

19         Q.     And you don't consider yourself an

20    expert in writing, do you?

21         A.     I think in the area of writing

22    instructions, I certainly have expertise.  I

23    wouldn't say I'm a published author in the sense

24    of writing novels or fiction.  But in writing

25    technical writing, manuals, warnings,

1    instructions, that's certainly an area that I

2    have experience and expertise.

3              I can't hear you, sir.

4              MR. BOORMAN:

5                   Caleb, I think you're muted and

6    freezing.

7    BY MR. DIDRIKSEN:

8        Q.    I'm sorry.  I'm sorry.  I had muted

9    myself, but I was getting feedback.  And you --

10   your speech was slowed down by the electronical

11   process.

12   (Discussion held off the record.)

13   BY MR. DIDRIKSEN:

14       Q.    Mr. Dorris, please try and say that

15   answer over again and I'll mute myself.

16             You know, you asked a question whether

17   this had been working, and now, of course, it's

18   not working very well.  Try and give your answer

19   again.

20       A.    I'll do my best.  I think you asked if I

21   had expertise in writing, and I said yes as it

22   relates to technical writing.  So writing of

23   safety communications, warnings, owner's manuals.

24   That's an area where I have experience and

25   expertise.  You know, I wouldn't broaden that out

1    and say I'm an expert in writing, you know,

2    fiction or something along those lines.  But in

3    kind of what we would think of as technical

4    writing, manuals, maybe training materials,

5    warnings and safe-related communications, I would

6    say, yes, I have expertise and experience in that

7    area.

8         Q.   Your only degrees are in engineering,

9    correct?

10        A.   My graduate degrees.  My master's and my

11   Ph.D. are both in industrial engineering.  My

12   undergraduate degree was in management from

13   Georgia Tech.

14        Q.   I received an engineering degree as

15   well, and in my own experience going to

16   engineering school, and probably the least

17   literate group of people in the whole university

18   because of lack of education provided on writing,

19   was the engineers.  Is that a fair assessment of

20   how the world turns in the universities today?

21             MR. BOORMAN:

22                  Object to the form.  Vague.

23   Speculation.

24                  Answer if you can.

25             THE WITNESS:

1           I mean I don't think I would agree

2    with that characterization.  I think that

3    particularly graduate students engineering, they

4    do a lot of writing.  They do a lot of technical

5    writing, they do a lot of writing for grants and

6    proposals and publications.  So it may be

7    technical more so than, you know, literature like

8    you would probably see in the English department,

9    but I think there is a lot of writing.  You know,

10   we spend a lot of time, at least in my program,

11   in graduate school, we talked about those sort of

12   things.  We reviewed publish literature.  We kind

13   of had a thing as a part of graduate we called

14   journal club where we would go through journal

15   articles.  We would learn how to read them and

16   talk about them and analyze them.  We would talk

17   about writing our own and publishing.  So I think

18   there is clearly a distinction between, you know,

19   the academic programs in the English department

20   and engineering.  But I would say there is

21   emphasis on technical writing, generally with

22   engineers.  But certainly in my experience in the

23   industrial engineering department, and in

24   particular, when you focus on human machine

25   interface or human factors and you look at how do

1    people relate to and understand instructions or

2    training material, I think you end up dealing

3    with that quite a bit.

4    BY MR. DIDRIKSEN:

5        Q.    Do you agree that technical writing is

6    different than writing for newspapers and TV?

7        A.    I would think so.  I mean there may be a

8    general media, I think that's probably a little

9    bit different.  There may be some journal kind of

10   magazines or articles that are more technically

11   oriented.  But generally when I talk about

12   technical writing, it would be things like

13   product-accompanying literature, manuals, you

14   know, catalogs perhaps, training materials, more

15   so than like a newspaper or kind of broadly

16   circulated magazine.

17       Q.    Have you written any portion of any

18   instruction manual?

19       A.    Yes.  I've worked on manuals as well as

20   other kind of safety communication warnings

21   labels and things for a wide variety of clients

22   across a wide variety of products.  I've done

23   that kind of work, yes, sir.

24       Q.    Please list for us some of the products

25   that you recall having written instructions on.

1    And for the purpose of this question, I'd like to

2    distinguish between instructions and warnings.

3    So I'm asking only about instructions.

4         A.    Well, just make sure you clarify -- I

5    mean your first question I guess was manual.  And

6    so in a manual, there may be safety-related

7    information.  So, for example, I would

8    characterize instructions about -- in this case,

9    about, you know, instructions about jacking up a

10   car.  In my mind, that is all safety-related

11   information.

12              So I just want to make sure I'm

13   understanding how you're distinguishing warnings

14   and instructions, I guess.

15        Q.    All right.  Let's discuss what is the

16   difference in your mind between instructions and

17   warnings.

18        A.    There's not always a clear distinction.

19   You know, it could be how it is presented or

20   formatted.  So in one discussion, authors may say

21   if you format with highlighting or -- or excuse

22   me, you highlight information with formatting

23   conventions, like a panel or a signal word like

24   "danger" or "warning," that that may be trying to

25   highlight it as what we might call a section or

1    highlight safety message or warning in a manual

2    versus not using those highlightings that, you

3    know, that in that discussion someway may

4    distinguish and say those are instructions not

5    warnings.  I think you should look at the

6    content.  So if the content is truly safety

7    related, even though it's written as procedure or

8    step-by-step set of instructions, I think it's

9    still communicating safety information.  And I

10   think many people may call that warnings as well.

11   So I think you have to kind of come up with an

12   operative definition that is used, you know, for

13   a discussion.  But it may not be universal.  And

14   so from one article to another, they may not

15   agree on how they're distinguishing between

16   warnings and instructions.

17           So I guess in my experience what I'm

18   saying is, that it really depends on what is the

19   conversation or what's the article or information

20   you're looking at.

21       Q.   All right.  Well, so for the purposes of

22   today, I'd like to ask you to supply us with an

23   operative definition of warning or warnings so

24   that I will know when you say warnings today in

25   the deposition, what you're intending to mean.

1      A.   I think that what I would say is that a

2  warning is a safety-related message that is

3  intending to either induce a certain pattern of

4  behavior, so things to do, or discourage

5  behavior, things not to do, to prevent personal

6  either injury or property damage.

7           So I would use "warning" -- and I think

8  generally I try to use it in a broad sense, any

9  safety-related message.  But if you would like

10  to -- you know, I will try to distinguish -- I

11  don't know that it will be necessary today, but

12  if there is some information that we're talking

13  about that we need to distinguish in an

14  instruction from a warning, you know, I can

15  certainly try to do my best to make sure I'm

16  clear about that with you.  But I would say a

17  warning or safety message is a commonly used

18  definition, would be a message intended to reduce

19  the risk of injury by encouraging safe behavior

20  and discouraging unsafe behavior.  And that could

21  be either physical injury or property damage.

22      Q.   All right.  So for the purposes of

23  today, I did my best to be a good

24  transcriptionist of your answer as to how define

25  warnings for today.  And it seemed to me you gave

1   two separate but very related definitions.  The

2   first one was that it would be safety-related

3   messages of things to do or things not to do to

4   avoid personal injury or property damage.  Did I

5   say that about right?

6        A.   I think that's fair.  I think most

7   descriptions, I think, would be consistent with

8   that.

9        Q.   And for the second one which was very

10  similar about with the middle things was,

11  warnings would be safety-related messages to

12  encourage safe behavior or to discourage unsafe

13  behavior again to avoid personal injury or

14  property.  Was that your other definition?

15       A.   Well, in my mind -- I believe what I

16  said was, in my mind that is the same definition.

17  And I was going to say that, you know,

18  encouraging safe behavior, those are usually to

19  do -- things to do.  And my example, you know,

20  discouraging unsafe behavior are things not to

21  do.

22       Q.   All right.  So is it fair then for the

23  rest of today that I would understand when you

24  talk about warnings that were working with that

25  that definition?

1       A.    Yes, sir.

2       Q.    And then how would you define

3   instructions?  Because here is the reason why I'm

4   asking you to define it at this time, that in

5   your report, at least, you refer at various times

6   to instructions and to warnings as though they

7   have some separate characterization, and I

8   understood your prior answer to say that there

9   are certainly is interplay and bleed-over between

10   the two.  But for the purposes of today, I'd like

11   to know how we will define instructions.

12       A.    I think what you're describing is

13   correct.  You can have information that would

14   both be considered an instruction and a warning

15   or a safety message.  So you could have an

16   instruction that does not relate to safety.  So

17   there could be instructions that don't relate to

18   safety in any way, and so I wouldn't characterize

19   that as a safety message or warning, but you

20   certainly can have instructions that relate to

21   safety.  And so, you know, in my mind, it's

22   perhaps a difference without a true distinction

23   or vice versa.

24            But an instruction is generally

25   characterized as information to either inform or

1    describe actions.  So I am trying to instruct you

2    either to understand a concept or to perform an

3    action or it could be, you know, avoiding certain

4    interactions.  So, you know, unfold this part --

5    you know, you could have instructions about how

6    to take a piece of cardboard and fold it into a

7    box, for example.  There may or may not be

8    anything related to safety in that, it could be

9    purely instructional in nature.

10        Q.    Okay.  Yes, I have to remember to unmute

11   myself each time to make it so the court reporter

12   can hear you clearly.

13            So then I had asked you -- well, just

14   for clarity of our record then, when we talk

15   about instructions today, that instruction

16   definition includes some additional information

17   to inform or describe actions to take or to avoid

18   in addition to warnings and sometimes including

19   warnings so that instructions are -- is under

20   these definitions, a larger set of words than

21   warnings are, because warnings are potentially

22   part of the instructions but are not all the

23   instructions.  Is that fair?

24        A.    I'm not sure I would fully agree with

25   that.

1      Q.    Please go ahead and describe in detail

2   what you mean by that.

3      A.    I think I agree with you that, you know,

4   you could have something that is an instruction.

5   So if you think of -- maybe the best way to

6   describe it, is if you think of a Venn diagram

7   overlapping circles, you could have information

8   that is a warning and may not be an instruction,

9   you can have information that is both a warning

10   and instruction, and you could have information

11   that is the just an instruction.  And I think

12   what's distinguishing those is, does it pertain

13   or relate to safety?

14      Q.    Thank you.  So it would be your

15   definition of warnings would always relate to

16   safety to some degree?

17      A.    Yes, sir.

18      Q.    And your definition of instructions

19   would sometimes include instructions that relate

20   to safety but other times would be instructions

21   that do not necessarily relate to safety,

22   correct?

23      A.    Yes, I think when we're talking about in

24   general about, you know, categories of

25   information, I would agree.

1    Q.   All right.  So then using those -- your

2  own definitions, are there any occasions that you

3  recall today where you worked for some company to

4  provide instructions that were not mostly warning

5  base?

6    A.   I don't think that I have worked on a

7  project where the bulk of a manual that we worked

8  on was not safety-related, at least I can't think

9  of one as I sit here.  I think it's more an

10  emphasis -- an interest is, are we communicating

11  safety information correctly, is usually when I'm

12  involved.  Oftentimes there is kind of a

13  prototype or a straw man that exist that I'm

14  being asked to evaluate, not always, but probably

15  most commonly.  And I would say most commonly,

16  you know, the scope of the assignment is an

17  interest in safety-related communications.  And I

18  think that -- you know, I guess I can't think of

19  a project as I sit here that was exclusively or

20  the preponderance was nonsafety, and I can't

21  thing of one that I would say necessarily, you

22  know, the vast majority was safety only and not

23  -- not including some instructions, you know,

24  that were perhaps not safety-related when we're

25  talking about a manual or document that

1    accompanies a product, you know, if that's what

2    we're talking about.

3         Q.   All right.  So you had said you had

4    worked for various companies working on their

5    documentation that would accompany a product.

6    What companies can you recall working for in that

7    fashion?

8         A.   Well, I've got nondisclosure agreements

9    that I'm not allowed to identify my client by

10   name or clients by name, but I can, you know,

11   generally kind of talk about categories or

12   products, I think, in a broad sense.

13        Q.   Okay.  Please answer with your own

14   restrictions.

15        A.   I am sure that I cannot recall, you

16   know, a complete list, but it has really run the

17   gamut in terms of types of products that I have

18   dealt with.  It has included large, heavy

19   equipment from heavy trucks to construction

20   equipment, things used in demolition of

21   buildings, all kind of types of mobile equipment.

22   I've been involved and looked at projects that

23   have involved machinery used in factories, I have

24   had a range of different types of tools.  So some

25   power tools, some nonpowered tools, you know,

1    more like hand tools, and I've worked with

2    manufacturers as well as trade associations, and

3    those could be potentially -- some of those would

4    be, you know, probably more industrial in nature

5    not used by homeowners, and some of those would

6    potentially could be used either in an

7    occupational setting or in a homeowner/consumer

8    situation.  Had things like common household

9    products, like -- I had a project that involved a

10   home oven or range, I've had projects that

11   include other things for consumer use, like one

12   would be categorized as a home healthcare device.

13   I've had law enforcement equipment of various

14   types.  I've have done training with various

15   different companies come in and talk about

16   warnings and safety communications and organizing

17   product information and those kind of trainings a

18   variety a of different manufacturers.  I've had

19   children's products as well.  So, you know, could

20   be things that you use with a child, so kind of

21   like a juvenile product is usually the category

22   they call it, kind of like strollers and those

23   kinds of things.

24        Q.   For purposes of the answer that you're

25   giving us, are you including litigation-related

1   services?

2        A.   No, sir.

3        Q.   All right.  Go ahead.

4        A.   I guess I understood the question to be

5   working on design projects outside of litigation;

6   is that right?

7        Q.   That was my intent.  I wasn't sure that

8   I worded my question properly to get that answer.

9        A.   Yes, sir.  That's how I've been

10  answering it.  So I think I mentioned kind of

11  children's products.  I've had some that were

12  children's toys, so like little riding scooters,

13  that kind of thing.  I've had bicycles.  So maybe

14  adults or children potentially that can ride on

15  bicycles.

16            So I mean those are kind of the

17  categories that come to mind or examples that

18  come to mind.  I'm sure that's not an exhaustive

19  list.  It really has run the gamut, you know,

20  from kind of industrial or occupational products

21  to potential consumer products and household kind

22  of type products.

23        Q.   During the last calendar year, say 2020,

24  what percentage of your time was spent in

25  litigation support?

1    A.    It probably was -- it's probably higher

2   than usual, a number of -- you know, but it's

3   been an odd year, obviously 2020.  So I'm trying

4   to think back.  I would say it was probably

5   higher than typical because litigation work was

6   able to kind of continue in this way and some of

7   the other projects I think may have been put on

8   hold and we weren't doing as much.  So I would

9   say maybe 85/90 percent.  But that's just purely

10   a guess.  Without going back, you know, and

11   trying to refresh myself, it's just a guess.

12    Q.    And how in -- in 2020, how did you use

13   the other 10 to 15 percent of your time?

14    A.    Other projects, but we did continue on

15   some consulting projects that were in process and

16   we were finishing.  But we've had a few that kind

17   of went on hold and they're considering, I think

18   -- or getting ready to start back up.  I think,

19   you know, the pandemic kind of affected a lot of

20   manufacturers.

21    Q.    So during 2020, you'd say you spent 10

22   to 15 percent of your time finishing consulting

23   projects for manufacturers?

24    A.    That's just my best guess, as I sit

25   here.  I mean it's -- you know, it's not based on

1    any documentation, it's just kind of a guess.

2         Q.   Sure.  What percentage of your

3    litigation support is done for defendants as

4    opposed to plaintiffs?

5         A.   Currently, I think I would say the

6    majority -- I think I have one or two cases open

7    currently where I've been retained by an attorney

8    representing a plaintiff, and then the remainder

9    would be someone representing either a defendant

10   or maybe a third-party defendant.

11        Q.   How many open cases do you have

12   approximately?

13        A.   It's probably in the range of 65 to 75,

14   something like that.  However, you know, again,

15   that's just kind of an approximation in terms of

16   open, active cases.  I guess I'm just trying to

17   qualify that obviously not everything is

18   necessarily active, everything has kind of gotten

19   delayed because of COVID, but probably something

20   in that range.

21        Q.   Sure.  Have you maintained a similar

22   book of business of 65 to 75 cases that are open

23   over the last five or ten years?

24        A.   I would think so, yes, sir.  I mean

25   something in that ballpark.  Things are kind of

1   always opening or closing, so it may, you know,

2   go up or below that at different points, but

3   that's probably a fair, you know, guess.

4       Q.   Would you say the vast majority of your

5   cases over the last five to ten years have been

6   historically been working for lawyers

7   representing defendants or third-party

8   defendants?

9       A.   Yes, I think it's probably something in

10  that 85 to 90 percent, you know.  It probably

11  would depend on the time frame, but I would

12  characterize it as the majority for sure.

13      Q.   I mean right now if you have one to two

14  cases for plaintiffs, what are your two cases for

15  plaintiffs that you recall at this time?  What

16  sort of scenario would they present?

17      A.   I don't think that I've been disclosed

18  in either of those, so I probably would not like

19  to not answer that.

20      Q.   Were they automotive cases or other

21  product-based cases?

22      A.   Other.

23      Q.   So if we use your higher number, the two

24  cases for plaintiffs, and I'll use your lower

25  number of total number of 65 cases and divide 2

1   by 65, we come out with about 3 percent of your

2   work currently would be plaintiff-oriented?

3        A.   I mean I'm not disputing the math, I

4   haven't done it in my head.  But, yeah, I mean

5   those are just my best recollection and kind of

6   estimates.  But is 2 by 65, something like 3

7   percent?  I would imagine.

8        Q.   More than 95 percent of your casework

9   historically has been defense-oriented, correct?

10       A.   No.  I think that estimate was currently

11  open, kind of -- I guess the two cases -- when

12  you asked me the question, my understanding was

13  kind of currently and active.  Over the last five

14  or ten years, I said it's probably similar but

15  maybe in the 85 to 90 or 95 percent.  You know,

16  it ebbs and flows depending on what's open and

17  closed, you know.  I have in the past had more

18  cases open at one time where I was retained by a

19  plaintiff's lawyer, so it just would be probably

20  incorrect to agree to that.

21       Q.   If you were to look at your work five

22  years ago, so let's say 2015, and I know I'm just

23  -- or be assured, I'm only asking for ballpark

24  answers here and notes perfection in your answer,

25  about what percentage of your work back at that

1    time would very been litigation support as

2    opposed to literature support for manufacturers?

3         A.   Well, so litigation-related cases or

4    kind of any projects that are not --

5              THE WITNESS:

6                   She can't hear us.

7                   In terms of a percentage of

8    consulting work related to litigation versus

9    consulting work not related to litigation, so it

10   could be, you know, various types of things, I

11   would, you know -- to pick out five years ago and

12   try and be accurate would probably be difficult.

13   But I'd say in the last, you know, five, ten

14   years, it was probably closer to maybe

15   three-quarters of my time litigation, something

16   like that.  But, you know, that's -- that's -- I

17   guess we're really stretching my memory, you

18   know, in a sense.

19        Q.   And then back five years ago, other than

20   doing, helping manufacturers with paperwork and

21   doing litigation, what other sort of tasks would

22   you have been doing for your business?

23        A.   Well, I represent Dorris & Associates to

24   the ANSI, A-N-S-I, Z535 Committee, so that is

25   work that I do on behalf of Dorris & Associates.

1    I participate, I guess, in professional

2    activities, so things like the Human Factors in

3    Agronomics Society, Society of Automotive

4    Engineers.  You know, that's probably not a lot

5    of my time, but doing work activities or

6    professional activities such as that.  I

7    volunteer my time currently as an adjunct faculty

8    that Auburn, but, you know -- I mean that's

9    professional.  I don't know that it's necessarily

10   on behalf of Dorris & Associates, but I would

11   characterize it as professional activity.  You

12   know, so those sort of things.

13        Q.   How do you -- how do you define human

14   factors?  Those two words, I'm saying real

15   specifically.  How do you define human factors?

16        A.   Well, human factors is the body of

17   research or science that looks at kind of human

18   capacities, characteristics, and limitations.

19   And then, you know, human factors is generally a

20   shorthand for human factors engineering, which is

21   trying to apply that sort of knowledge about

22   human capabilities and characteristics, both

23   cognitive as well as physical, to the -- applying

24   that to the design or evaluation of either a

25   product or a system.  So commonly, I think -- you

1    hear it more commonly today, human-machine

2    interface, when we talk about interaction between

3    a human being and a product.  Or it could be, you

4    know, a job or a position on an assembly line,

5    those sort of things.  So it's really applying

6    knowledge about human beings to the design or

7    evaluation of a product.  And that could be

8    physical, but it could also be cognitive.  So

9    evaluating warnings or safety information, how do

10   they understand how they interact with the

11   product.

12        Q.   Do you have any specific psychology

13   training?

14        A.   I've taken courses in psychology as an

15   undergraduate, as well as in graduate school.

16   I've had -- psychology is utilized, you know, at

17   least aspects of it, are utilized in human

18   factors courses.  So you'd be hard-pressed to

19   talk about -- to participate in a human factors

20   class without talking about, you know, aspects

21   such as information processing models, so how do

22   human beings process information.  So I have

23   taken classes in psychology, engineering

24   psychology, organizational behavior, as well

25   as -- I would say that's included in courses --

1    like graduate courses, I had took both in

2    industrial design as well as in human factors.

3         Q.   Is it fair to say you are not a

4    mind-reader?

5         A.   Sure, I would agree with that.

6         Q.   That you are not a mind-reader?

7         A.   I guess I'm not a mind-reader, and I

8    don't know of anyone who is.

9         Q.   Have you given a complete description of

10   how you define human factors as a study?

11        A.   I mean I think so.  I've done my best.

12   I think it's consistent -- I tried to talk about

13   human factors and give some references in my

14   report, and I think what I told you today was

15   consistent with that.  I mean you're free to -- I

16   guess I can flesh it out more if you have some

17   questions, but I think it's a good definition.

18        Q.   So one of the things that you will not

19   be doing today is telling us exactly what

20   Seanesee Richardson thought, correct?  You will

21   not be doing that?

22        A.   Correct.  I mean I think I talk about

23   that in my report, is that's unknown.  I think

24   it's speculative to talk about what his specific

25   knowledge or what he was specifically thinking.

1    We can look at what we know about certain actions

2    and see if that's consistent with instructions or

3    warnings information in the manual, you know,

4    procedures.  But to say anyone can say

5    specifically what was in his mind, I would not do

6    that and I don't think anyone can.

7         Q.   And so it's your belief that -- that you

8    would have to speculate to tell us or the jury

9    what was in Seanesee's mind?

10        A.   I think it would be speculation on the

11   part of any expert, including myself.  I guess

12   the only potential limitation to that is to the

13   extent there is any testimony about things that

14   he said or descriptions of his actions, you know

15   we can -- you know, that might be helpful to a

16   jury, kind of looking at it from that

17   perspective.  But to say -- I would not come in

18   and say my background in human factors allows me

19   to discern specifically what he was thinking.  I

20   would not characterize an opinion that way.

21        Q.   When you are working on a warnings

22   aspect of instructions for manufacturers, are you

23   generally given a draft to improve?

24        A.   I would say most often there is a draft

25   document that -- not always, but most often there

1    is a draft document, whether it's a draft label

2    or a draft owner's manual.  But typically, in my

3    experience, there has been, you know, some

4    document that we start with.

5        Q.   When you are asked by a manufacturer to

6    assist in their paperwork, are you normally given

7    or loaned the specific object or assembly process

8    so that you can use your hands in an attempt to

9    follow the instructions yourself to see the

10   degree to which you think the instructions are

11   effective?

12       A.   I mean I can't say that's happened in

13   every case, but I would say most commonly, yes.

14   In my experience, most commonly we are able to do

15   either an inspection to look at an exemplar or a

16   product, particularly if it's something we're

17   unfamiliar with or have no experience with.  I

18   mean I guess there could be an occasion where

19   we've already done in the past and we have prior

20   experience that we're drawing upon, but I would

21   say that's pretty frequent.

22       Q.   The thing that is frequent is if you're

23   helping a manufacturer with a not huge item, that

24   they'll give you the item to work with so that

25   you can coordinate your belief in how the

1   instructions work with the item itself?

2       A.   Yes, sir.  Or that we have access to it

3   somehow.  But not necessarily loaned or what, but

4   we may could go to an inspection somewhere to see

5   it, that kind of thing.  But, yes, I think

6   generally that's a common step of the process.

7       Q.   Do you believe that -- do you believe

8   that what's an adequate instruction is the same

9   today as it would have been in 2005?

10      A.   I mean I guess that would be very --

11  that seems awfully broad.  I guess my concern

12  would be it might be for a specific product or a

13  specific industry, there may be some information

14  that was learned, so instructions could certainly

15  evolve.  In looking back, you may say, you know,

16  there's some information in 2005 that maybe we

17  didn't know or we didn't have, and you wouldn't

18  want to use that same instruction today.  I mean

19  that's a possibility.  So I guess that's kind of

20  the caveat, I would say.

21          Generally speaking, how information is

22  crafted, recommendations about providing clear

23  and understandable information, you know, those

24  guidelines have not changed.  How we generally

25  craft language has not changed.  But, you know,

1    there might be something unique to a product or

2    industry.  So for that reason, I guess it would

3    probably be too broad to agree to what you said.

4         Q.   All right.  Breaking that down into

5    different subbits, you do not assume in 2021 that

6    the general public is less able to follow

7    instructions given than they were in 2005, are

8    you?

9         A.   I think I understand the question, and I

10   would agree.  I'm not assuming that consumers

11   today, that somehow the population has changed

12   and they're less able to follow instructions.

13   Just thinking about individuals, no, that would

14   not be an assumption.

15        Q.   Okay.  So then it would be fair to say

16   that what is an acceptable instruction by your

17   standard today, should be the same as what was an

18   acceptable standard -- an acceptable instruction

19   in 2005, correct?

20        A.   I think it would go back to the earlier

21   caveat.  I mean it could be something specific

22   that was learned or understood.  I mean that body

23   of knowledge could change.  But in general, would

24   I say the guidelines that are given to warnings

25   or technical writers -- maybe I should say it

1   that way.  The general guidance provided to

2   technical writings about crafting either warnings

3   or instructions that are not related to safety, I

4   don't think they have substantively changed

5   between 2005 and today.  I'm not aware of

6   something, you know, substantive in terms of

7   that.  So when you look at and evaluate a message

8   and you say it's deficient in 2005 and there is

9   no change in terms of material substantively,

10  knowledge about risks or interaction or something

11  like that, then, yeah, the language would be

12  consistent.  I would expect it to be the same

13  today.  But we have to add the caveat of, you

14  know, there is always -- you could learn

15  something in that time period just from a

16  scientific perspective.  And I would generally

17  think that's going to be more product or industry

18  specific, not how to cast warnings and

19  instructions.

20       Q.   I think you've answered my question.

21  And just for me to use a different set of words

22  to see if I've got your answer correct,

23  whatever -- whatever are the applicable standards

24  in 2021 as to what constitutes an effective and

25  acceptable warning, is not different from

1   whatever would have constituted an acceptable and

2   adequate warning in 2005; is that correct?

3        A.   I guess I would just change the word

4   "standards."  I'd say the general guidance about

5   crafting adequate instructions hasn't changed.

6   There are some standards that have come about,

7   you know, that did not exist in 2005 that exist

8   today.  So I just want to make you aware that --

9   I would say the general guidance about crafting

10   instructions has not substantively changed.

11        Q.   And with respect to some creation of a

12   standard, it's your belief that any new standard

13   that's been created since 2005 would have still

14   gone toward the same definitions and guidelines

15   that were already in place?

16        A.   They may have created a definition.  You

17   know, they might not have been a commonly used

18   term.  And I can give you a specific example, if

19   you'd like.

20        Q.   Yes.  Please.

21        A.   So the ANSI Z535 Committee, we developed

22   a standard called the .6 standard.  And in that

23   standard, we created essentially what was a new

24   term when we talk about a supplemental directive.

25   I don't believe that that term existed before, it

1      was certainly was not commonly used.  And it is

2      intended to kind of talk about a safety message

3      that is referring you to an additional

4      information.

5              So an example might be on the label on

6      the jack in this case, it direct readers to the

7      owner's manual.  You could characterize that as a

8      supplemental directive.  So that term probably --

9      I just don't recall, I have not studied it, I

10     guess.  But I don't recall it being commonly in

11     use.  So that might be an example.

12        Q.   And so the ANSI 35Z, you said --

13        A.   535.

14        Q.   535Z?

15        A.   The Z is first.

16        Q.   Z535?

17        A.   Yes, sir.  That committee existed, but

18     the .6.  So Z353 .6 standard has come out since

19     2005.

20        Q.   I see.  But that .6 standard perhaps

21     coined the phrase "supplemental directive" but

22     the use of supplemental directives in effect

23     existed before that phrase was coined; is that

24     fair?

25        A.   I would agree, I think that's a fair

1    characterization.

2         Q.   And so the creation of that standard

3    language use "supplemental directive," was not

4    creating so much of a new standard but was

5    documenting and putting words to a practice that

6    was already in place before the .6 standard of

7    formalized the idea, correct?

8         A.   Yes, I think that's fair.  But we're

9    saying that term, that phrase, "supplemental

10   directive," I don't recall it being commonly

11   used, but people did refer to other sources of

12   safety information, that practice existed,

13   absolutely, I think that's fair.

14        Q.   And as a follow through to that

15   question, those practices existed before even

16   though there might have been some new standards

17   put in place, they were more formalizing existing

18   standards than changing the way you do things?

19        A.   I guess I would agree to the extent what

20   you're saying is, we thought about on the

21   committee and looked at what kind of conventions

22   are commonly used in practice and some of those

23   were adopted into the standard, yes.  We

24   certainly weren't, you know, creating this in a

25   vacuum without thinking about best practices or

1    commonly used think techniques, so that's fair.

2        Q.   So how would -- so for any question that

3    I give that relates to instructions or warnings

4    for the rest of today, I'm going to assume that a

5    single standard applies to them from 2005 to 2021

6    unless you tell me otherwise.  Okay?

7        A.   Yes.  And you say standard, you mean

8    kind of in terms of evaluating the adequacy?

9        Q.   Yes.  Yes.  That's exactly what I mean.

10       A.   Yeah.  And I just -- when you say

11   "standard," in my mind, I think of a voluntary

12   consensus standard.  So something that's, you

13   know, more formal, like Z535.6.  But you're more

14   kind of generally what would I look at in

15   evaluating the adequacy and kind of general

16   guidance.  I think I'm with you, yes, sir.  I

17   believe we're saying the same thing.

18       Q.   Right.  Right.  And so part of what I'm

19   trying to just have some comfort in is that if

20   I'm asking you what is appropriate or not

21   appropriate about the owner's manual or the jack

22   warnings for this particular vehicle, a 2006

23   Chrysler Minivan with Stow 'n Go, if you tell me,

24   oh, I think that part of the warning was good or

25   that part of the warnings could have been

1   improved, I'm expecting you to tell me if that's

2   true regardless of where you stand between 2005

3   and 2021?

4        A.   I understand what you're asking, I

5   believe, and I will do my best if there is

6   something that needs to be distinguished based

7   on, you know, changes over time, I will call that

8   to your attention.  I'll do my best.

9        Q.   Thank you, very much.  That's what I'm

10   asking.

11             All right.  So then in terms of when

12   you're working on instructions and warnings, is

13   there any normal fashion in which you expect the

14   consumer to read?

15        A.   I guess I'm trying to understand the

16   question.  I mean generally we look at that

17   you're going to read top to bottom, left to

18   right.  But if you're asking do we expect them to

19   read like the entire document or jump around, I

20   guess I need to understand your question.

21        Q.   It sounds like you understood my

22   question really well, because that's what I was

23   next going to try and ask.  You know, in certain

24   languages they read from right to left instead,

25   and they might read from the bottom of the page

1   to the top of the page.  And you and I are

2   speaking in English today and our conventions are

3   to read from left to right and start at the top

4   and work our way to the bottom.  Is that what you

5   in your work expect people to do, to start at the

6   top and read toward the bottom, start with

7   instruction No. 1 and then proceed to instruction

8   No. 2?

9        A.   Well, I would expect that when we're

10  talking about instructions that are written in

11  English, that consumers who read English will

12  understand that's the convention.  They would

13  understand that it starts at the beginning and

14  then progresses through a document, and on a

15  particular page you read top to bottom, left to

16  right.  You know, I don't know of any difficulty

17  with understanding that kind of convention

18  because obviously that would affect comprehension

19  or the ability to get through the document.

20            Now, I would say in response to your

21  question, it is -- it is known that there are

22  some people who may be not willing to read all of

23  the information, they may not start at the top of

24  the page.  They may look for a particular piece

25  of information, so they may jump around.  They

1      may filter out portions of information.  I think

2      I talked about that in my report.  So, you know,

3      I can't say my expectation is that someone will

4      pick up an owner's manual and read it from the

5      first page to the last page and read everything

6      on a page, it's going to be person specific, what

7      is it that they're looking at and what they're

8      interested in.

9          Q.   So when you're working on a manual, what

10     is your expectation?  Is your expectation -- and

11     how do you do it?  Do you expect people to start

12     at the beginning and work their way through the

13     end or do you expect them to jump around?  What's

14     your expectation?

15         A.   Well, there are people that don't read

16     manuals at all, there are people that read

17     portions, they may only refer to a manual as a

18     reference, they may only look up specific

19     information, there are people that will read it

20     cover to cover.  So my expectation is when I'm

21     working on a manual, you want to present

22     information in a clear format so that users can

23     find the information they can navigate to

24     information that they're looking for, and that

25     they understand there will be safety information.

1    You know, as an example with an automobile, there
2    is -- it is reasonable to expect that consumers
3    will understand their safety information in this
4    manual.  And so is it possible that someone may,
5    you know, skip through the how to wear a seat
6    belt section to get to how to change a tire,
7    sure, that certainly can be a circumstance.  But
8    you want to present the information in a way that
9    they can understand there is a sequence of steps,
10   we want you to follow the sequence of step, and
11   I'm presenting it in a clear way that you can go
12   through those.  So my -- I would say I think
13   what's generally accepted is the goal is to
14   provide information in a way that it can be
15   understood and read and followed, and that in
16   terms of how to do that, you know, there's
17   probably a lot of different ways you can do that
18   appropriately.  There is no one right way.
19        Q.   When you say there is lots of different
20   ways to do that, I think I lost the track of what
21   you were saying.  Lots of different ways to do
22   what?
23        A.   To present information.  Or just -- you
24   know, it would be inappropriate to suggest there
25   is only one right way to present information that

1   it has to be organized in a certain way.  I think

2   that it's widely accepted.  Even NHTSA,

3   N-H-T-S-A, NHTSA has said that -- and they were

4   walk talking about warnings and safety

5   information, that, you know, it's not reasonable

6   to expect that there is only one right way, that

7   there may be, you know, different variants or

8   versions that are also appropriate.  And so you

9   have options, I guess, as a technical writer, is

10  what I'm trying to convey.

11      Q.   But the standard would require even

12  though there might be more than one way to say

13  something and to present it, standards do require

14  that it be clear enough for the consumer to

15  understand, correct?

16      A.   I would agree with that, you want it to

17  be capable of being read, capable of being

18  understood, and capable of being followed.  So I

19  think those are kind of the three attributes.

20          MR. DIDRIKSEN:

21              We've been going for just -- not

22  that long, but somebody has turned my air

23  conditioning on to where I'm starting to turn

24  into an icicle.  So can we take a two-minute

25  break while I fix this?  Maybe five minutes?

1          MR. BOORMAN:

2              We've been going for about an hour,

3      let's just take a 10-minute break.

4      (A short recess was taken.)

5      BY MR. DIDRIKSEN:

6          Q.   Do you, in your work for manufacturers,

7      recommend that the manufacturers order their

8      instructions and warnings in any particular

9      order?

10         A.   No, I can't say there's a particular

11     order that is always followed.  I think it should

12     make sense, so it should be logical and

13     practical.  But I can't say there is one set of

14     generalizations on how to order a manual or

15     instructions, you know, for all products, no,

16     sir.

17         Q.   In your view, what makes for an

18     effective warning?

19         A.   I think it's the three attributes that I

20     mentioned earlier.  It needs to be capable of

21     being read, so it needs to be capable of being

22     noticed and read, it needs to be capable of being

23     understood, and it needs to be capable of being

24     followed.  And so you want to effectively

25     communicate to consumers what they need to do.

1        Q.    So the warning has to be capable of

2    being noticed and read, the warning has to be

3    capable of being understood, and the warning has

4    to be capable of being followed?  That's the

5    three attributes?

6        A.    Yes, sir.  I think that's fair.

7        Q.    When you're working for a manufacturer

8    adjusting warnings, do you have them -- intend to

9    write them at a certain grade level or reading

10   proficiency?

11       A.    No.  There is not a general -- there is

12   no accepted practice or consensus that you can

13   choose a specific grade level, and oftentimes

14   that sort of reading index or indices are

15   unhelpful because you have to use a larger

16   section of information.  They really came about

17   by looking at, you know, textbooks and trying to

18   look at language that's used, and they really are

19   focused on using shorter simpler sentences, you

20   know, in terms of where you end up on the grade

21   level kind of index.  But trying to apply that as

22   a rule to warnings or instructions, it's been

23   assessed as suggested occasionally but there is

24   just no consensus and there is no practical way

25   to really use that as a meaningful tool.  So I

1    don't recommend that.

2        Q.   So in your own practice as an assistant

3    in providing instructions and/or warnings to

4    manufacturers, you do not attempt to apply any

5    particular grade level or reading proficiency

6    level?

7        A.   Yes.  If I understand your question, we

8    don't try to use like the Flesch-Kincaid reading

9    index to come up with a grade level, we don't do

10   that.  It's not meaningful or really helpful as a

11   criteria or criterion.  Rather, I would say that

12   you want to think about the characteristics of

13   your audience.  So some language might be

14   appropriate, you know, in one context and it's

15   not in another.  So technical jargon may be

16   appropriate in instructions that relate to a

17   sophisticated piece of scientific equipment that

18   is going to be used in specialized laboratories,

19   but you may want to avoid, you know, things like

20   that in products that have a broader consumer

21   base.

22       Q.   Do you believe that FCA Chrysler should

23   have expected individuals of all sorts of reading

24   proficiencies to look at the owner's manual?

25       A.   I think it's reasonable to expect that

1   consumers will know there is an owner's manual.

2   When you say "all sorts of proficiencies," I

3   guess that could be intended to include people

4   who are illiterate, and so I don't think anybody

5   necessarily expects an illiterate person to read

6   a manual.  But that person would know that there

7   is safety information and so they could get the

8   information indirectly, by getting assistance

9   through family and friends that can read.  But

10  that -- is there an expectation that only people

11  with a higher, you know, level of education read

12  manuals than people with a lower level of

13  education don't read manuals?  No.  I don't know

14  any kind of basis for that assumption.

15       Q.   And, in fact, auto manufacturers and

16  auto dealers seek to sell their vehicles to any

17  and everyone who would like to buy one rather

18  than saying you can't buy my car unless you have

19  a reading proficiency, correct?

20       A.   I'm not aware of a practice where they

21  try to limit, you know, have some sort of reading

22  comprehension test or something, no.  I'm not

23  aware of that.  I would say they sell to the

24  general public.

25       Q.   And you have driven many cars over your

1    lifetime, have you not?

2         A.   Yes, sir.

3         Q.   Have you rented a car before?

4         A.   Yes, sir.

5         Q.   And in your travel for your work you've

6    rented cars many times, haven't you?

7         A.   I would agree.

8         Q.   And many of those cars would be makes

9    and models that you didn't own because it was fun

10   to drive something different, right?

11        A.   Or not fun.  Yeah, I've driven a

12   range -- I would say rental cars are probably,

13   you know -- there is some probably common

14   thoughts about rental cars.  But, no, I've driven

15   a range of different vehicles in my lifetime,

16   and, yeah, I think renting cars for work when

17   you're traveling is probably one of the reasons

18   why I've seen a number of different vehicles or

19   driven a number of different vehicles.

20        Q.   Fair enough.  And would you say it has

21   historically been very unusual for you to look in

22   an owner's manual in a rent-a-car?

23        A.   No.  But -- I would not agree with that.

24   But I would -- I tend to look at owner's manuals

25   and, you know, it's because that's my work,

1    that's what I do.  I tend to rent from Hertz and

2    they have the owner's manuals in the glove box

3    for the vehicles.  I don't necessarily read it or

4    go through it before I leave the rental location,

5    but I would say I have a general tendency to look

6    at the manuals in the rental cars because it's of

7    interest to me.  I like to pay attention to, you

8    know, what's going on and what's being done in

9    terms of manuals.

10        Q.    Okay.  But that's -- that's more focused

11   on your specific interest than your work than any

12   perceived need on your part to look at an owner's

13   manual before you get in the seat and turn the

14   engine on and drive away?

15        A.    As a generalization, that's true.  There

16   may have been occasion where I needed to look up

17   how do I turn on the wipers or things like that,

18   but I think as a generalization, what you said is

19   correct.

20        Q.    But that is another example of how

21   automobiles are provided to the general public

22   regardless of their reading comprehension skills,

23   not only just through sales but through

24   rent-a-cars, right?

25        A.    I guess I'm not aware of some literacy

1   test associated with renting a car, I think

2   that's correct.  I mean there is an expectation

3   that you will be a licensed driver if you're

4   going to be operating a motor vehicle, and so you

5   have to have a certain, you know, base of

6   knowledge.  And there may be accommodations for

7   folks that are illiterate to take those tests.  I

8   guess.  I'm not sure.  But that might be

9   something that occurs.  But to get a license and

10  be a licensed driver, you're going to have at

11  least some base of information that you've

12  proven.

13      Q.   For example, in Louisiana, we have a

14  very large Hispanic population.  There is many

15  people who don't speak English who drive cars.  I

16  guess the state gives them driver's license tests

17  in Spanish.  But those realities haven't -- so

18  far to your knowledge, haven't made it so that

19  all automobiles are provided with owner's manuals

20  in both Spanish and English, do they?

21      A.    In my experience, auto manufacturers

22  often have other languages available.  But in

23  terms of when you purchase your car, I think, you

24  know, traditionally in the United States it's

25  been English language used in manuals most

1      frequently, but, you know, if you were

2      Spanish-only speaking and you went into a

3      dealership and brought in a car, could you

4      request a Spanish translation?  You know, that's

5      certainly a possibility.  But I would say, you

6      know, as a generalization, most of time in the

7      United States we see English as kind of at least

8      a default sort of language.

9           Q.   So in your work and experience, what

10     are -- what's the purpose of illustrations that

11     are provided within owner's manuals?

12          A.   Well, generally -- and this is a broad

13     "generally," the illustrations are provided to

14     supplement information.  So written information

15     in a manual and illustrations are there to kind

16     of supplement that or convey some information.

17     So as an example, oftentimes there might be an

18     illustration of the instrument cluster and some

19     annotation to describe, you know, what are the

20     various indicators that might come up.  You know,

21     this is your speedometer, this is your

22     tachometer, these are lights that might come on

23     at various times, and that supplements the

24     information where they describe those each

25     individual item and what circumstances they may

1   come on.  So if the -- if the brake light comes

2   on in your vehicle, you could see an illustration

3   that shows where it is, but you could also read

4   what is a description of when it would come on,

5   how it functions, that sort of thing.  So I would

6   say generally, and this is broad, it's there to

7   supplement.

8        Q.   Have you participated in the writing or

9   re-arranging of any instruction manuals that have

10  more illustrations than they had words?

11       A.   I don't think that I have ever worked on

12  one that was exclusively illustrations, but I

13  guess I can't think of one that I can say for

14  sure had more illustrations than words, but there

15  may be some that have a lot of illustrations and,

16  you know, maybe comparatively similar amounts of

17  illustrations and words.  I mean, you know, for

18  simple products that it's more related to

19  assembly of a product, there may be more diagrams

20  or illustration than words.  So I've had some

21  like that.  I don't know that I can say there

22  were more illustrations than words, but, you

23  know, given the changes in the document, like a

24  simple one-page or a couple of pages about

25  assembling a product rather than a more

1   comprehensive owner's manual for a product, there

2   certainly may be more, or at least comparatively

3   I would say, almost as many illustrations as

4   words perhaps.

5        Q.   You ever put together a Lego project

6   with your son?

7        A.   I have, yes, sir.  Well, I'm probably

8   the backseat driver, but yeah.

9        Q.   Your son likes Lego?

10       A.   To this day he does, yes, sir.

11       Q.   Has he put together any of the 3,000

12   piece Lego structure?  My stepson, who is 11,

13   does that.

14       A.   Yes, I couldn't tell you for sure the

15   number, but big.  Lots of pieces, for sure,

16   absolutely.

17       Q.   Those instructions are primarily all

18   pictures, right?

19       A.   From my recollection they were, I would

20   say, predominantly illustrations.

21       Q.   Have you ever put together a piece of

22   Ikea furniture?

23       A.   I have not.

24       Q.   Have you ever received or assembled any

25   furniture that came in a box?

1       A.    I'm sure I have at some point in my

2   life, yes, sir.

3       Q.    Do you recall those being mostly

4   illustrations?

5       A.    I can't say I have a specific

6   recollection.  I mean I know what you're

7   referring to Ikea.  I've heard people describe

8   that they have more illustration than words.  I

9   don't have any personal experience with that, but

10  I can't tell you I can specifically recall for

11  something that I assembled, you know, what the

12  instructions look like.  I just don't have that

13  kind of recall.

14      Q.    So apparently those aren't manufacturers

15  who you have ever worked for?

16      A.    I have not worked for Ikea, if that's

17  what you're asking, yes, sir.

18      Q.    Have you ever worked for any

19  furniture-assembly instructions for any furniture

20  companies?

21      A.    I'm sorry.  I had a -- the phone rang.

22  I'm sorry I put it on "do not disturb."

23            Have I worked for anyone that has done

24  furniture manufacturer and worked on their

25  instructions?  I just don't recall a project like

1    that as I sit here.

2         Q.    And how important do you think the

3    illustrations provided are to an instruction

4    manual?

5         A.    I think it depends.  You know, it's such

6    a broad question.  It would depend on what is

7    written, what are you trying to convey.  I think

8    illustrations can be very helpful in conveying

9    information to consumers.  You know, I think I

10   said in my report, I think the illustrations that

11   are used in the subject manual are appropriate,

12   and I think they're helpful.  But to say that you

13   always need illustrations, I think, would be an

14   overstatement.  So it really does depend on what

15   instructions and what product you are looking at.

16        Q.    You expect the consumer to look at and

17   try and understood the illustrations, don't you?

18        A.    If they're reading a section of

19   information and it includes and refers to

20   instruction -- to an illustration should the

21   consumer, you know, look at that and try to

22   understand it, sure, I would agree with that.

23        Q.    There's a common phrase, a picture is

24   worth a thousand words, right?

25        A.    Yes, I've heard that.  I'm not sure that

1    it's always true, but I've heard that

2    generalization for sure.

3         Q.   How would you rephrase it?  A picture is

4    worth 500 words instead of a thousand?

5         A.   No.  I have made the point that if

6    illustrations, you know, were clearly superior,

7    we probably wouldn't have gone away from

8    hieroglyphics in terms of communications.  Words

9    have a lot of value, they have a lot of meaning.

10   They allow us to express a good point.  I'm not

11   going to try and dispute a rephrase, you know, A

12   picture is worth a thousand words.  I think there

13   are times a picture can be very helpful or

14   illustrations can be very helpful, but I think it

15   would be -- you can't overstate that.  I think

16   you have to be cautious and say you can't say

17   every manual has to have illustrations, or that

18   illustrations alone make for a superior set of

19   instructions, I think that would be too far.

20        Q.   You think it's important that the

21   illustrations match the product that's provided?

22        A.   To some degree.  I think that you should

23   be able to look at an illustration and based on

24   what's provided both in the words, the

25   description, the illustration, and your actual

1   physical intersection with the product, you

2   should be able to understand what's being

3   conveyed.  So the illustration is a part of it.

4   I can't say it has to be an identical match, you

5   know.  There's kind of a turn of phrase "for

6   illustration only" or "for illustration purposes

7   only."  So it doesn't have to be a super detailed

8   or technical representation, but it should be

9   sufficiently similar that you can discern based

10  on the context of the writing, as well as your

11  interaction with the product, what you're being

12  asked to do or not to do.

13      Q.   Do you believe that the use of the wrong

14  set of words can create harm?

15      A.   I mean it can, sure.  I mean it's

16  possible.  It would depend on the words and the

17  circumstance.  I mean you could use incorrect

18  wording and it may not create a risk, but is that

19  a possibility, sure.

20      Q.   Would you agree that use of improper

21  illustrations that don't match the product

22  provided, could create harm?

23      A.   Yes.  I mean it's binary, either it

24  could or it could not, you'd have to look at the

25  specific one.  But to say that a bad illustration

1    could never result in a risk, I mean obviously I

2    wouldn't agree with that.

3        Q.   But you would agree that sometimes a bad

4    illustration could create some of level of risk?

5        A.   That is a possibility.  You'd have to

6    look at the specifics of, you know, the

7    illustration as well as the context, as I

8    described.  You know, what words are provided as

9    well as the physical interaction afforded by

10   actually trying to perdu the task.  But sure,

11   nobody can rule out and just say as a broad

12   generalization that an illustration couldn't

13   cause, you know, an issue, you just have to look

14   at it.  You have to go through and take the time

15   to do the analysis.

16       Q.   When you're helping a manufacturer with

17   their written instructions and warnings, is it

18   one of your goals that you do the best you can to

19   remove any ambiguity from the instruction?

20       A.   For written instructions, you want to be

21   correct, you want to be -- generally I would say

22   you would try and avoid ambiguity, but, you know,

23   there may be times where you use qualitative

24   terms and you rely on users to apply information

25   and use judgment based on, you know, common

1   knowledge as well as the context.  So I wouldn't

2   say that everything has to be, you know, explicit

3   or extremely explicit.  But as a generalization,

4   if there is a safety message that's critical and

5   I thought there was some ambiguity in that, I

6   would point it out.  And it may cause a

7   deficiency.

8        Q.    When you say "it may cause a

9   deficiency," you're talking about ambiguity in

10   language and provided images?

11        A.    Sure, we can include illustrations as

12   well.  I think that's fair.  Again, you have to

13   look at them together.  When we're talking about,

14   you know, instructions, they're generally going

15   hand in hand.  But, you know, is it possible that

16   ambiguity could result in a risk?  Sure, that's

17   possible, but you need to look at it.  I just

18   would not say everything has to be, you know,

19   extremely explicit, or, you know, you have to

20   have a detailed drawing such as a, you know, a

21   CAD drawing, that level of detail and

22   illustrations, you know, I certainly would

23   disagree with that.

24        Q.    In fact, would you believe that that a

25   CAD drawing might or might not be effective as a

1    form of communication to the general public?

2         A.    Might or might not?  Sure.  I mean it's

3    either one -- it would depend on the illustration

4    and the audience, but it has to be one or the

5    other.  It's kind of binary.

6         Q.    How important is it to you that written

7    instructions be specific and explicit?

8         A.    I think it's going to depend on the

9    context as I was describing earlier.  Generally

10   we look for specific -- specificity to some

11   extent, at least.  Explicitness to some extent,

12   at least.  Primarily you want to provide enough

13   detail and information that consumers can

14   understand and follow the information.  So that's

15   going to vary.  You can't as a generalization

16   say, you know, a degree of explicitness that we

17   can put out and say this is what all warnings and

18   instructions should shoot for.  You know, there

19   is no consensus for that.  And so I would say to

20   the extent that the user can understand what is

21   being described and that they can -- again, based

22   on the context of the writing as well as the

23   illustrations and the interaction, that they can

24   understand what they're attempting to do.  That's

25   the degree of specificity or explicitness that

1    you're looking for.  And there is no clear way to

2    objectively quantify that.

3        Q.    This case involves -- and your work on

4    this case involves a set of owner's manual

5    instructions and warnings, correct?

6        A.    In part.

7        Q.    Do you believe that the user must read

8    the whole section before doing anything?

9        A.    Let me just make sure I understand.  Am

10   I going to come in and say the user must read the

11   entire tire-changing section before doing

12   anything?  No, I don't think I would agree with

13   that.  I mean I think that would be a good idea

14   to familiarize yourself with the process.  I

15   think that's the intent of what the safety

16   information is trying to convey, you know.  But

17   might they kind of go, you know, one step at a

18   time, you know, that's certainly a possibility.

19   But I think, you know, as a general practice

20   looking through and understanding what are all of

21   the steps before you undertake the activity, I

22   think consumers understand that's a good idea.

23       Q.    But your -- I heard two answers there.

24   So one answer I heard was the consumer is not

25   required to read the whole section before trying

1    to change the tire?

2         A.   I would agree to the extent that we're

3    saying can you follow one step at a time, you

4    know in terms of what's laid out in the

5    tire-changing section, and if you follow those

6    information, the warnings and instructions, you

7    could still perform this safely?  Then, yes.  So

8    you're not required in the sense that you have to

9    have read some information on a later page.  You

10   can follow along in a chronological or ordered

11   fashion without skipping ahead, and you can still

12   do this safely?  Yes.  So it's not required in

13   that sense.

14        Q.   So you would not criticize Seanesee

15   Richardson if he started at the beginning of

16   jacking and tire-changing and he worked his way

17   through that process from the first page in the

18   manual?

19        A.   No, I wouldn't call it criticism.  I

20   think it would be the testimony I gave you

21   before, that I think consumers understand looking

22   through the section and look -- being familiar

23   with what the steps are is an appropriate thing,

24   that that's what the safety information is

25   encouraging you to do.  But if anyone, including

1   Seanesee, attempted to follow the instructions,

2   started at the beginning of the section and went

3   in a -- without jumping around or without, you

4   know, picking what parts to read, if they're

5   reading it and going in order, you know, I

6   wouldn't say that I'm critical in the sense that,

7   you know, you can't do this safely or that that

8   behavior causes a specific risk.

9      Q.   All right.  And so I'd like to clarify.

10  So to the degree that Seanesee Richardson started

11  at the beginning of the jacking and tire-changing

12  section and didn't jump around but went page by

13  page and did his best to follow the directions,

14  you would not criticize his process in proceeding

15  in that fashion, if he did?

16        MR. BOORMAN:

17           Objection.  Speculation.  Vague.

18           But answer if you can.

19        THE WITNESS:

20           I understand your question, and I

21  would -- in that hypothetical, I would not be

22  critical if that was, you know, the situation, if

23  that was a hypothetical.  I don't think that the

24  facts of this case would support that

25  hypothetical situation.  Just as an example, the

1    vehicle was jacked up and raised up.  That's not

2    discussed or addressed in the sequence of

3    activities until later in the sequence.  So I

4    don't think the evidence would support, you know,

5    that hypothetical.

6                    But in terms of your hypothetical if

7    someone started at the beginning of the jacking

8    section and was working through one at a time, I

9    can't say that I'm necessarily critical of that

10   behavior.

11       Q.   All right.  And as you pointed out, the

12   jacking of the vehicle appears later in the

13   series of numbers that are provided on steps to

14   do.  Is that what you said?

15       A.   Yes, sir.  I use that -- that jacking

16   occurs later in the sequence.  Also, there are

17   earlier steps that were not followed.  There's no

18   evidence that the wheel was chocked, you know,

19   those sort of things.  So there are steps that

20   appeared earlier before trying to retrieve the

21   tire, and there are things like lifting the car

22   that come after.  As an example, Mr. Sullivan has

23   said that he thought that Seanesee was kind of at

24   step 2 -- between step 2 and step 3, as I read

25   his deposition.  So I don't think the evidence

1    supports that.  But that the jacking occurs

2    later, is one piece of that, sure.

3         Q.   Blocks were supplied with the vehicle,

4    were there?

5         A.   Blocks, you said?

6         Q.   Yes.

7         A.   Correct.  I'm not aware of blocks or

8    wheel chocks being provided with the vehicle.

9         Q.   So you're not critical if he didn't have

10   any blocks, that he didn't use them since the

11   vehicle -- the vehicle manufacturer didn't think

12   blocks were important enough to provide with the

13   vehicle, correct?

14        A.   No, I wouldn't agree with that.

15   Obviously, I think that users should follow the

16   instructions because -- I don't think that it's

17   common that wheel chocks are provided with

18   vehicle.  I haven't tried to survey it.  But in

19   my personal experience, I don't think that's

20   common.  You know, you can use anything from a

21   block of wood to a rock or something to attempt

22   to chock a wheel.  So I think I would disagree

23   with the question, as you asked it.

24        Q.   In what fashion do the instructions --

25   does the instructions use any words at all to

1    describe what is a block?

2        A.    I guess I'll have to look at the section

3    to see the exact wording.  I think they generally

4    kind of use block as, you know, perhaps both a

5    noun and a verb, but let me...

6              Yes, I think in the written instructions

7    in the -- in the owner's manual.  So looking at

8    page 377 of the owner's manual, the version

9    that the Richardson family had, it's kind of

10   using block as a verb.  Block both the front and

11   the rear of the wheel diagonally opposite the

12   jacking possession, block the left -- and then it

13   goes on.  So it's using it in that language.  And

14   then there is a diagram which appears to show

15   kind of a block of wood and errors pointing at

16   it.  So I think they used it both as a noun and a

17   verb in the written information.

18       Q.    There is no place within the written

19   information that provides any description of what

20   is a block?

21       A.    No, not written.  There is an

22   illustration, you know, but they don't try to

23   specify like dimensions of lumber or something

24   like that, correct.  That's correct.

25             Q.    And so, for example, for this blocking

1    of the wheel, this illustration is critical

2    because it provides the only description of what

3    a block might look like or what a block might be?

4        A.   No, I don't think I would agree with

5    that.  I think it's a helpful illustration.  I

6    think it provide, you know, something that a user

7    can look at if they wanted to understand where

8    they should be placed or, you know, what's being

9    depicted here.  But could you use something other

10   than, you know, a rectangular block?  I mean yes,

11   there are wheel chocks and things that are

12   available aftermarket.  So you could use

13   different things, would be my understanding,

14   than, you know, one specific dimension or one

15   specific type of material.  So I guess I would

16   disagree with what the question the way you asked

17   it.

18       Q.   Explain to me how a 16-year-old would

19   understand what is meant by a block?

20       A.   I think that in terms of looking at this

21   diagram, that you can see what appears to be

22   illustrated.  You know, some dimensional lumber

23   kind of has grain, looks like to me, have wood

24   grain appearing in that illustration.  I think

25   that 16 year olds have been around and likely

1   would have enough information to understand, you

2   know, wheel blocking or wheel chocking.  You

3   know, that's pretty common as an example with

4   trailers and things.  So to the extent, you know,

5   he had participated in Boy Scouts and been on

6   camp-outs, if they have a trailer and they block

7   or chock the wheels with the trailer, he likely

8   could have seen that.  I don't know that he did.

9   But I would say is -- I think to the extent there

10  was a question about what that meant, then he

11  could certainly ask.  He could ask his mom, he

12  could ask his dad, he could find out more

13  information.  And we know that didn't occur from

14  Mrs. Richardson.  She said that he did not ask

15  any information.  So all I can tell you is, I

16  don't think this is outside of common knowledge,

17  you know, for licensed drivers.  Generally, I

18  think there is helpful information kind of

19  depicted in the illustration.  But if someone

20  after all of that was still confused, then they

21  can try to get that sort of information from

22  another source.

23       Q.   So you would agree that you'd have to

24  speculate as to what he knew or didn't know and

25  the degree to which the combination of these

1    words and this illustration made sense or didn't

2    make sense to him, correct?

3         A.    And I would add to that -- yes.  And I

4    would add to that, I think anyone would be really

5    speculating, did he even read this page or not.

6    We just don't know.  We don't know what he read,

7    if anything at all.  But in terms of what was

8    specifically in his mind on this day, the only

9    information we potentially have, I think it comes

10   through the statements and testimony of

11   Mrs. Richardson.

12        Q.    Is there a warning attached to this

13   instruction related to blocking?

14        A.    I'm not sure I'm understanding -- when

15   you say -- are you limiting your question to the

16   information that's simply appears on page 377?

17        Q.    Yes.  On page 377 it says, and I quote,

18   Block both the front and real of the wheel

19   diagonally opposite the jacking position.  For

20   example, if changing the right front tire, block

21   the left rear wheel.

22             And that's all the words it uses about

23   blocking other than the illustration that

24   underneath it says the word "block."  Is that

25   correct?

1      A.    On this page, yes, sir.  There's

2   information on the label, but, yes, sir, on this

3   page, you're correct.

4      Q.    Is there any warning in the owner's

5   manual that tells you what will happen if you

6   fail to block the wheel?

7      A.    Oh, is there a specific discussion about

8   some consequences explicitly linked to blocking?

9   No, sir, I don't think there is language such as

10   that.  I think there is information about

11   instability of a vehicle once it's raised on a

12   jack, and so I think a reader would understand

13   that blocking the wheel relates to trying to

14   prevent the vehicle from moving which relates to

15   instability and the potential for a vehicle to

16   fall.  But in this section, does it say if you do

17   not follow this particular information about

18   blocking, you know, that the vehicle could fall

19   off the jack, no, sir, it does not.

20      Q.    So there is no consequence anywhere that

21   you know of as to what would be the adverse

22   consequence of failing to block, correct?

23      A.    I think that's kind of broad the way you

24   asked that.  What I would say is, there is

25   clearly information related to the danger of

1    being underneath a vehicle when it's raised, as

2    well as the potential for -- I'd just like to

3    finish and then we can hash it out.  -- as well

4    as the potential for the vehicle to fall off the

5    jack.  That relates to the stability of the

6    situation, that relates to, you know, potential

7    movement of the vehicle.  I think that, you know,

8    a licensed driver, someone 16 years of age, would

9    be able to understand the reason that you're

10   blocking a tire, is to try to limit the movement

11   of the vehicle.  And so that would relate to the

12   potential for the vehicle to move while it's

13   raised up on the jack.  And so I think the

14   warnings that talk about the stability or

15   instability of a raised vehicle on a jack and the

16   potential consequences that could occur, I think

17   they apply.  But I certainly agree when you ask

18   is there some information in this particular

19   section that says that if you, you know, similar

20   to the words of your question, if you do not

21   block, then X, Y, Z can happen, no, sir, there is

22   no language such as that in the section.

23        Q.   To be clear, there is no wording about

24   the consequences of failure to block anywhere in

25   the owner's manual in the section on jacking and

1    tire-changing, correct?

2              MR. BOORMAN:

3                   Objection.  Asked and answered.

4              THE WITNESS:

5                   I would disagree.  I think you made

6    that question very broad.  And I would give you,

7    you know, basically the same answer that I did,

8    that I think there is information that relates to

9    potential consequences, the danger of a raised

10   vehicle, the potential instability, and the

11   potential for a vehicle to fall off the jack.  So

12   I think that relates to it.  Do those explicitly

13   mention blocking, do they call it out?  Not that

14   I recall, no, sir, but I think you would

15   understand that this is a precaution that's being

16   identified in this section that relates to tire

17   changing and there are initial warnings about the

18   risks and potential injury associated with tire

19   changing.  So I think a reader would understand

20   those things are related.  But I don't recall an

21   explicit sentence that uses the word "blocking"

22   and then goes on and talks about the vehicle

23   falling off the jack.  If that's simply your

24   question, no.  But when you opened it up and made

25   it more broadly, I can't agree.

1    BY MR. DIDRIKSEN:

2        Q.   All right.  Do you have a copy of the

3    Richardson's manual with you?

4        A.   Yes, sir.

5        Q.   Okay.  We can take a break while you

6    study, but I want to ask you to study the entire

7    section on jacking and tire changing, and I'd

8    like for you to tell me whether blocking or block

9    is addressed anywhere other than this one

10   paragraph and one diagram on page 377 in

11   connection with vehicles with Stow 'n Go seating.

12       A.   I'll be glad to take a break.  However,

13   I think it's going to be the same answer that I

14   just gave you.  I'm not saying the word "block"

15   appears explicitly in the other safety messages,

16   but I think a reader would understand that that

17   is a precaution related to this activity and that

18   these are risks associated with it.  I'm not

19   trying to suggest to you that the word "blocking"

20   appears somewhere else.  I mean I'm glad to take

21   a break and look, but --

22       Q.   Well, I specifically --

23       A.   I'm sorry.

24       Q.   I do specifically want you to take the

25   break and read the entire section because I want

1   you to be able to confirm or deny whether the

2   words "block" or "blocking" appear anywhere else

3   in this section on jacking and tire changing, a

4   warning or an instruction in any fashion.

5          So we'll take a break at this time while

6   we takes a look.

7          MR. BOORMAN:

8          Okay.  And just, Michelle, for the

9   record, this is part of the time that goes with

10  the deposition.  This is being instructed by

11  counsel.  So if you're keeping time, this should

12  be included.  Thank you.

13  (A short recess was taken.)

14  BY MR. DIDRIKSEN:

15      Q.   Did you speak to Mr. Boorman during the

16  break?

17      A.   He did call me, yes, sir.

18      Q.   And what did he discuss?

19      A.   He just simply said keep listening to

20  the questions and answering them, and asked if I

21  needed a lunch break, that kind of thing.

22      Q.   He didn't talk to you about your

23  answers?

24      A.   No, sir.

25      Q.   And what is your answer to the question?

1       A.   I think I guess need the specific

2  question again.

3       Q.   The specific question is, do the words

4  "blocking" or "block" appear anywhere in the

5  section on jacking and tire changing other than

6  on page 377?

7       A.   Only when it comes up again in the

8  nonStow 'n Go seating option.  But as it relates

9  to Stow 'n Go seating jacking instructions, it's

10  only on page 377 that I saw the word "block" or

11  "blocking."

12       Q.   And so you did not see in any of the

13  warnings in that section the word "block" or

14  "blocking;" is that correct?

15       A.   I think I said that earlier, yes, sir.

16       Q.   You did not see the word "block" or

17  "blocking" in any of the warnings in the Stow 'n

18  Go section at all?

19       A.   Correct.  I think that's what I told you

20  earlier, yes, sir.

21       Q.   And you agree that at least in

22  connection with the short paragraph or two

23  sentences on block, the illustration is an

24  important supplement to the words used, correct?

25       A.   Yes, I guess "important" is a fine

1    characterization.  It's certainly helpful.  I

2    don't know that I can say it's deficient if the

3    illustration wasn't there, I guess I hadn't

4    thought about that.  But I think "important" and

5    "helpful" are fine words to use.

6         Q.   Would you agree that illustrations in

7    general should be helpful?

8         A.   I mean I guess yes as opposed to

9    unhelpful, then yes, it would have to be helpful.

10   So you want them to be capable of being

11   understood and to assist users in performing

12   actions or understanding a concept.  So in that

13   regard, helpful, yes, sir.

14        Q.   But you saw the testimony that Seanesee

15   Richardson had the owner's manual open on the

16   deck over the side sill near where he was

17   working, correct?

18        A.   Well, Mrs. Richardson -- I recall

19   testimony from Ms. Richardson that she recalled

20   seeing the book out, the owner's manual book out,

21   and she had talked about the sliding door open

22   area on the passenger side, and I discussed that

23   in my report.  I don't -- you know, she never saw

24   him reading it or using it specifically.  If it

25   was open or closed, I would have to defer to her

1    testimony.  I just don't recall as I sit here,

2    but I do recall her saying that she saw it out.

3    From memory, I guess that's as far as I can

4    confirm.

5         Q.   Now, have you ever known of another

6    vehicle that had its spare tire located in

7    between the driver and passenger seats under the

8    car?

9         A.   I don't know.  I mean I've driven cars

10   and not known where the spare tire was located.

11   So, I can't point you to one as I sit here but,

12   I've not tried to undertake that, you know,

13   survey different vehicles.  So I just don't know

14   one way or another.

15        Q.   But at least within your own experience,

16   you would agree that this spare tire location is

17   unusual and perhaps even unique?

18        A.   We're talking about -- that's--  I

19   haven't seen this location on any car that I knew

20   where the spare tire was, but that's probably,

21   you know, a handful of cars.  We're probably

22   talking about three or four cars.  So it's

23   probably not a helpful metric.  But all I request

24   tell you is that in my personal experience, I

25   don't recall a similar configuration, but I just

1    don't think that's, you know, going to assist

2    anyone in terms of whether this is prevalent or

3    not.

4         Q.    How old are you, sir?

5         A.    I'm 46.

6         Q.    How many cars have you owned?

7         A.    Maybe five, something in that ballpark.

8         Q.    All from the same manufacturer, or are

9    they all different?

10        A.    It's been a variety.

11        Q.    Did you ever work with your friends on

12   their cars?

13        A.    That's not something -- I mean I'd help

14   them out, I guess, if they had an issue, but

15   I'm -- you know, I'm not an automotive mechanic.

16   I probably wasn't going to be a lot of help.

17        Q.    That's not your forte?  Actually

18   changing tires isn't something that you would

19   consider yourself an expert in, correct?

20        A.    I mean I guess -- I would not call

21   myself an expert tire-changer.  I don't know if

22   there is such a person or not, maybe somebody who

23   works for Roadside Assistance but.  I've done it

24   a few times in my life, a handful of occasions.

25   But I think, no, my expertise is more on the

1    instructions and safety information pertaining to

2    that rather than saying my opinions are based on

3    some experience or expertised based on actually

4    performing tire changes.

5        Q.    And you said you've changed tires a

6    handful of times.  That means probably five or

7    less times in your whole life?

8        A.    Yes, sir, I think that's fair.

9        Q.    And were they -- all of those tire

10   changes on the same vehicle, or were they on a

11   variety of the five vehicles that you've owned?

12       A.    A variety of vehicles, but not always

13   vehicles that I have owned.

14       Q.    But you apparently keep your vehicles

15   for a long time if you've been driving for 20

16   years and have only had five vehicles, right?

17       A.    I think there's an expression about

18   until the wheels fall off, right?  No, I tend to

19   own them for longer period of time, I guess.

20       Q.    And so the main vehicles on which you

21   have any knowledge of where spare tires would be

22   would be the ones you've owned?

23       A.    Well, I had to change a tire on a rental

24   vehicle before, or at least begin the process,

25   and my recollection is, you know, it was kind of

1    in the center, maybe more towards the rear on an

2    SUV that I had rented.  So it's not limited only

3    I guess to cars that I have owned, I guess as I

4    understood your question.

5         Q.   Okay.  But the one that you did remember

6    where it was under, it was under the back deck

7    some place close to the rear bumper?

8         A.   I would say relatively closer than this

9    vehicle.  You know, this one, I would say, is

10   more towards the front of the vehicle.  But I

11   can't tell you how far, you know, from like the

12   rear bumper how far inward, I just couldn't tell

13   you.

14        Q.   You have never written instructions or

15   warnings for Chrysler's Stow 'n Go vehicle

16   instruction manual, have you?

17        A.   No, sir.

18        Q.   Have you in your whole career ever

19   written any instructions for Chrysler or Chrysler

20   products?

21        A.   Yes, I guess the problem I'm having is

22   -- I guess if I answer that, you know, I have a

23   nondisclosure agreement, and so I guess I would

24   have trouble answering that because it seems like

25   it would either confirm or deny, I guess.  But I

1   have not done a project related to tire changing

2   or Stow 'n Go seats on tire changing for

3   Chrysler.

4       Q.   All right.  And then is it fair to say

5   that your first contact with this particular

6   owner's manual would be in connection this

7   litigation?

8       A.   I cannot recall specifically looking at

9   this one in the past, but I have looked at, you

10  know, hundreds, maybe thousands, of owner's

11  manuals.  It's possible I have looked at it, you

12  know, in some other context for some other

13  reason, but I certainly do not recall looking at

14  tire changing procedures on this, you know, make

15  and model year of vehicle before, no, sir.

16      Q.   You agree with Mr. Household that the

17  common intuitively obvious meaning of body is

18  your trunk?

19      A.   No, sir.  I tried to express my

20  disagreement with that point in my report.  So,

21  no, sir.

22      Q.   What does intuitive obviously mean to

23  you?

24      A.   It's a phrase that I use often, say

25  something that would be obvious or understood

1    based on context.  So when we talk about from an

2    HMI or Human Machine Interface perspective, an

3    interface that is intuitive meaning something

4    that a user can understand or figure out.  And so

5    intuitively obvious would be I can understand

6    this concept or I can understand how to interact

7    in part based on either common life experiences

8    or information that we generally expect the

9    consumer base to have or through interaction.  So

10   it's kind of a broad term.

11       Q.   But sort of implies preexisting

12   knowledge on somebody's part, right?

13       A.   Or that it could be understood by the

14   context.  I think it includes both of those.  As

15   I recall that I use that phrase in this report as

16   it related to knowledge that a vehicle could fall

17   off a jack and there is a danger associated.  And

18   I think that comes -- I think people can

19   understood that by looking at the scenario.  But

20   I think that's also commonly known, and I think

21   all the Richardson family agreed with that.

22       Q.   Was there any study or text that

23   provides you a basis for stating what is commonly

24   known and what is not commonly known,

25   specifically with respect to jack use?

1      A.    I think I understood the question.  It

2  was cutting in and out a little bit.

3            Is there an article that I can point to

4  where I'm relying upon in terms of what is

5  commonly known as it relates to jacking vehicles?

6  I'm just trying to make sure I heard the question

7  correctly?

8      Q.    Yes.

9      A.    No, there is no specific published

10  literature that I'm aware of.  I think in terms

11  of talking about, if I raise up a vehicle and if

12  it were to fall off, you know, could that pose a

13  risk?  I think that's commonly understood based

14  on a general understanding of the world in

15  physics, that if something heavy were to fall and

16  I were in a place where I could be struck by that

17  I could be injured.  I don't know of anybody

18  that's bothered to research that or publish that.

19  And I don't think that -- so I think that's a

20  reasonable expectation that people would

21  understand there is potentially a risk.

22      Q.    We walk under bridges and through

23  doorways and under ceilings and under objects all

24  the time.  We're all conditioned to do that,

25  right?

1      A.   I mean we walk under building

2   structures, Sure.  I mean I would agree with

3   that.  I wouldn't say that's a fair analogy to

4   lifting a vehicle on a jack.  But do we walk

5   under things that may be constructed and

6   suspended and are intended to remain in a

7   suspended place, sure.

8      Q.   Once the vehicle has been lifted on the

9   jack and -- and it appears secure on the jack and

10   it appears not to be moving on the jack, then

11   wouldn't it be normal to believe that it stay at

12   rest on the jack?

13      A.   I don't think I would agree with that.

14   I think that people would understand things could

15   happen, you know, that would cause it to

16   become -- I don't think people would necessarily

17   characterize that as being very stable, that I

18   think someone could look at it and say if

19   somebody bumped this car while it's up on a jack

20   it could fall off.  I would generally expect

21   people understand that.  I mean that's not a

22   fundamental basis, I guess, of one of my

23   opinions.  I think it's fair to talk about that

24   when we talk about jacking vehicles.  But, you

25   know, regardless of their understanding, I think

1    Chrysler has explicitly warned about the risk

2    that it could fall off of the jack.  But I think

3    just putting that aside, I think users would

4    understand something could happen outside of my

5    control that could cause a vehicle to fall off a

6    jack.  They would not by comparison think it's

7    nearly as stable as if it were on all four

8    inflated tires.

9         Q.    Do you have any textual authority that

10   provides you the definition that "body" means

11   arm?

12        A.    Well, I don't think I'm saying that, but

13   I can't think of a specific text that points to

14   that.  Generally when -- for example, when they

15   talk about injuries, you know, in literature, I

16   tend to see things like trunk, you know, related

17   to kind of what I understood Mr. -- or excuse me

18   -- Dr. Householder to be speaking about, so there

19   is those kind of references.  But is there some

20   written down definition that says "body" equals

21   arm or "body" means arm, no, sir.  But I don't

22   think that's what I'm saying either.

23        Q.    But you would agree "body" does not

24   equal arm?

25        A.    I don't think that someone would think

1   that "body" means arm alone.  I think if you say

2   don't move any part of your body, they would

3   include arms as part of that.  Generally body --

4   I don't think there is any accepted convention

5   that "body" is limited in some way.  And

6   definitely when you say any part of a body, I

7   don't think that limits it to the trunk in some

8   way.

9        Q.   But to give that answer, you're assuming

10  what other people think or don't think, correct?

11  You could say arm if you want.  This instruction

12  could say don't put your hand under the vehicle?

13       A.   Well, I think that would probably be

14  less helpful.  I think the point is any part of

15  your body, which would include the hand and it

16  would include the arm, it would include a head.

17  So I think just saying "don't put your hand"

18  would be less specific rather than using the

19  phrase, you know, "any part of your body" which I

20  think is more specific and inconclusive.

21       Q.   But you would agree you're not an expert

22  on what "body" means and what "body" doesn't

23  mean, are you?

24       A.   I would not limit my expertise in that

25  way.  But I do author warnings and I talk about

1    what sort of language should be used, and I just

2    don't see a basis in any of the published

3    literature or anything that I can point to that

4    someone so would interpret the phrase "any part

5    of your body" to somehow exclude arms as

6    Dr. Householder has suggested.  I mean that's

7    kind of his hypothesis.  I don't know of any

8    basis.  I can't bring you anything.

9              On the converse, I can't say here's an

10   article that says when you say "any part of your

11   body," people reported that that included arms.

12   But I think that's perhaps because people have

13   not bothered to kind of validate or investigate,

14   you know, things that would appear to be

15   intuitive or obvious.

16       Q.   The first warning in the tire changing

17   section which talks about getting under a jacked

18   up vehicle is dangerous, the third sentence in

19   that little paragraph says -- or fourth sentence

20   says, If you need to get under a raised vehicle,

21   take it to a service center, right?  Are those

22   the words it uses?

23       A.   I think it's the fifth sentence.  But if

24   you need to get under a raised vehicle, take it

25   to a service center where it can be raised on a

1    lift, yes, sir.

2        Q.   Okay.  That doesn't say if you need to

3    reach under a raised vehicle, does it?

4        A.   Does it say "reach under it," no, sir.

5    It says "get under."  And it's in the context of

6    the rest of that information.  But does that

7    sentence say "reach under," no.  It says "get

8    under."

9        Q.   You wouldn't necessarily object in the

10   same manner to someone who simply reached under a

11   vehicle with their arm, maybe their shoulder,

12   would you?

13       A.   If someone is reaching under a raised

14   vehicle, I think that would clearly violate this

15   warning.  It's a bullet point.  You know, it's a

16   paragraph, a number of sentences, but I don't

17   think it would be reasonable to expect someone

18   reads this where it says, Getting under a

19   vehicle, a jacked-up vehicle is dangerous.  The

20   vehicle could slip off the jack and fall on you.

21   You could be crushed.  Never get any part of your

22   body under a vehicle that is on a jack.

23           I don't think that when they read the

24   fifth sentence they would somehow say that

25   reaching is okay.  You have to look at the

1    context in which it's communicated.

2         Q.   Even the words "getting under a

3    jacked-up vehicle" seem to me to imply more than

4    simply reaching under.  Do you disagree?

5         A.   I mean I disagree with that conclusion

6    in that I don't have the same conclusion as you,

7    if that's what you're asking.  I think that if

8    you look at the context of this warning and the

9    context of the situation, that people would

10   understand Chrysler is attempting to communicate

11   that they don't want any part of the body to be

12   under the vehicle.  They've explicitly said as

13   much.  And so trying to look at one sentence I

14   guess without consideration to the rest of the

15   information, I just don't think that's -- it's

16   not a valid methodology for evaluating warnings,

17   but I think I would disagree in the sense of

18   there's information that I think is clear, that

19   is inconclusive.

20        Q.   Let's try and read that entire warning

21   together once more with a focus on my idea of

22   whether it really warns you against reaching

23   under a vehicle.

24             It starts out, Getting under a jacked-up

25   vehicle is dangerous.  The vehicle could slip off

1    the jack and fall on you.  You could be crushed.

2    Never get any part of your body under a vehicle

3    that's on a jack.  If you need to get under a

4    raised vehicle, take it to a service center where

5    it can be raised on a lift.

6              Did I use all the words that time?

7         A.    I believe so.

8         Q.    And nowhere in that does it say that

9    reaching under the vehicle is dangerous, does it?

10        A.    I agree that it does not use the word

11   "reaching," but I disagree because I think that

12   information is clear and explicit in that

13   reaching would be prohibited.  When it says

14   "never get any part of your body under a

15   vehicle," along with the remainder of the

16   information about the risk that it could fall,

17   that it could crush you, that doesn't somehow

18   exclude your arm or other parts of your body.  So

19   I agree with you that it does not use the phrase

20   "reaching," but I think that it does

21   appropriately address the scenario of reaching

22   through the information that is provided.

23        Q.    But that's just your conclusion as a

24   reader and an English speaker, correct?

25        A.    Well, I think I'm drawing upon my

1    experience in terms of writing and evaluating

2    warnings and safety information for many years

3    now, I'm relying upon the body of literature that

4    talks about how to craft warnings and safety

5    messages.  I've looked at information and

6    publications that have tried to look at and

7    evaluate comprehension of different messages.

8    And so recommendations about being explicit and

9    so defin- -- qualify phrases like any part of

10   your body, I think those are appropriate.  And I

11   just don't see a basis to say someone would

12   misunderstand it.  I would also add to that that

13   I don't believe that any of the Richardson family

14   has suggested that they had the misunderstanding

15   that Dr. Householder has suggested.  They said

16   the warning was clear, they understand it.  But

17   in particular, Mrs. Richardson said she did not

18   believe it could be followed, but she didn't

19   understand or know about the spare-tire hook.  So

20   that's not to suggest that they somehow

21   misunderstood this warning but in the way that

22   Dr. Householder has kind of suggested as a

23   hypothesis or a scenario in this case.  So I just

24   don't know of anything in terms of facts specific

25   to the case, general literature that you could

1    rely upon that would support his hypothesis.

2    He's done no -- it's his hypothesis and he has

3    done no, you know, data collection or anything to

4    support it that would contradict it.  The

5    information, I believe, is clear and consistent

6    with available guidance about how to write safety

7    information and consistent with kind of accepted

8    practice.

9        Q.   So your conclusion is that you, as an

10   expert -- you consider yourself an expert in

11   instructions and warnings, right?

12       A.   Yes, sir.

13       Q.   So with your background and information,

14   it's your conclusion that a normal consumer will

15   understand that warning we just discussed to

16   include you can't reach under the vehicle?  Is

17   that your conclusion?

18       A.   Yes, sir.  I think for the reasons we've

19   discussed today and in my report.

20       Q.   But you agree that members of the jury

21   are going to be English speakers and they're

22   going to read that and they're going to make

23   their own conclusions as to whether that includes

24   "don't reach under the vehicle or not," correct?

25       A.   Sure.  Absolutely a jury is going to --

1    as I understand it, you're going argue that to

2    the case, you know, to the jury and they have to

3    make their own mind up, sure, absolutely.

4        Q.   And you agree that the warning as stated

5    doesn't anywhere say the word "reach"?

6        A.   The paragraph that we read does not

7    include the word "reach," yes, I agree with that.

8        Q.   And the paragraph that we read also

9    doesn't say anything about putting your hands or

10   your arms under the vehicle.  It uses instead the

11   word "body," correct?

12       A.   No, I don't agree with that

13   characterization.  It says "never get any part of

14   your body."  It's not just the word "body."  And

15   I think you have to look at the entirety of the

16   message, that it would address hands and arms in

17   the context of what's being described, the danger

18   that's being described.  But it doesn't use the

19   word "hand" or "arm" or "reach."  To that extent,

20   I think we agree.

21       Q.   Therefore, to that extent, you would

22   agree that this warning is ambiguous as to

23   whether you can reach under it with your hand or

24   your arm?

25       A.   No, sir.  I think we've talked about

1  that.  And I will disagree with that

2  characterization for the reasons that we've

3  talked about today and in my report.

4       Q.   You would agree that other opinions can

5  be held by other experts, correct?

6       A.   Sure.  I mean obviously Dr. Householder

7  has suggested that he thinks there is some

8  ambiguity just on this information, on this page.

9  I don't think he held that opinion as it relates

10  to the warning on the jack label.  But in terms

11  of -- you know, it's my understanding he holds

12  that opinion, and I tried to explain, you know,

13  today and in my report why I disagree but sure,

14  he holds a different opinion, yes, sir.

15       Q.   And you respect his right to hold a

16  different opinion from you on that question?

17       A.   I mean I respect his right to hold it, I

18  would just say he has not provided a clear basis

19  for it.  I don't see any reason why he has come

20  to that conclusion, and I don't see any relevance

21  as it relates to this particular case in terms of

22  some fax or information that would include us to

23  conclude Seanesee read this information and came

24  to that conclusion.  It would be contrary to the

25  same -- you know, his brother Patrick, his

1   father, his mother didn't come to that

2   conclusion, so it would be contrary to his

3   family.  So I just don't see any case-specific

4   facts to support it.  I mean he has the right to

5   his opinion, but I think he would have to be able

6   to provide a clear basis, you know, to kind of

7   express it.

8       Q.   And on interpretation of the English

9   language and the words used in this warning, you

10  agree that the members of the jury also have the

11  right to their opinion as to whether this

12  effectively tells you not to reach under the

13  vehicle or not, correct?

14      A.   Oh, sure.  Obviously, the jury I guess

15  will have kind of an ultimate opinion in this

16  case in terms of, you know, what conclusions they

17  come to.

18      Q.   Including their own conclusion as to

19  whether this first warning and the jacking and

20  tire-changing section effectively warns not to

21  reach under the vehicle, correct?

22      A.   Yes.  I mean my understanding is that

23  that is an issue in this case.  Dr. Householder

24  has talked about it, you know, to some extent.

25  It's I guess my perception that that's something

1    you will present in your case to the jury and

2    they'll have to make up their mind on whether or

3    not this warning and all of the safety

4    information is appropriate, sure, I agree with

5    that.

6         Q.   So your accepting of the fact that that

7    two different opinions would be presented to the

8    jury and the ultimate decision of which decision

9    of which opinion is correct is going to be up to

10   the jury, correct?

11             MR. BOORMAN:

12                  Hold on.  Hold on a second.  I

13   apologize Dr. Dorris.

14                  Let me just object to the extent

15   we're getting into areas of legal conclusion, and

16   perhaps the judge may have something to say on

17   this.

18                  So with that objection, please

19   answer the question.

20             THE WITNESS:

21                  I mean obviously that's -- I think

22   that's correct.  And what I was going to say is

23   your question assumes that we're both testifying

24   at trial, then the jury would have to look at

25   what is presented to them and what do they find,

1    I guess, credible or convincing, not only in

2    terms of the presentation and the analysis, but

3    the facts of the case.  You know, obviously the

4    lawyers play a role in that, how well do they

5    present information and get it across to the

6    jury.  But assuming that Dr. Householder

7    testifies and I testify, you know, I expect

8    you'll ask me questions and you'll ask him

9    questions, and the jury will ultimately have to

10   make a conclusion.

11   BY MR. DIDRIKSEN:

12        Q.   You also understand that even if you're

13   the only one to testify, the jury would have the

14   right to agree with your opinion or not about the

15   effectiveness of this warning?

16             MR. BOORMAN:

17                  The same objection.  That gets into

18   legal areas of the judge may be involved in.

19                  But subject to that, please answer.

20             THE WITNESS:

21                  I mean I guess I understand your

22   question.  The hypothetical that I were the only

23   witness to testify about warnings, then the jury

24   would have to agree or disagree?  Sure.  I mean

25   it's kind of, to some extent, you know -- I guess

1    if I were the only one testifying, there wouldn't

2    be an expert kind of contradicting me, so perhaps

3    take that into account.  But I imagine you would

4    want to cross examine me, as you are today, and

5    then the jury will have to take out of that

6    whatever they value and appreciate.  Sure, that's

7    clearly my understanding of the process under

8    your hypothetical.

9    BY MR. DIDRIKSEN:

10        Q.    Have you kept a win/loss ratio on the

11   cases in which you've been involved?

12        A.    You mean like which side that I was

13   retained by, did they prevail are not?  No, sir.

14   You know, just like in this case, I think I have

15   one small piece of it, and, obviously, you know,

16   the judge and the lawyers play a big role.  But I

17   couldn't tell you, you know, a percentage of

18   times that I was retained by a side and they got

19   a verdict that was beneficial to them, no, I

20   can't tell you.

21        Q.    But you recognize that whoever hired you

22   has not won every time, correct?

23        A.    Oh, I think that's correct, yes, sir.

24        Q.    And so there has been times when you

25   gave opinions that if accepted, would have helped

1    your side win, but for whatever reason, the trier

2    of fact didn't -- didn't rule in your client's

3    favor?

4         A.   Well, I think that may be an

5    oversimplification.  As I said, warnings are only

6    one part of it.  There is often, you know, design

7    claims and other things going on.  I mean is it

8    possible that the jury said Dr. Dorris doesn't

9    know what he's talking about?  Sure, that's a

10   possibility.  I've never gotten that kind of

11   feedback.  But in terms of, you know -- I guess

12   what I would say is, I recognize that I come in

13   and I provide the information that I think is

14   helpful to a jury.  They don't necessarily know

15   the body of literature, what's been studied,

16   what's been looked at, what kind of

17   recommendations are out there for technical

18   writers and designers of warnings.  So I think it

19   provides a valuable piece of it.  But that's just

20   one small piece of an overall case that's

21   presented to the jury.

22        Q.   You've admitted already that you don't

23   know any tests or scholarly literature or any

24   other verifiable source that can be used to

25   support your opinion that body might include

1    reaching under a vehicle?

2              MR. BOORMAN:

3                   Objection.

4              THE WITNESS:

5                   I think, you know, you've kind of

6    worded it differently than I have said.  What I

7    have said is that the phrase "any part of your

8    body," that when you use those sort of

9    qualitative terms to describe it, that people

10   would understand and I would expect that they

11   would understand that would include any part,

12   meaning their hands, their head, you know, things

13   that are connected, that there is no accepted

14   convention that "body" only means your trunk.  Or

15   that when you say "any part of your body" that

16   that's somehow narrows it to a trunk and doesn't

17   expand it, in terms of how we commonly safety

18   information to be explicit, to be inclusive,

19   phrases like that are commonly used.

20                   But in terms of can I say somebody

21   has specifically studied that and I can point you

22   to, no.  But I'm not aware of anything that I can

23   think of in terms of general guidance or

24   literature in terms of accepted practice that

25   would support, you know, the opposite proposition

1    which is Dr. Householder's opinion.  So I guess

2    maybe an analogy would be, if a graduate student

3    came to me and said this is his hypothesis and he

4    wants to do study, I would really challenge him.

5    You don't form a hypothesis based on nothing, you

6    have to have some credible information based

7    observation to kind of come to a hypothesis.  And

8    I just don't -- I understand what Dr. Householder

9    is saying in terms of some people may call their

10   trunk a body or the core of their body, but I

11   just don't see anything to support his kind of

12   application of that to this language in this

13   case.

14   BY MR. DIDRIKSEN:

15       Q.   Would you agree that that warning -- the

16   first warning in the jacking and tire changing

17   section, would have been more clear if the middle

18   sentence that you're talking about in any part of

19   your body, if it instead said never get any part

20   of your body, not even a hand or foot, under a

21   vehicle that is on a jack, would be more clear

22   than including the reaching under or putting a

23   foot under the vehicle?

24       A.   I would not agree that it would be more

25   clear.  I think it is clear, I think that is

1    understood from the language.  You know, would it

2    include a reference to a hand, sure.  I mean I

3    obviously acknowledged you've inserted the word

4    "hand" in there, but I don't see a basis to say I

5    would expect that to be understood by a greater

6    percentage of people by using the word "hand" in

7    that sentence versus the phrase "any part of your

8    hand" -- excuse me -- "any part of your body."  I

9    just don't see any basis to say that somehow

10   would be understood by more people.  So I just

11   couldn't agree that it would be more clear.

12            MR. DIDRIKSEN:

13                 I'd like to take a short lunch

14   break, please.  Does a half an hour sound good to

15   you guys?

16            MR. BOORMAN:

17                 That's fine with me.

18                 Dr. Dorris, are you okay with a

19   lunch break now?

20            THE WITNESS:

21                 Yes, I'm easy going.  I mean I don't

22   need one, but if you guys want one, let's do it.

23            MR. BOORMAN:

24                 Okay.  Great.  30 minutes?

25            MR. DIDRIKSEN:

1              I think that should do.

2    (A lunch break was taken.)

3    BY MR. DIDRIKSEN:

4         Q.   Are you intending for your opinions

5    today to include telling us what a firm-level

6    surface is?

7         A.   I don't think -- I mean I'm not going to

8    add any more, I don't think, to that description.

9    I think the only reference I made -- I have not

10   been to the scene, so the only reference I made

11   in my report was it appeared that there were some

12   first responders that would not agree or seemed

13   to disagree with that characterization, but I

14   have not been to the scene and I'm not going to

15   add any more language or qualifications to that.

16        Q.   So you personally do not have an opinion

17   as to whether it was parked on a firm-level

18   surface one way or the other, correct?

19        A.   I do not because I have not been to the

20   scene.  It just seems that they were at least

21   some witnesses that didn't agree to that, but not

22   based on independent evaluation, no, sir.

23        Q.   Are you aware that 2006 was the first

24   year that Chrysler Grand Caravan were stored with

25   Stow 'n Go seating?

1     A.    I know there was discussion about that

2   being a new feature, I guess I couldn't say I

3   paid attention to say if it was 2006 or maybe a

4   model year or two earlier, but it was a

5   relatively new feature, at least I guess is my

6   memory, but I'll defer to the Chrysler witnesses.

7     Q.    All right.  Well, I would like for you

8   to assume that the first year was 2006 for Stow

9   'n Go vehicles.  All right?

10     A.    Okay.  Yes, sir.

11     Q.    So if that assumption is true, then what

12   special activities do you think Chrysler should

13   have undertook to make sure that the new features

14   that only existed for the first time on these

15   2006 vehicles would be adequately addressed in

16   the instruction manual?

17     A.    Well, there is no one set of activities

18   that has to be conducted.  It's my understanding

19   that they talked about doing engineering

20   evaluations, doing work with prototype mockups,

21   doing kind of what they call clinics, both with

22   internally and externally participants.  So those

23   are all appropriate things in terms of trying to

24   evaluate a new feature and get feedback in terms

25   of interaction.  But from a human factors

1    perspective, there is not one specific

2    methodology or activity to do to evaluate either

3    the written instructions or the features

4    themselves.

5         Q.   Have you been given copies of any either

6    internal or external clinics that were conducted

7    to test the language in the instruction manual?

8         A.   I don't recall seeing any documentation

9    other than the testimony of the witnesses.  So if

10   something has been produced, I guess I have not

11   seen it or haven't recognized it.

12        Q.   As part of your studies, did you not ask

13   whether there was any documentation of any

14   clinics, either internal or external, to test the

15   new language for the new owner's manual?

16        A.   I guess my memory is there -- from

17   reading the depositions, at least I got the

18   impression there wasn't some specific

19   documentation or it wasn't available if there was

20   some.  But I mean I perhaps am misattributing it.

21   I don't recall making a specific request in terms

22   of responding to your question, but I think I had

23   the impression that there wasn't documentation

24   available.  And I believe I got that from reading

25   the testimony.

1      Q.   So you today at least know of no

2   documentation that supports the claim that there

3   was any clinics, either internal or external, to

4   test the adequacy of the new language that was

5   put in to the owner's manual that related to Stow

6   'n Go seating?

7      A.   Other than testimony, I don't recall a

8   specific document, if that's what you're asking

9   about.  No, sir, I can't point you to a document.

10      Q.   And you don't recall any testimony of

11   anyone who actually attended such a clinic

12   either, do you?

13      A.   My memory -- and I may be incorrect.

14   But my memory is I don't recall any of the

15   Chrysler witnesses saying if they participated,

16   but I may be mistaken about that.  There were

17   several, maybe three or four, witnesses that

18   talked about the process but I'll have to defer

19   to them.  I can't point you to one as I sit here.

20      Q.   All right.  If you look at page 378 of

21   the owner's manual, under a title Spare Tire

22   Stowage Stow 'n Go Seating -- tell me when you

23   get there.

24      A.   Under the right-hand column, yes, sir.

25      Q.   It says, For vehicles equipped with Stow

1    'n Go seating, the spare tire stowed inside a

2    protectable cover located under the center of the

3    vehicle by means of the cable wench mechanism.

4    The spare tire drive nut is located on the floor

5    under a plastic cap between the front seats."

6         It is your understanding that when they

7    first moved the spare tire to that location, that

8    would have justified the creation of this new

9    paragraph that described this new location for a

10   spare tire, correct?

11   A.   I guess I don't recall the testimony in

12   that sufficient detail.  But if this was a new

13   location and a new mechanism for lowering it,

14   then that, you know, is it reasonable to conclude

15   that that is new information in a manual, then

16   yes.  But I guess I can't confirm from memory,

17   you know, if that's, you know, accurate or not.

18   Q.   The next paragraph says, The tool pouch

19   contains three pieces and can be assembled into a

20   spare tire hook to remove the compact spare tire

21   cover assembly from under the vehicle or a wench

22   T-handle to raise/lower the compact spare tire

23   cover assembly.

24        Do you see that language?

25   A.   Yes, sir.

1    Q.   There is no explanation -- there is no

2    words used to explain how to assemble either the

3    spare tire hook or the wench T-handle, is there?

4    A.   Not on this page.  On the next page as

5    it lies open, there is a diagram that talks

6    about -- or depicts the components and the

7    configuration, and there is some words indicating

8    which is the wench T-handle and which is the

9    spare tire hook.  But in terms of on this page

10   378 in that right-hand column, I would agree.

11   Q.   Let me try again.  Looking at page 378

12   and 379, there is no set of words used to

13   describe how to assemble a spare tire hook or how

14   to assemble the wench T-handle on either page, is

15   there?

16   A.   You know what, I think that is a little

17   too broad.  If you look at No. 2, the paragraph

18   that's numbered 2 on page 379, they talk about

19   assembling the wench T-handle extension to form a

20   T, so there are words that appear there.

21   Q.   The main instructions -- would you agree

22   the main instructions on the way in which to use

23   the different pieces to assemble this spare tire

24   hook or the wench T-handle, is the diagram on the

25   left-hand column on page 379?

1        A.    I mean that's the only diagram.   There

2    is information -- there is some wording,

3    obviously, in the manual, there is some wording

4    embossed on the extension pieces themselves, but

5    I mean I guess it's fair to call it the main

6    because it's kind of the diagram showing how the

7    three pieces would fit together.   I mean I guess

8    I wouldn't argue with characterizing it as

9    "main," but there is information in other places

10   as well.

11       Q.   How do you think they picked the coin --

12   the phrase "spare tire hook"?

13       A.    I don't recall that being asked.   I

14   don't have any information how they specifically

15   decided on it.   I mean it describes what the

16   purpose is, so I think, you know, it's reasonable

17   to look at it and say the title or the name is

18   describing what it's used for, but I can't

19   have -- I don't recall any testimony and I don't

20   have any independent knowledge.

21       Q.   What does a "hook" mean to you?   Or let

22   me ask that differently.

23            How do you define the word "hook"?

24       A.    Well, again, I think generally a hook

25   would be something that you can grab with, in a

1    very broad sense.  Obviously, you know, the
2    context in which it's used may bring something
3    specific to mind.
4            So if we're talking about fishing and I
5    say I need another hook, I think most people
6    would think it's a fish hook.  But, you know, in
7    this context, talking about a spare tire hook, it
8    would be to reach the location of the tire to
9    grab it in order to retrieve it.  So I think
10   generally a "hook" would be something that would
11   be capable of not only -- you know, grabbing a
12   hold of, for lack of a better description, but
13   you're able to retrieve something, you're able to
14   kind of take hold.  You know, it's probably not
15   the best way to articulate it, but I'm trying to
16   give you a very clear, but, you know -- I think
17   just saying "hook" in general could be quite
18   broad.
19       Q.   The goal of the words used in the
20   owner's manual is to be able to communicate with
21   a common man, correct?
22       A.   Yeah, I think I understand what you're
23   saying.  Yes.  There is not -- there is not a
24   reason to assume anything other than kind of
25   licensed drivers when you're talking about an

1  owner's manual for a vehicle, that this is for

2  the United States or, you know, North American

3  market.  But in terms of are you -- you're not

4  contemplating any specific degree of education or

5  specialized training, no, sir.

6      Q.   Do you agree that most people when they

7  think of "hook," when you say "hook" to someone,

8  they normally think of something that normally

9  looks like a fishing hook?

10     A.   Yes, it's going to be -- have a bend

11 sufficient that you can grab hold.  If I just

12 said hook, you know, people might think of

13 Captain Hook, they might think of a fishing hook.

14 I think the context is important, what are you

15 talking about in order to direct them.  But to

16 me, I like to fish, so fishing hook comes to mind

17 pretty quickly.

18     Q.   I'm going to say that fishing hook is

19 the first thing that comes to mind for me too or

20 a hook used for picking up straw bales or Captain

21 Hook's hand which is kind of like what a hook

22 would look like for picking up a straw bale.  All

23 of those hooks that we're talking about that come

24 to mind for you and for me, all turn back on

25 themselves, don't they?

1      A.    I guess I don't know -- lucky enough not

2  to have worked on a farm and had to pick up a

3  straw bale, so I'm not sure what that looks like.

4  But a fishing hook for sure has more of a radius

5  and tends to kind of loop back towards itself.

6  But, you know, I think the point being that there

7  is sufficient bend or radius to allow you to

8  grade hold of something, you know, and pull back

9  and, you know, keep a hold of it as you're

10  pulling on it.  But certainly a fish hook I think

11  more of kind of a bend or radius rather than a

12  90-degree turn, if that's what you're asking.

13  But I don't think that is to the exclusion of

14  other designs.

15      Q.    Okay.  And in that picture on page 379,

16  as you point out that what's been named the spare

17  tire hook just has a 90-degree bend at the end

18  and kind of looks like a long shank bill, right?

19      A.    I would characterize it as 90 degrees.

20  I didn't measure it, but approximately.  Yes,

21  that it's a long -- so that you can reach under

22  the vehicle and it has a bend that I think is

23  approximately 90 degrees, I think that's a fair

24  description.

25      Q.    It doesn't really look like a hook when

1    you -- what pops into your mind is what a hook

2    would look like, does it?

3         A.   I think in this context, it -- I don't

4    look at it and I never looked at this diagram and

5    said, Boy, that doesn't look like what I

6    expected.  You know, if we're talking about a

7    fishing hook and you put a fishing hook next to

8    it would it look somewhat different, sure, I

9    think it would.  But in terms of explaining that

10   the intention is to get the spare tire to be able

11   to grab a hold of it, I think people would be

12   able to understand the terminology "hook."

13            So I guess I haven't thought of it as

14   somehow inconsistent in terms of the design of 90

15   degrees with the terminology "hook."

16        Q.   Or since it's just a plastic item, they

17   could have put a radius on it and made it look

18   like a fishing hook and it would be easier to

19   understand what a purpose would be, wouldn't it?

20        A.   I'm not sure you could use it if it

21   looked like that, though.  I think the fact that

22   you're reaching under and trying to grab a hold

23   of it -- you know, a fishing hook is used very

24   differently.  It's hooking into the corner of the

25   fish's mouth, we hope.  I mean could they have

1    made it differently?  I guess I don't know of a

2    reason why not, but you would have to ask the

3    folks at Chrysler.  But if you did something like

4    that, I think that may impact your ability to use

5    it, and it's kind of -- that would be a negative

6    trade-off compared to, you know, something that I

7    don't think causes any confusion and I haven't

8    seen any evidence that there was any confusion,

9    you know, in this particular case.

10        Q.    A fishing hook is also used to pull

11   something out of the water that you can't

12   necessarily see until you hook it, right?

13        A.    Oh, sure, that you may not see the fish

14   before it bites down?  Sure.

15        Q.    Right.  And if this -- if this was

16   shaped more like a fishing hook, you might

17   understand that you're going fishing under the

18   vehicle hoping to hook the spare tire that's kind

19   of difficult to see because of the strange

20   location, right?

21        A.    I just don't agree with that, you know,

22   description.  I think you can see the spare tire

23   when you lower it with the wench, you can look

24   under, you can see it.  In terms of

25   understanding, you know, using a hook to reach in

1    and grab it, I think that would be understood.  I

2    don't think that, you know -- I guess I would say

3    to the extent you're suggesting it needed to look

4    more like a fishing hook, that I guess I haven't

5    thought about that today, that's not what, you

6    know, Dr. Householder or anybody has said.  To

7    the contrary, he seemed to think that the

8    45-degree angle of the jack handle would be

9    confused.  So just thinking about it, I don't

10   think that it would add anything in terms of

11   making it look like a fishing hook, and it's not

12   clear that you could use it.  But I wouldn't

13   describe the activity as really kind of going on

14   a fishing trip.  I think you're reaching under

15   with this device to grab hold and pull it out,

16   and I think that's understood by the illustration

17   as well as the written instructions.

18        Q.   You think that the fact that it was

19   twilight and the sun was going down had any role

20   that it played in this accident?

21        A.   I'm not aware of that.  I haven't heard

22   any description that or suggestion that Seanesee

23   had any difficulty in visualizing or seeing

24   anything.  So I'm not aware of the time of day or

25   lighting level having impacted this.  You know,

1    if you're working on a car and you need more

2    light, a lot of times you can do that.  Phones

3    these days have flashlights on them.  But I guess

4    I'm not aware of any evidence.

5          Q.   So on the jacking instructions, No. 1

6    talks about loosening wheel nuts, No. 2 says to

7    remove the compact spare tire cover assembly,

8    assemble the wench handle extensions to form a T

9    and fit the wench T-handle over the drive nut,

10   rotate the nut to the left approximately 33 turns

11   until the wench mechanism stops turning freely.

12   This will allow enough slack in the cable to

13   allow you to pull the spare tire out from under

14   the vehicle.

15          You've read that before, I'm sure, huh?

16     A.   Yes, sir.

17          Q.   And it is the goal of an owner's manual

18   to communicate what's needing to be done to the

19   common man, right?

20     A.   You want to convey information so that

21   it could be understood by the audience, yes, I

22   agree with that.

23          Q.   And so you should -- the expectation --

24   I'm starting the sentence all over again.  I keep

25   flaying about in my use of words.  It's part of

1    my problem with being an engineer first.  I don't

2    always get my sentences out all in order.  Let me

3    try again.

4           The common man is supposed to understand

5    from this language that this T-handle has to be

6    turned 33 times until the mechanism stops turning

7    freely, right?

8        A.   No, I don't think that's what it's

9    conveying.  It said approximately 33, but it says

10   to rotate until it stops turning freely.  And

11   they qualify that and they said approximately 33.

12   But it's not -- I guess the way you worded it, it

13   sounded like you're only turning 33 and then

14   stopping.

15       Q.   Now, are you aware that the mechanism

16   has to be turned 47 turns until it stops turning

17   freely?

18       A.   I know that -- I think that activity has

19   been done on the subject vehicle and it was more

20   than 33, I just can't tell you from memory I

21   recall the number in terms of -- until it stopped

22   turning, what it was for the subject vehicle.

23       Q.   You think 47 turns is approximately 33?

24       A.   Sure.  In terms of, you know, it's more

25   than you might guess.  I mean it's a lot, a lot

1    of rotations.  So I don't think that -- in the

2    context of the sentence, that approximately 33

3    would somehow cause someone to stop turning at 33

4    turns --

5          Q.   If you go to a restaurant --

6          A.   -- in terms of the information.

7          Q.   If you go to a restaurant and the

8    waitress tells you, oh, that cost $33 and then

9    she hands you a bill for 47, you think that would

10   be approximately 33, 47?

11         A.   I think in that context I wouldn't say

12   it's approximately.  But if she said it's

13   approximately $33 and it turned out it was 47, I

14   don't know that I would have a quibble there.

15   But if she told me a definitive price and it

16   turned out to be different, I certainly would ask

17   about it.

18         Q.   What does it mean to you -- and I guess

19   really the question is, what would it mean to the

20   jury, the phrase "this will allow enough slack in

21   the cable to allow you to pull the spare tire out

22   from under the vehicle"?

23         A.   Well, it's explaining why you're

24   undertaking this activity.  It's explaining why

25   you should rotate until it stops turning freely,

1    and it's explaining that you will have enough

2    slack in order to retrieve the tire.  It's not

3    directing you to retrieve it yet, it's not,

4    saying you know, anything along those lines;

5    however, it is explaining why you're rotating the

6    nut until it stops turning.

7         Q.   And it says it will allow you enough

8    slack in the cable to allow you to pull the spare

9    tire out from under the vehicle.  That is telling

10   you that at some point in this process you are

11   going to have to pull the spare tire out from

12   under the vehicle, correct?

13        A.   I would agree with that, at some point

14   the tire has to be pulled out, yes, sir.

15        Q.   Now, if Mr. Richardson completed No. 2

16   with the help of his mom and the wench mechanism

17   was turned until it stopped turning freely, at

18   that point the cable is slack enough to allow him

19   to pull the spare tire out, right?

20        A.   Let me just make sure I understand.  If

21   it were turned -- in the hypothetical, if it had

22   been turned until it stopped, that should allow

23   enough slack to pull it out from underneath?

24   Yes, sir, that's my understanding, and I believe

25   that's been demonstrated on the subject vehicle

1    as well.

2         Q.   But now in his particular car, the

3    height of the spare tire was 6 3/4 inches and the

4    space underneath the exhaust pipe was only 5 1/2

5    inches, correct?

6              MR. BOORMAN:

7                   Objection.  Vague as to location.

8                   But please answer if you can.

9              THE WITNESS:

10                  I know there has been an issue in

11   terms of, you know, what were the measurements

12   and what was the subject vehicle and those sort

13   of issues at various points of clearance.  I

14   can't tell you I recall the specific numbers,

15   it's not something I focused on, but I know that

16   -- I think Mr. Sullivan and Dr. Vogler have kind

17   of addressed that issue.

18   BY MR. DIDRIKSEN:

19        Q.   All right.  But you understand that in

20   the Richardson's vehicle there are the space

21   between the exhaust pipe and the ground was

22   shorter than the side height of the spare tire,

23   correct?

24        A.   I just can't agree, you know, in terms

25   of specific dimensions, the tire versus, you

1    know, the available clearances of those things, I

2    would have to defer to others that have seen the

3    subject vehicle and done measurements.  I know

4    there is an issue in discussing about -- about

5    if, you know, I guess the scenario if there is

6    not sufficient clearance available, would a user

7    understand, you know, that they could potentially

8    jack up the vehicle or they could try and pull it

9    from the other side.  I guess that's how I looked

10   at the issue.  I just have -- I can't agree on

11   the question in terms of what the dimensions are,

12   because I just don't know.

13       Q.   Would it be important to you in

14   considering warnings as to whether the dimension

15   was insufficient to allow the spare tire to come

16   out?

17       A.   I think the answer is, as I understand

18   your question, no.  In terms of what I've

19   understood that issue in this case, you know,

20   there has been discussion about over time vehicle

21   changing, you know, sag in the suspension or

22   other reasons, I couldn't give you a list or tell

23   you, you know, that I have any independent

24   evaluation of that.  But looking at it from a

25   warnings perspective, I think there is sufficient

1    information to address that potential scenario.

2    You don't have to pull the spare tire from the

3    passenger side where you're intending to change

4    it, you could pull tell from the other side of

5    the vehicle.  And it's my understanding, you

6    know, the muffler is routed on the passenger

7    side, not on the driver's side.  Additionally, I

8    think the information is clear that if for some

9    reason -- they specifically talk about if a tire

10   is flat.  But if there is some clearance issues,

11   you could use the jack to jack up the vehicle to

12   raise it just enough for clearance, I think I

13   talk about this in my report, but that's a later

14   portion of the instructions.  But I think there

15   is information that addresses that potential

16   scenario.

17        Q.   So you would agree if the -- if you get

18   to that step and you're trying to move the tire

19   out from under it and you have insufficient

20   space, that what you need to do at that point is

21   to jack it up?

22        A.   Well, if you assemble the spare tire

23   hook and try to pull it from the passenger side

24   and were unsuccessful, you could try it from the

25   other side.  The instructions do not require you

1   or direct you to pull it from the passenger side.

2   Is it an option that you could raise the vehicle

3   enough for clearance, I would agree with that.

4   But it's not -- the instructions are not telling

5   you that's what you have to do.  But I -- if you

6   had attempted to remove the tire using the spare

7   tire hook and had a clearance issue, you know,

8   then you would have to address that.

9        Q.   All right.  And so you don't actually

10  fault Mr. Richardson for believing that he had to

11  use the jack to lift the vehicle a little bit in

12  order to get the spare tire out from under the

13  side of the car?

14       A.   Well, that's not my understanding.

15  Again, we've talked about we don't have any

16  specific knowledge about what his understanding

17  or what his belief was.  In terms of my

18  understanding of the events, the vehicle had been

19  raised and then he attempted to get to the tire,

20  so there is no description of any attempt to try

21  and retrieve it and having clearance issues

22  before trying to get underneath the vehicle.  And

23  we know that he did not have the spare tire hook

24  because his mother had those extensions formed as

25  the T-wench handles.  So I guess we don't know

1      what he was specifically thinking as we've talked

2      about earlier today, but I guess that

3      hypothetical you were asking me doesn't really

4      comport with my understanding of, you know, the

5      facts in the case.

6                But if somebody had to raise the vehicle

7      a little bit to get clearance to pull out the

8      tire in accordance with the available warnings

9      and instructions, I wouldn't be critical of that.

10         Q.   If someone attempted to use what they

11     thought was a spare tire hook, the spare tire and

12     its carrier out from under and it wouldn't work,

13     are you specifically critical of somebody

14     reaching under the vehicle, just simply reaching

15     with their arm to grab hold of the spare tire and

16     its carrier and drag it out?

17         A.   I mean I think the answer is yes as

18     we've talked about.  That is inconsistent with

19     the available warnings and safety information.

20     So I'm not -- I would not say that it's

21     appropriate to violate the warning to reach

22     underneath with your arm and whatever portion of

23     your body additionally you need to get under

24     there and try and reach it either with your hand

25     or some other tool that's not the spare tire

1    hook.  I would also say that using something

2    other than the spare tire hook is not consistent

3    with trying to follow the instructions, you know,

4    going from one step to another that kind of

5    reflects an attempt to use your own judgment, I

6    guess, rather than rely upon information in the

7    manual.

8         Q.   Do you know what the dimension is from

9    the edge of the car to the edge of the spare tire

10   carrier?

11        A.   I don't know off the top of my head, no,

12   sir.

13        Q.   Do you know the dimensions of the car at

14   all?

15        A.   Not from memory no, sir.  I mean I've

16   seen it in person, but -- I've seen an exemplar

17   in person, but I think Dr. Vogler and Dr. Gwin

18   and, you know, perhaps Mr. Sullivan and

19   Dr. Householder have some measurements, but I

20   just don't recall what they are.

21        Q.   Where did you see an exemplar?

22        A.   It was here in the Atlanta area.

23        Q.   Was it at a law firm's office?

24        A.   No.  I don't recall the -- I don't

25   recall the facility name, but it was being stored

1    somewhere on the north side of Atlanta.

2         Q.   When you visited the vehicle, what was

3    its condition?

4         A.   The exemplar seemed to be in fine

5    condition.  I photographed it and I think we

6    produced those photos to you in terms of

7    describing it overall, I don't know that I, you

8    know, could do more than what you can see.

9         Q.   Did you make any specific measurements

10   on the exemplar?

11        A.   I don't think I guess made any specific

12   measurements of the vehicle itself, I think I may

13   have taken some photos of the tools or the jack

14   itself with a tape measure present just to give

15   it some reference.  That's my memory.

16        Q.   And it's your belief that you produced

17   your photos in response to -- in advance of your

18   deposition today?

19        A.   That was my understanding.

20        Q.   Do you recall what date you took the

21   photographs?

22        A.   It was, I think, early October of 2020.

23        Q.   And at the time that you took your

24   photographs was the vehicle having any work done

25   on it?

1      A.    No, sir.  It was -- it had been stored

2    at this facility and it wasn't undergoing any

3    sort of other inspection or other repair work or

4    anything.

5      Q.    Did you specifically ask whether there

6    had been any repair work done on the vehicle?

7      A.    I did not, to be honest.

8         MR. DIDRIKSEN:

9            I need to take a five-minute break.

10   (A short recess was taken.)

11   BY MR. DIDRIKSEN:

12     Q.    Do you have your photos available to

13   you?

14     A.    I believe so, yes, sir.

15     Q.    Do you remember what was the condition

16   of the tires at the time that you saw the

17   vehicle?

18     A.    They were inflated.  I did not measure

19   to see -- you know, take a measure of what the

20   pressure was.  But the tires seemed -- I just

21   don't recall any defects that I saw, they were

22   just all four inflated.

23     Q.    All right.  Do you know if they were

24   essentially new tires?

25     A.    I don't recall as I sit here.  I don't

1    recall them, you know, being particularly worn

2    out from memory, but...

3         Q.   Would it matter to you whether they were

4    new or old?

5         A.   Not to me specifically.  I know that

6    that issue of clearance has come up and that

7    others are looking at that and evaluating it and

8    have tried to do so systematically.  But for my

9    purposes, looking at an exemplar, it was really

10   to be able to perform a task analysis.

11        Q.   All right.  So for you, it didn't really

12   matter whether there were new tires or old tires

13   or how big the clearances were?

14        A.   Correct.  I was not attempting to

15   measure that.  It's my understanding others were

16   looking at those issues.

17        Q.   You did not attempt to make measurements

18   related to interference between the exhaust and

19   the tire, correct?

20        A.   I did not attempt to make measurements,

21   that's correct.

22        Q.   But the exemplar as it was presented to

23   you, were you able to pull the spare tire out

24   from under the exhaust pipe?

25        A.   I was.

1   Q.   And I can't remember what your answer

2   was.  Did you specifically ask them whether they

3   had done any work on the vehicle before you saw

4   it?

5   A.   I don't recall asking that question, so

6   I don't think that I did, but nothing was

7   reported to me, you know.  I don't know the

8   history of that vehicle.  I didn't get like a

9   CARFAX report or anything like that.

10   Q.   You didn't ask the facility that was

11   holding it what work, if any, they had done on

12   it?

13   A.   Correct.  I mean as far as I know, they

14   are just a storage, you know, facility not -- not

15   a repair shop or anything.  So I guess my

16   expectation is they hadn't done anything, but I

17   did not specifically ask.

18   Q.   On page 381 of the Jacking and Changing

19   of Tire section, it repeats the exact words

20   inside a warning box that are used on the very

21   first warning box in the Jacking and Tire

22   Changing section, correct?

23   A.   I believe that's correct, the first

24   bullet in that page 376, I believe that's

25   correct.

1      Q.   But those words are, been reproduced --

2   just the first bullet of the three bullets, is

3   reproduced inside a warning box on 381, correct?

4      A.   Yes, sir.

5      Q.   And under that it says, If either front

6   tire is flat, it may be necessary to jack up the

7   vehicle to remove the contact spare tire covering

8   assembly from under the vehicle.  Refer to Jack

9   Engagement locations in the following steps for

10  Proper Jack Placement, correct?

11     A.   I believe you read that correctly, yes,

12  sir.

13     Q.   Okay.  So the Jack Engagement

14  instructions are on the next two pages, next

15  three pages, correct?

16     A.   Well, I believe that the diagram appears

17  on page 383, and 384 there is some description

18  verbally.  And page 382 just kind of generally

19  refers that there are two engagement locations on

20  each side of the body.

21     Q.   Okay.  So in terms of the jacks, the

22  instructions that are -- that are provided on

23  jacking of the vehicle are on pages 382, 383 and

24  384, correct?

25     A.   In terms of engagement, that's correct.

1    Q.   All right.  And the diagram that's on

2    383 shows a jack with the sill located

3    immediately above a pivot point on a jack,

4    correct?

5    A.   I think I understand what you're asking

6    me.  But it looks like there is a pin on the jack

7    head.  I don't know if somebody would look at

8    that and think that's a pivot head, but there

9    seems to be kind of a rivet and it appears kind

10   of more in line with the flange one way or

11   another, I think that's correct.  I understand

12   people have talked about that, and I don't

13   dispute that.

14   Q.   Wait.  What did you call that, little,

15   round object again?  You called it a --

16   A.   I think somebody might look at it and

17   think it's kind of like a rivet.

18   Q.   Okay.  So you're looking at this

19   diagram, you see that there is a rivet on the

20   side of the jack head and that the sill seems to

21   be engaged on top of that jack just above the

22   rivet, correct?

23   A.   Well, the rivet is a little hard to tell

24   from the illustration, but it's, you know, close

25   to if not in line with the civil flange.  But I

1    think the illustration shows the sill flange

2    coming down into a channel on the jack, so that's

3    how I would describe it.

4         Q.   And the sill flange seems to be

5    approximately over the rivet head?

6         A.   The pen -- yes, I think the pen is, you

7    know, close to the sill flange in this

8    illustration in terms of, you know, I think

9    people talk about that and described it.  I don't

10   think it's a major reference point for

11   individuals, but in this illustration, does it

12   look, you know, at least close to the sill

13   flange, you know, at least in this kind of

14   illustration, I think it does.

15        Q.   And would you agree in this illustration

16   the wide, flat part of the jack head does not

17   appear to be in contact with the underside of the

18   sill?

19        A.   Not in this snapshot, right.  I mean I

20   think it's -- it's showing how the sill flange --

21   it's kind of showing what is being described on

22   the next page in that the sill flange is

23   engaging, going into this channel.  And it

24   doesn't look like in this illustration that kind

25   of the flat jack head has come into contact with

1    the underbody yet, but it's raising up.

2         Q.    Okay.   But in this illustration, the

3    sill flange is already seated in the bottom of

4    the -- what you described as the little channel

5    above the rivet head, correct?

6         A.    I don't think -- I don't think I would

7    agree with that.   It looks as though it's getting

8    close to the bottom, but I don't think you could

9    look at this and determine, you know, is that

10   bottomed out or not.

11        Q.    All right.   Now, you've seen pictures of

12   the actual jack that are provided with the

13   vehicle, have you not?

14        A.    I've seen photos of the subject jack.

15   I've seen and used an exemplar jack with the

16   exemplar vehicle, and I have obtained an exemplar

17   jack since the time of my report.

18        Q.    All right.   This is the subject jack.

19   Can you see it?

20        A.    I mean to some extent, yes, sir.

21        Q.    And is this jack similar to the exemplar

22   jack you had?

23        A.    I believe so.   I mean from the side

24   profile, I think it looks similar.

25        Q.    And you agree that this jack, the jack

1    head of this jack, is not the same as the jack

2    head in the illustration on page 383?

3        A.   I've heard people describe, and I don't

4    dispute there are some, you know, slight

5    differences, but I think as I talk about in my

6    report, that this is an illustration and not an

7    attempt to be, you know, a CAD drawing or a

8    photograph.

9            But, yes, you can point to some things

10   and say this looks a little bit different than

11   what you see in a physical drawing, yes, sir.

12       Q.   Then if Mr. Richardson attempted to use

13   the jack that was provided with the vehicle in

14   the same fashion as is shown in the illustration

15   on page 383, do you have a complaint about him

16   attempting to do that?

17       A.   If he attempted to use it as

18   illustrated, I think when you attempt to do that,

19   you would seat the flange inside the channel on

20   the jack head.  I think it would look like -- and

21   I've talked about this in my report and have some

22   photographs to kind of show, that would be what

23   has been, I think, identified and agreed as

24   proper engagement.

25           In terms of the kind of alternative of

1   what Dr. Householder has proposed, I would not

2   characterize that as similar to this

3   illustration, and so I don't -- you know, I would

4   not characterize it in that way.  So when you say

5   similar to the illustration, to me that means

6   having it properly engaged as has been talked

7   about by witnesses.

8        Q.   What do you -- how do you describe or

9   define the word "engage"?

10       A.   Well, I think in this context, it's

11  talking about the flange coming down into this

12  channel, so it's kind of locking in or

13  interlocking in the channel.  I don't know -- you

14  know, obviously there can be, you know, to some

15  extent multiple definitions.  I mean if you get

16  engaged, you're usually talking about marriage.

17  But if I'm engaging, people are listening to me.

18  But I think when you're talking about mechanical

19  engagement, you're talking about, you know,

20  it's -- it's, in fact, kind of in between or

21  inserting into in a way like that.  I mean that's

22  just my kind of general description in trying to

23  describe it.

24       Q.   All right.  So if you turn to page 384,

25  item 6, it says, These locations are on the sill

1    flange of the body and consist of a pair of

2    down-standing tabs.  So that sentence is trying

3    to tell you where along the sill flange you're

4    supposed to lift, in between the tabs, correct?

5        A.   Yes, sir.  It's referring to the

6    illustration that's labeled Jack Engagement

7    Locations.  So that's what refers to as "these

8    locations."

9        Q.   And then the next sentence says, The

10    jack is to be located, engaging the flange

11    between the pair of tabs closest to the wheel to

12    be changed.

13        So that -- the words are you put the

14    jack -- I guess that means the jack goes into the

15    two down-standing tabs and is supposed to engage

16    the flange between those pairs, right?

17        A.   Yes, sir.  It's giving you info- -- I

18    guess kind of two pieces of information there,

19    you know, where relative along the body of the

20    vehicle are you going to place your jack as you

21    raise it up, how should it actually come into

22    contact with the vehicle itself, and it's talking

23    about engaging the flange.  So I think it's kind

24    of relative on the vehicle as well as relative to

25    the jack and the flange itself.

1      Q.   So now where, if anywhere, in the

2   instruction manual does the instruction manual

3   define what is meant by "engaging the flange"?

4      A.   I don't think there is a definition of

5   it in terms of describing it, I think they do it

6   verbally, you know, in writing, as well as

7   through the illustration that we looked at.

8      Q.   The flange that you -- your

9   understanding of the sentence is they're talking

10  about the sill flange still, correct?

11     A.   Yes, sir.  They describe the flange as

12  having the down-standing tabs, and it's my

13  understanding that's what has been referred to as

14  the sill flange.

15     Q.   And then it says the jack is to be

16  located engaging the flange between the tabs

17  closest to the wheel to be changed.  And engaging

18  the flange is not defined anywhere, is it?

19     A.   There's not a digitally verbal

20  definition, there is an illustration showing that

21  the flange itself inserting into the grove or

22  engaging into the slot.

23     Q.   Now, on the jack that was actually

24  provided with the vehicle, it has -- it has

25  little sideways slots on the top of the jack

1    head, doesn't it?

2         A.   No, sir.  I think -- I saw what you were

3    pointing to and I would describe those more kind

4    of as dimples.  They don't go across the body of

5    the jack head, you couldn't insert anything in to

6    those.  There is dimples on both sides, but there

7    is nothing connecting them.

8         Q.   Where, if anywhere, do the instructions

9    use the word "insert"?

10        A.   As it relates to this engagement,

11   they're calling it, you know, engage or

12   engagement, they don't say "insert."  That's my

13   word, you know, in our discussion today.

14        Q.   I see.  So that's not in the instruction

15   insert anywhere?

16        A.   Well, as it relates to No. 6, I don't

17   think it says "insert."  Obviously, you just read

18   the sentence where it talks about engaging the

19   flange, it talks about, you know, and refers you

20   to the illustration.  But in describing that,

21   yes, I said "insert."

22        Q.   Yes, but if you look at all of the words

23   in instructions 5, 6 and 7, the word "insert"

24   never appears?

25        A.   I think that's correct, yes, sir.

1    Q.    And there in 5, 6 and 7, there is no

2    definition of "engaging the flange"?

3    A.    Not a verbal definition, if that's what

4    you're asking.  As I said, there is an

5    illustration depicting that the flange going into

6    the slot, that that's -- you know, then they

7    describe that verbally as engaging the flange in

8    No. 6.  But if you're simply asking if there is

9    another sentence defining "engage," no, sir.

10   Q.    And in the illustration that you're

11   referring to is entitled Jack Engagement

12   Locations, not Jack Engagement --

13   A.    I missed the last -- I'm sorry.

14   Q.    Here on page 383, all of the words on

15   that page are Jack Engagement Locations, correct?

16   A.    Well, that's the title of the

17   illustration.  There is words in terms of the

18   section heading.  But in the title of that

19   illustration, you're correct.

20   Q.    And the locations that are indicated on

21   that drawing are behind the front wheel and in

22   front of the back wheel in between down-standing

23   tabs, correct?

24   A.    Yes.  I mean I think I understand your

25   question.  And, yes, they're showing there are

1   two locations on this side (indicating).  The

2   preceding instruction explains that there are two

3   on both sides, so four total.  And then they have

4   -- they don't show the jack engaging in the kind

5   of overall picture of the minivan, but in the

6   exploded view, they now have added the jack and

7   they're showing how it, in fact, engages with the

8   sill flange.

9        Q.   But the picture of the jack, we agree,

10  in that little blown-up circle on page 338, that

11  jack head is different than the jack head that

12  was delivered with the vehicle?

13       A.   I think we've talked about you could

14  point to things and say there are some

15  differences.  I think there are definitely

16  similarities.  I think based on the information,

17  not only the illustration and the written

18  instructions, but a physical interaction

19  attempting to do this, I think users can

20  understand it.  But could you point to something

21  and say this looks a little different than the

22  physical jack, sure.

23       Q.   And whether the users can understand it

24  or not, that's actually going to be up to the

25  jury who is a representative group of possible

1   users of this instruction manual, correct?

2       A.   I mean I don't know who the jury pool

3   will be, but they're, you know, ordinary people

4   obviously.  And will they ultimately -- you know,

5   I think this kind of goes back to that line of

6   questions, sure.  Are they going to come to their

7   ultimate decision if this goes to trial?  You

8   bet.

9       Q.   Is there any reason in your mind why

10  Chrysler failed to say that the flange -- the

11  sill flange has to be inserted down in to some

12  portion of the jack head?

13      A.   Well, I mean I disagree that it's a

14  failure.  I think I understand your question.

15  And, you know, could you word it differently?  Of

16  course you could.  I think we talked about that

17  earlier in this deposition, is there's not one

18  right way.  But I don't think there is anything

19  deficient in terms of the instructions when you

20  look at it again.  Not only the illustration, not

21  only the verbal or written instructions, but also

22  the physical interaction afforded by the tool

23  itself in a vehicle.  I don't think -- you know,

24  I don't know see a basis to say it's confusing,

25  particularly when you look at what is the

1    alternative.  And the alternative is proposed by

2    Dr. Householder, and I kind of characterize it as

3    trying to balance a knife edge on top of a seesaw

4    because the head does pivot because it's a very

5    small interface, for lack of a better term, of

6    the sill flange resting on top in his high

7    hypothesis.  So that does not look a like the

8    illustration.  And so I guess I'm left with, you

9    know, looking at it, I don't see any basis to say

10   -- and he hadn't produced any data or studies or

11   any information again to kind of support his

12   hypothesis in that regard.

13        Q.   You agree that the choice of phrase of

14   engaging the flange is a poor choice of words?

15        A.   No, sir, I disagree for the reasons

16   we've talked about today.

17        Q.   Don't you agree that you can engage two

18   surfaces on a knife edge?

19        A.    I don't think I would call that engaged,

20   I would call that more precarious.  I think a

21   knife's edge weighing down with a vehicle on top

22   of a horizontal surface, whether it pivots or

23   not, that could be precarious.

24        Q.   Do you think of "engaging the flange" as

25   an -- to be an engineering terminology?

1      A.    I don't think I would characterize it

2    that way.  I mean "engaging" is I don't think a

3    technical term.  But in terms of, you know -- I

4    think the sill flange, would everybody know what

5    the sill flange is?  Maybe not before they look

6    and read the illustration and look at the

7    vehicle, but I think you can discern that.  I

8    think you can understand that given the context.

9    I just don't think the phrase "engaging" is

10    somehow technical or likely to be under -- past

11    the understanding of an expected reader.

12      Q.    You don't disagree that the expected

13    reader -- that the jury is expected to be the

14    expected reader at the end of the day?

15      A.    Well, the owner of the vehicle, but, you

16    know, could that be somebody off the jury?  Sure,

17    it could be, I mean as far as I know.

18      Q.    So you're not going to testify at trial

19    anything about the dimensions of the vehicle or

20    the manner in which the accident actually

21    occurred, are you?

22      A.    I think that's correct.  If at all, it

23    would be tangential.  You know, I described in my

24    report that I was able to pull it out on the

25    exemplar.  But I'm not going to come in and talk

1    about specific numbers or measurements in terms

2    of clearance.  I think there are others looking

3    at that issue.  I think the only other thing just

4    to be, you know, inconclusive to respond to your

5    question, to the extent that Mr. Sullivan has

6    said there needed to be some additional

7    information about sagging springs and that needed

8    to be more clear, I disagree with that.  So it

9    could come up in that context, but not a

10   biomechanical analysis of clearance or the

11   position of Seanesee, no, sir.

12        Q.   You personally don't know of any

13   specific evidence that Seanesee Richardson

14   believed that he was doing anything dangerous

15   when he reached beneath the vehicle, do you?

16        A.   I don't have any independent knowledge.

17   I think we talked about that earlier.  No one can

18   say what was specifically in his mind.  I do

19   think that all of the Richardsons had agreed that

20   it would be dangerous to get under a jacked-up

21   vehicle, and so the family didn't lack that

22   knowledge, I guess in terms of the brother or

23   mother or father.  But nobody -- I haven't seen

24   any evidence telling us specifically what

25   Seanesee knew or decisions that he made.

1       Q.   The brother and the mother and the

2   father were asked that question after the brother

3   and the son was rendered functional quadriplegic

4   for the rest of his life.  Do you think that

5   might have had an impact on their belief on

6   what's dangerous and what's not dangerous?

7       A.   Purely having a tragic accident can

8   happen -- could affect your hazard perception,

9   but there was not a response that, you know, I

10  didn't know that before but we do now.  There was

11  no explanation.  They agreed that it was

12  dangerous and didn't suggest that they did not

13  recognize that before his accident.

14          So my reading of the testimony didn't go

15  along with that.  Might they view it as more

16  dangerous today after this accident, sure, that's

17  certainly the likelihood.

18      Q.   Do you believe this location of the

19  spare tire is inherently dangerous?

20      A.   No, I don't think it's the location of

21  the tire, I think the danger is associated with

22  getting underneath a raised vehicle on a jack.

23  And I think that's independent of the tire

24  location.  We see auto manufactures warn about

25  this risk.  I would say almost universally,

1    regardless of where the tire is located, there is

2    warnings not to get under the raised vehicle.

3        Q.   Your testimony has been limited in the

4    past, hasn't it?

5        A.   I didn't catch all of that.  I'm sorry.

6        Q.   Your testimony has been limited by

7    Courts in the past, has it not?

8        A.   Yes, sir, I think there have been

9    occasions.

10       Q.   Quite a few actually, right?

11       A.   I don't know how many.  I can think of

12   at least a couple.

13       Q.   Do you have recall the case entitled

14   Graves versus Toyota Motor Company?

15       A.   Yes, sir.

16       Q.   And do you recall that your testimony

17   and conclusions were concluded to be too

18   speculative to pass either the reliability

19   threshold of rule 702 or to be helpful to the

20   trier of fact?

21       A.   I don't recall specific language.  My

22   recollection is that opinions related to driver

23   behavior or driver distraction were excluded.

24   And in part that was related, or I do would say

25   it's based on the fact that testimony from the

1   investigating police officer was ruled

2   inadmissible.  So that took away, you know, a

3   portion for the basis of my opinions.  You know,

4   I was not precluded from offering testimony about

5   warnings or instructions, as I recall.

6        Q.    Do you recall the Watkins versus Vestal

7   Manufacturing Company case?

8        A.    Not by name, I need more information.

9        Q.    That was a products liability case in

10  the Northern District of Georgia.  Your lawyer --

11  you were hired by it was either Gary Seacrest or

12  Douglas Dumont?

13       A.    You know, I do remember that case

14  because that was that -- Ryan Seacrest's dad was

15  the lawyer.  Yes, I remember that.

16       Q.    And do you recall you were not permitted

17  to testify in that case?

18       A.    No.  My recollection was there was some

19  limitation related to an opinion.  And as I

20  recall, I don't think it was an opinion I was

21  intending to offer, but, you know, it's been a

22  while.

23       Q.    How about the case American Family

24  Mutual Insurance Company versus Techtronic?

25       A.    I don't know.  What product was

1       involved?  The name is not ringing a bell.

2            Q.    It was a power stroke product?

3            A.    If it was a pressure washer case, Power

4       Stroke was maybe the brand of the pressure

5       washer?  Does that sound right?  I recall that

6       case that involved a pressure washer.  And I

7       think, as I recall, the judge ruled there

8       wouldn't be any testimony from any

9       warnings-related experts in that case.  And I

10      think that was in part because the warnings issue

11      had become quite narrow by the time of trial.

12           But maybe I'm misattributing, but that's

13      my recollection.

14           Q.    Do you recall that you were not allowed

15      to testify about what would be a common

16      understanding of warnings because that was within

17      the understanding and knowledge of an average

18      juror in that case?

19           A.    I don't recall any warning from a ruling

20      or order.  My general recollection was that the

21      scope of the warnings-related issues had become

22      very narrow.  You know, it wasn't as inclusive as

23      when the case started.  And I think that was part

24      of the reason that the judge said that they

25      wouldn't have, you know, either the plaintiff's

1    or the defense's warnings expert testify.  But I

2    just couldn't tell you that I recall language

3    from an order.

4         Q.   And then in the estate of Munoz versus

5    Ford Motor Company, there were questions asked of

6    you regarding Chrysler's funding of studies.  Do

7    you recall those questions?

8         A.   No, but I don't -- you'd have to refresh

9    my memory on the case.  The name doesn't ring a

10   bell.

11        Q.   You just don't even recall the case at

12   this time?

13        A.   Just by the caption, no, sir.  You would

14   have to tell me more.

15        Q.   Which cases do you recall today in which

16   your testimony was limited or prohibited?

17        A.   I recall the pressure washer case, and I

18   recall the Graves versus Toyota case.  I think

19   there may be a case where there was an order

20   trying to prevent duplication.  There was another

21   human factors expert retained by the same client,

22   and the judge wanted to prevent us from

23   overlapping, so he was addressing more of the

24   physical interaction and I was addressing the

25   warnings and instructions.  And as I recall, the

1    plaintiffs had made a motion to exclude me

2    entirely but the judge said no, that rather

3    they'll just make there's no overlap.

4           So those were the ones that come to

5    mind.

6       Q.   You agree when drafting instructions,

7    those -- one of the important goals to fulfill is

8    to avoid ambiguity, correct?

9       A.   I think that's a fair statement as a

10   very broad general statement.  You know, you have

11   to look at what is the information, would it be

12   considered ambiguous, what's the context, how is

13   that information being provided.  But as a

14   generalization, would I tell people you want to

15   avoid ambiguity, yes, but it doesn't mean you

16   have to be necessarily so specific or explicit as

17   to provide, you know, more information than you

18   need.

19      Q.   Do you have any complaint that there

20   were too many warnings provided in this owner's

21   manual?

22      A.   No, sir, I don't.

23      Q.   Do you think there were too few warnings

24   in this owner's manual?

25      A.   No.  But in fairness, I have tried to

1    focus on, you know, the safety information

2    related to the issue in this case.  I haven't

3    tried to go through and evaluate all of the

4    aspects of this owner's manual, like about

5    airbags or how to wear the restraint system.  I

6    haven't focused on that because it wasn't an

7    issue.

8         Q.   Have you, as part of your work for

9    manufacturers, created your own illustrations or

10   drawings?

11        A.   I don't recall doing a lot of

12   illustration work.  I mean generally it would

13   probably be talking to graphic designers.  I have

14   done a little bit when we were -- when I was

15   working with trade association on a particular

16   symbol to be used related to injuries using that

17   power tool, but that's something I would probably

18   contract out with a graphic designer or talk to a

19   graphic designer in-house at a trade association

20   or manufacturer or whomever.  So it's not

21   something I would typically do.  I might provide

22   input but not do the design work myself.

23        Q.   You provided on page 9 of your report a

24   sentence that -- just listen to it because you'll

25   probably remember it, That the nature of the

1    hazards and consequences of being struck by a

2    vehicle falling from a raised jack are not

3    technical and do not require specialized training

4    or knowledge to recognize.

5              Is that your own writing?

6        A.   I believe so.  I've certainly used, you

7    know, similar language, I think, in other

8    reports, not specifically a vehicle falling from

9    a raised jack, I don't recall if I'm used that

10   before, but talking about language not being

11   technical or requiring specialized knowledge,

12   I've used similar language, at least in other

13   reports.

14       Q.   And so for that reason, you would agree

15   that you don't need to be an expert to talk about

16   that hazard?

17       A.   Yes, I don't -- I mean I guess I'm

18   trying to understand what you're saying.  I think

19   it will be helpful to have testimony from human

20   factors experts as it relates to evaluating

21   warnings and instructions, but just simply a very

22   narrow issue of, you know, understanding the risk

23   and is it one that people don't need specialized

24   training to require, I don't think that takes

25   expert testimony probably, but what is the

1  relevance of that?  How does that concept then be

2  applied to the evaluation of warnings

3  instructions.  I think that's, you know, where a

4  human factors expert can provide some benefit.

5       Q.   On page 10 of your report, you said,

6  Similarly, familiarity and prior experience with

7  a product are also recognized as factors

8  decreasing the individual's hazard perception.

9  That is as people use product without a safety

10 problem, they have to become more confident in

11 their interactions and less concerned about

12 potential dangers.

13          That's part of your opinion, right?

14      A.   Yes, sir.  I'm describing findings in

15 the research literature.  But yes, sir, I would

16 agree with that.

17      Q.   All right.  But you're not claiming that

18 Seanesee was familiar with the jack and that he

19 suffered from a decreasing hazard perception

20 because he was so familiar with the jack, are

21 you?

22      A.   We don't know his specific knowledge.  I

23 mean I've said that in my report, we've talked

24 about that today.  We do know that he has been

25 around or involved in two other prior tire

1   changes.  So I think these are things the jury

2   should contemplate and think about.  But in terms

3   of can I come in and say, you know, specifically

4   what his knowledge was, no, but we know he had

5   been involved in prior tire changes.

6        Q.   So we don't know how many months or

7   years elapsed between those tire changes, do we?

8        A.   I don't recall the specific dates.  At

9   least as I sit here today, I don't recall if that

10   was asked.  But in terms of, you know, the sort

11   of knowledge and training or experience

12   generally, I think that was explored in the

13   depositions.  But I guess no, I don't -- at least

14   I don't recall.  I'll defer to the testimony.  I

15   don't recall if the dates were identified.

16        Q.   But you're not claiming that Seanesee

17   was so familiar with the jack that he would have

18   a decrease in hazard perception, are you?

19        A.   I'm saying we don't know.  I'm saying we

20   understand, you know.  And by "we," I mean the

21   folks that participate in research and

22   publication in the area of warnings and responses

23   to warnings, that prior experience and

24   familiarity certainly can have that effect and it

25   can impact how people make decisions and what

1    decisions they actually make.  And in this

2    particular case, we know there is prior

3    experience, but fortunately it's unknown what his

4    specific knowledge or attitudes or perceptions

5    were.  So I think they're all things for the jury

6    to consider, but I don't think anyone can come in

7    and say he had, you know, this specific thought

8    in mind as we talked about earlier, I just don't

9    think anybody can do that.

10        Q.   And you're not saying -- you know of two

11   isolated events where he was present while a jack

12   was used, you're not saying he was using the jack

13   every week?

14        A.   Every week, no, sir, that's not my

15   understanding.  I think the second -- the first

16   event Mrs. Richardson described primarily the

17   stranger who helped them as doing most of it, the

18   second event, Patrick and Seanesee were involved

19   and is my recollection, Patrick said he didn't

20   use the jack, so that would leave Seanesee.  But

21   in terms of using it like on a weekly basis, no,

22   sir, I'm not going to come in and say that.

23        Q.   In your next paragraph, you say Injuries

24   from raising jacks with -- from raising vehicles

25   with jacks occur each year with some degree of

1    frequency, correct?

2        A.    I think that's a correct statement.  I'm

3    just looking in my report to see where that would

4    appear.

5        Q.    You said it second to the bottom

6    paragraph on page 10?

7        A.    Okay.  I see that language, yes, sir.

8        Q.    And you believe that statement, jack

9    accidents are frequent?

10       A.    No, I didn't say "frequent," I think

11   they're rare when you compare them to motor

12   vehicle crashes, but there's some frequency.

13   This study published one estimate based on Neiss

14   data, N-E-I-S-S, but I don't think it's something

15   I would characterize as necessarily frequent when

16   you look at injuries and accidents associated

17   with motor vehicles overall.

18       Q.    How many -- how many jack accidents did

19   it claim have occurred in whatever time period it

20   was looking at?

21       A.    From memory, I think it was about a

22   hundred, something in that neighborhood.

23       Q.    Per year?

24       A.    I think it was a year long data

25   collection.

1          Q.    Okay.  And then at the bottom of that

2     paragraph, would you agree that the numbers that

3     you provided are the -- in 55 percent of the jack

4     accidents, injury sustained are moderate to the

5     severe?

6          A.    So including the severe with moderate,

7     that it would be 55 percent, yes, sir.

8          Q.    So more than half of these jack

9     accidents resulted in moderate or severe

10    injuries?

11         A.    I think that would be correct based on

12    the data.  I mean obviously I'm just quoting from

13    the NHTSA publication, how they presented it, but

14    I think I understand how you're grouping those

15    categories, and I think your numbers are right.

16         Q.    And this is a 1998 NHTSA study, right?

17         A.    Yes, sir, publications.

18         Q.    Do you know over how many years the

19    study was conducted?  Was it more than one year?

20         A.    I think I have data -- from memory, I

21    think it was collected for a one-year period.  I

22    don't know how long your overall study was in

23    analyzing and dealing with it, but the data said

24    itself, I think it was a one-year period.

25         Q.    You provided a quote for the top of page

1    13 from a study, from a McCarthy study from '87,

2    that the results suggest further that in some

3    circumstances, clear and direct constructions may

4    be more effective than a warning in eliciting the

5    desired behavior.  Do you agree with that?

6         A.   Yes, I do as I've described it.  If you

7    read my description, what they are in this

8    particular study, they're really only looking at

9    how it's formatted or highlight.  They're not, as

10   we've talked about, truly saying this isn't

11   safety-related information, but they're saying in

12   this particular study, it didn't need to be

13   inside of a box highlighting it as a warning,

14   that embedded safety messages is kind of, I think

15   the term.  And this may go back to something we

16   talked about earlier in this deposition, imbedded

17   safety messages.  I think that was a common

18   practice, but that term may have come about when

19   the 2006 standard evolved that we talked about

20   earlier or at the very beginning of the

21   deposition.  But -- so that was not an uncommon

22   practice necessarily, but that term may not have

23   been out there.  So at the time of this report or

24   this study by McCarthy, I would say I don't think

25   embed and safety information was a term of art.

1    They seem to be distinguish -- if you read the

2    study, that's really what they're distinguishing

3    is, information kind of in a paragraph versus

4    inside a box to look at and be formatted more as

5    a warning in terms of just formatting, not the

6    content, but the formatting.

7        Q.   And I'd like refer you to the bottom of

8    page 15 of your report.  On the last couple of

9    lines, you say given the information in the

10    manual and physical queues of the tools, I am not

11    aware of any basis to suggest that users in

12    general would mistakenly perceive the jack handle

13    as spare tire hook.

14            How often are you relying on the

15    physical queues of a tool in order to make your

16    opinion?

17        A.   I'm not sure I follow that question.  Do

18    I talk about physical queues of a vehicle or a

19    tool, have I talked about those in other cases?

20    Yes, sir.

21        Q.   What do you mean by physical queues of

22    the tools?

23        A.   It's what's being described in that

24    paragraph.  So that whole paragraph, I'm talking

25    about the differences in appearance and sort of

1     what you can look at and tell in terms of the

2     tools, so that would be physical tool.  Would

3     have 45-degree angle on the rounded bar of the

4     jack handle, which doesn't clear the body of it,

5     you know, it's kind of like a cupped hand almost,

6     would that be sufficient to use as a hook by

7     contrast looking at the physical design of the

8     tire hook provided by Chrysler?  So it kind of

9     carries on, and I have the illustration that's

10    referenced in figure 4 on the next page.  But

11    it's not more than what what's being described in

12    the section of the report.

13         Q.   Would you agree that on normal user is

14    going to end up having to try to look at physical

15    queues from the tools when they're trying to

16    understand the user's manual?

17         A.    Well, you're going to.  I mean it's not

18    that it's -- there is no way around it.  You're

19    using -- you're picking up the jack, you're going

20    to raise it, you're going to use the tool, you're

21    going to use the T-wench handle.  You're

22    physically going to use and interact with those.

23    And so that's part of, you know, the overall

24    evaluation when you look at warnings

25    instructions.  You have a to not just look at the

1    words that are on the paper or the illustration,

2    but you have to think about users are going to be

3    physically interacting with these portions.

4    That's the interface part of human machine

5    interface.

6         Q.   And so, for example, when the diagram

7    given by Chrysler doesn't match the jack head

8    that's given by Chrysler but they both have

9    something that you might call a dent in them,

10   those are the kind of physical queues that you're

11   saying that are left to the interpretation of the

12   user, correct?

13        A.   As I'm physically interacting with the

14   jack head and I'm raising it up and trying to

15   engage the sill flange, I'm looking at the

16   illustration, I've read the words.  I'm also

17   relying upon what I'm seeing and how it's

18   interacting, sure, I think that's part of it.

19   There is no way around it.  And so does it look

20   similar to the picture?  I think what we've all

21   described as proper engagement, definitely in my

22   mind looks like the illustration.  And what

23   Dr. Householder has proposed, does not look like

24   the illustration.

25        Q.   However you and Dr. Householder clearly

 1    disagree about that opinion, don't you?

 2        A.    You know, I'll defer to Dr. Householder

 3    to explain his opinions, but he suggested that as

 4    a possibility.  I just -- it's not clear to me

 5    what his basis really is for that.

 6        Q.    Toward the top end of the first

 7    paragraph at the top of page 21, you suggest that

 8    a certain placement of the jack would obviously

 9    allow for more surface area contact between the

10    jack and the vehicle.  You're not suggesting for

11    a moment that your normal consumer would think

12    larger surface area contact is an obvious desire,

13    are you?

14        A.    Oh, sure.  I think people understand

15    having more contact with something you're trying

16    to lift would aid in stability.  When you're

17    reading warnings and instructions that warn you

18    about a risk that it can fall and that, you know,

19    more height is less stable, that you want to have

20    more contact between the surface areas as opposed

21    to kind of the knife's edge on the, you know,

22    seesaw, I think by comparison users would expect

23    or would want to see more engagement, that they

24    would associate that as more stability.  So I

25    don't think that's a technical concept.

1      Q.   So because it's not a technical concept,

2    it's not a concept that you think needs expert

3    opinions at all?

4      A.   I think in talking about this issue, the

5    illustrations, I think you want to think about

6    what is the physical interaction and how do

7    people interact not just with the illustration

8    alone, but looking at that and thinking about it.

9    So I think it's something I would mention, but

10   does it require an expert to necessarily say more

11   surface contact is better?  No, I'm not saying

12   that.  But how is it applied?  What is the

13   impression of that in the evaluation of warnings

14   and instructions in this case, I do think there

15   is some value.

16     Q.   You agree that in general, engineers

17   would have more knowledge about what's the

18   benefit of the surface area -- a larger surface

19   area contact than would a laymen, right?

20     A.   I mean obviously engineers are going to

21   have some specific knowledge and training in

22   terms of engineering and doing calculations and

23   looking at force and area, you know, those sort

24   of things.  But in terms of when I'm trying to

25   lift up a car, that I would want more surface

1    area rather than the knife's edge, I don't think

2    that takes an engineering degree.

3         Q.   When considering what are good

4    instructions and what are bad instructions, what

5    would you say is a bad instruction?

6         A.   Well, I think we kind of go back to that

7    criteria, right?  So instructions or, you know,

8    safety messages, so instructions that relate to

9    safety, they need be capable of being noticed and

10   read, they need to be capable of being

11   understood, and they need to be capable of being

12   followed.  So if you can't understand the

13   information or it's impossible to follow it, you

14   know, I would say that's a bad instruction.  You

15   know, I think that the relevant instructions and

16   safety information in this case meet those

17   criteria, but I think if, you know, that's

18   probable the best description I can give you.

19        Q.   What would you say is a bad warning?

20        A.   I think it would fall into the same

21   category.  It could be, you know, you're unable

22   to -- or unlikely to notice it because of, you

23   know, a variety of reasons, you can't understand

24   it when you read it and you can't follow it.  I

25   mean that would certainly sound like a bad

1    warning to me.

2         Q.   As a general rule, do you agree that

3    clear instructions are the goal?

4         A.   When you're writing instructions, do you

5    want them to be clear so that people can be clear

6    and follow them, yes, sir.  If that's what you're

7    asking, then, yes, I agree.

8         Q.   And do you agree that pictures and

9    graphics need to help explain what the next steps

10   would be?

11        A.   If you provide illustrations they should

12   be able to be understood in the context.  And by

13   "context," I mean the wording that was provided

14   as well as the physical interaction that's

15   afforded.  You know, so in that way I would

16   agree.  But it doesn't mean that an illustration

17   always has to in- -- precede an instruction.  You

18   know, you said the next information.  So I

19   wouldn't agree it always has to proceed, but

20   should it be helpful in terms of communicating

21   information, sure.

22        Q.   What problems arise due to bad

23   instructions?

24        A.   I think it's such a broad question.  It

25   could be a misunderstanding of what to actually

1    do.  If we're just talking about instructions

2    that are not related to safety, then there is not

3    a risk of harm, either personal injury or

4    property damage.  If we're talking about

5    instructions that are safety related, then there

6    couldn't be a risk of physical harm or property

7    damage if the safety-related instructions are

8    deficient.

9        Q.   What problems arise from pictures that

10   don't match the provider?

11       A.   Again, it would depend.  You would have

12   to look at the picture and the say, you know,

13   does this relate, is it a problem or not?  And so

14   you have to go through an analysis.  What is the

15   information that's available, the context?  What

16   is the written instructions?  What is the

17   illustration really looking?  Do we think these

18   differences are material that someone would rely

19   on and use this illustration?  You know, is it

20   trying to just illustrate a concept?  It doesn't

21   have to necessarily be a true fidelic (spelled

22   phonetically), you know, photograph.  You know,

23   you have, I think, more license with an

24   illustration than if you provided a photo or

25   something like that.  And so I think it becomes a

1    unique analysis, let's look at the illustration

2    at issue, let's look at the available

3    information, what's the product, what's the

4    interaction afforded.  So it may or may not be an

5    issue.

6        Q.    But one of the problems that I arises

7    from illustrations that don't match the product

8    is then it becomes a requirement on the consumer

9    to try and figure out more about what they're

10   supposed to do because they provided an

11   illustration as an instruction that doesn't match

12   what they have in front of them, right?

13       A.    I'm just trying to make sure I

14   understand the hypothetical.  If we assume an

15   illustration is deficient and it's creating some

16   confusion for a user, do they then need to try

17   and figure out what to do?  I mean based on my

18   understanding of your question, it's kind of

19   giving your its own answer.  Yes, they'd have to

20   figure out.  If there's not information in

21   written instructions, they're information in

22   context, but, you know, like I said, it really

23   becomes a unique analysis that you have to look

24   at an illustration of product and the context.

25       Q.    In this case itself, we have a jack head

1   that's different from an illustration and we have

2   the use of engagements or to engage the jack head

3   with the skill -- with the sill flange but there

4   is no definition of what they mean by "engage."

5   So you don't -- clearly you're being paid by

6   Chrysler not to see that as ambiguous, correct?

7           MR. BOORMAN:

8               Objection.  First of all, he is

9   asked -- that's a complex question.  It's also

10  argumentative.  He's answered that questions,

11  parts of that question a couple of times.

12              But answer if you can.

13          THE WITNESS:

14              Yes, I'm not paid by Chrysler just

15  to tell them what they want to the hear.  I mean

16  I would reject that part of it.

17              But in terms of do I think there is

18  some deficiency in the instructions or the

19  illustration, no, I think it's substantially

20  similar to what you see in real life.  I've

21  provided photographs and illustrations and some

22  annotations to those in my report.  I tried to

23  talk about the reasons, you know, with you today

24  as well in my report.  Obviously, I think you

25  understand, you know, that I disagree with

1    Dr. Householder.

2    BY MR. DIDRIKSEN:

3        Q.   You do agree that there is an interplay

4    between unclear instructions and mistakes

5    occurring, correct?

6        A.   I mean there can be.  If an instruction

7    is unclear, could that result in someone acting

8    contrary than you intended?  Sure.  I mean that's

9    a possibility.  But you have to look at each

10   incident and each set of instructions and the

11   context on a unique basis.

12       Q.   In a similar way, you would agree that

13   there is interplay between unclear warnings and

14   the occurrence of injuries, correct?

15       A.   That's a possibility.  Just because

16   information is characterized as unclear, doesn't

17   mean that people acted in an unsafe way.  If

18   they're unclear and don't know what to do, you

19   know, and they know that safety is on the line,

20   then they should get additional information.

21   They should get clarity before proceeding.  So

22   just saying something is unclear doesn't mean

23   people necessarily act in an unsafe way or

24   necessarily are injured.

25       Q.   However, unclear instructions can't --

1    or unclear warnings can lead to injuries, I'm

2    sure you agree with that?

3        A.   I mean it could.  You could come up with

4    a hypothetical where I would agree with that,

5    sure.

6            MR. DIDRIKSEN:

7                Is this a good time for everybody

8    else to take a ten-minute break?

9            THE WITNESS:

10               Sure.

11           MR. BOORMAN:

12               Fine with me.  See you in ten

13   minutes.

14   (A short recess was taken.)

15   BY MR. DIDRIKSEN:

16       Q.   So did you examine or look at any other

17   owner's manuals for Chrysler Stow 'n Go Minivans

18   from the years 2007 to 2021?

19       A.   I'm trying to recall if anything was in

20   my file.  There wasn't -- if I saw some it's not

21   registering with me.  I'm not remembering.  But

22   I'm trying to look at my file listing to see if

23   there is anything logged in.

24               I don't see any logged in to my file.

25   And if they were, I mean I'm just not recalling

1    having reviewed them.

2         Q.   Do you recall reviewing CARE reports of

3    Chrysler Minivan jack failures complaints?

4         A.   I think I looked as some as I was

5    reading the testimony of one of the Chrysler

6    witnesses.  But, you know, I didn't spend -- I

7    didn't do a deep dive, I wouldn't say, but I

8    looked at them and read the testimony.

9         Q.   Did you make any conclusion related to

10   those jack-failure complaints?

11        A.   No.  You can't really use customer

12   complaint or contact like that, that sort of data

13   or information in the analysis of warnings of

14   instructions.  It rarely provides any insight.

15   You know, my recollection is there are a number

16   of, I think, burns that were discussed, but I

17   didn't do any sort of statistical or deep dive on

18   the data, just because I didn't see anything that

19   would provide really any insight and that not the

20   kind of data set that usually is helpful.

21        Q.   So you would think that a series of

22   accidents involving the jack shouldn't be noticed

23   to the manufacturer that they might have a

24   problem with their instructions?

25        A.   No, I don't think you can conclude that

1    there is an issue with the instructions.  You

2    know, as I think the Chrysler witness explained,

3    a number of them were activities that were

4    clearly contrary to available warnings and

5    instructions.  So just because someone acted in a

6    way that violates a warning, doesn't mean you can

7    conclude that the warning is at fault or

8    deficient.  I think that analysis is independent

9    of have any accidents or, you know, incidents

10   ever occurred.

11        Q.   Have you performed any focus groups or

12   other group testing, any of the language that

13   you're forming opinions about herein?

14        A.   You broke up a little bit.  But have I

15   done any focus group or other data collection as

16   it relates to the relevant warnings and

17   instructions in the subject manual?  No, sir.

18        Q.   What is the total of all of your

19   invoices to Mr. Boorman or FCA?

20        A.   Those invoices I believe were produced.

21   I didn't add them up, so I don't know as I sit

22   here.  It's probably a little bit bigger file

23   than usual, and, you know, I spent a fair amount

24   of time on it.  But I don't know what -- whatever

25   has been produced should be accurate.

1    Q.   What is your billing rate for them?

2    A.   Mine is 385.

3    Q.   Who's David Shattock?

4    A.   He is my research assistant that is

5    helping me on this particular case.

6    Q.   What's his background?

7    A.   He has a degree, I believe, from Auburn

8    but he had a strong sort of research background

9    and experience before he came to work at Dorris &

10   Associates.  He's been with us for several years

11   now, and, you know, so we have trained him

12   specifically kind of in what we want in terms of

13   job duties here.  But we look for folks that have

14   some strong experience in terms of doing

15   research, findings documents, being able to

16   review documents and those sort of thing before

17   they come to work with us.

18   Q.   Is he is degreed engineer?

19   A.   I don't think his degree is in

20   engineering, no, sir.

21   Q.   How about Jonathan Dorris?

22   A.   He is my brother who works with me at

23   the company.

24   Q.   What's his background?

25   A.   He has an industrial engineering degree

1    from Georgia Tech.

2         Q.   What about Cory Leigh Brown?

3         A.   She works in our office and she

4    primarily, you know, for this case was an

5    administrative assistant, so she might be doing

6    scheduling or those sort of things.

7         Q.   You think -- do you know whether you

8    were paid for some of your invoices?

9         A.   That's a good question.  Have we

10   received any payment, I don't know.  That's a --

11   that's a great question.

12        Q.   One of your latter invoices said that

13   you were at that point owed $31,500.

14        A.   I don't -- whatever you see, you know,

15   the documents should be accurate.  Obviously

16   during the COVID pandemic, I know the auto makers

17   were being asked to, you know, go and make, you

18   know, ventilators and things like that, so I

19   don't know if that's affected payment times or

20   anything.  But I have not been involved in that

21   piece of it, you know, accounts receivable, so I

22   don't know if we have received any payments for

23   this particular case.

24        Q.   Do you believe your firm has charged

25   over $50,000 for what you've done so far on this

1    case?

2        A.    It could be.  I have not added it up,

3    but it certainly could be in that ballpark.

4            MR. DIDRIKSEN:

5                Thank you.  That's all my questions

6    for today.

7            THE WITNESS:

8                Okay.

9            MR. BOORMAN:

10               Okay.  Dr. Dorris will read and

11   sign.

12   (Whereupon the deposition was concluded at 2:44

13   p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    WITNESS' CERTIFICATE

2

3

4

5      I have read or have had the foregoing testimony

6    read to me and hereby certify that it is a true

7    and correct transcription of my testimony with

8    the exception of any attached corrections or

9    changes.

10

11

12

13   ------------              ----------------------------

14   Date Signed                    Nathan Dorris, Ph.D.

15

16

17

18   -------  Signed with corrections as noted.

19   -------  Signed with no corrections as noted.

20

21

22

23

24

25

1                    <u>R E P O R T E R ' S   C E R T I F I C A T E</u>

2

3       This certification is valid only for a
transcript accompanied by my original signature
4    and original required seal on this page.

5              I, Michelle Vidrine-Corona, Certified
Court Reporter in and for the State of Louisiana,
6    as the officer before whom this testimony was
taken, do hereby certify that (Nathan Dorris,
7    Ph.D.) to whom oath was administered, after
having been duly sworn by me upon authority of
8    R.S. 37:2554, did testify as hereinbefore set
forth in the foregoing (178) pages; that this
9    testimony was reported by me in the stenotype
reporting method, was prepared and transcribed by
10   me or under my personal direction and
supervision, and is a true and correct transcript
11   to the best of my ability and understanding; that
the transcript has been prepared in compliance
12   with transcript format guidelines required by
statute or by rules of the board, and that I am
13   informed about the complete arrangement,
financial or otherwise, with the person or entity
14   making arrangements for deposition services; that
I have acted in compliance with the prohibition
15   on contractual relationships, as defined by
Louisiana Code of Civil Procedure Article 1434
16   and in rules and advisory opinions of the board,
that I have no actual knowledge of any prohibited
17   employment or contractual relationship between
myself and a party litigant in this matter.  I am
18   not related to counsel or to the parties herein,
nor am I otherwise interested in the outcome of
19   this matter.

20

21

22

23        _____

24        Michelle Vidrine-Corona, CCR, #96023
          Certified Court Reporter

25