**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

|  |  |
|---|---|
| **WILLIAM RICHARDSON, individually and on behalf of Seanesee Richardson, as his legal guardian, and SEANESEE RICHARDSON,**<br><br>        Plaintiffs,<br><br>v.<br><br>**FCA US, LLC,**<br><br>        Defendant. | Civil Action No. 7:19-CV-15 (HL) |

**ORDER**

Plaintiff William Richardson filed this lawsuit following an incident in which his son, Seanesee Richardson, was injured while changing the tire of his family's 2006 Dodge Caravan. There are several motions pending before the Court: Defendant Fiat Chrysler Automobiles US, LLC (FCA)'s Motion for Summary Judgment (Doc. 68), Defendant's motions to exclude the expert testimony of Pete Sullivan (Doc. 70) and Lila Laux (Doc. 71); Defendant's Motion to Seal (Doc. 163) and Defendant's Motion to Strike Plaintiffs' First Amended and Supplemental Statement of Disputed Facts and Opposition to FCA's Statement of Material Facts. (Doc. 167). The Court held a hearing on all five motions on August 12, 2021. For the reasons given herein, the Motion for Summary Judgment is GRANTED in part and DENIED in part; the Motion to Seal is GRANTED; the Motion to Strike is DENIED; and the *Daubert* motions are DENIED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On December 12, 2016, Plaintiff Seanesee Richardson ("Seanesee"), a minor, and his mother, Kimberly Richardson ("Mrs. Richardson"), discovered a bubble in the sidewall of the front passenger tire on their 2006 Dodge Grand Caravan. Seanesee was leaving for an Eagle Scout meeting, and he and Mrs. Richardson decided to change the tire before driving the vehicle to Valdosta. Seanesee was 16 years old at the time of the incident, did not have a driver's license, and had never changed a tire. He had been present with his father during two prior tire changes.

Seanesee retrieved the owner's manual from the vehicle and reviewed the instructions. Mrs. Richardson went to the driver's side of the vehicle to lower the spare tire to the ground. The spare tire in the 2006 Dodge Grand Caravan is located underneath the vehicle between the driver and passenger seats. Mrs. Richardson used the tools provided with the vehicle to lower the spare tire, by turning a cable winch mechanism located under the center console of the vehicle. The handle of this winch is also part of another tool that is designed to help retrieve the spare tire from underneath the vehicle.

After loosening the lug nuts on the front passenger side tire, Seanesee had to jack up the vehicle to remove the spare tire from underneath the vehicle. The underbody of the van had an exhaust pipe that prevented Seanesee from retrieving the tire without jacking the vehicle up. After jacking the vehicle up and ensuring the

spare tire had been lowered, Seanesee attempted to retrieve the spare tire without the provided retrieval tool (which was still in Mrs. Richardson's possession).

During the attempted retrieval, the jack failed, and the van fell off the jack and hit the ground, crushing Seanesee, and causing an anoxic brain injury. No witnesses saw the vehicle fall, and Seanesee is unable to testify as to exactly what happened at the moment the jack failed.

Plaintiffs brought suit against FCA US, LLC in the Superior Court of Lanier County on December 11, 2018. Plaintiffs' Complaint sets forth claims for manufacturing defects related to the location and installation of the exhaust pipe, which did not allow for appropriate ground clearance to retrieve the spare tire without jacking up the vehicle. Plaintiffs also allege claims of failure to warn and design defect, all related to the placement of the spare tire, the underbody of the vehicle, and the unclear directions for retrieving a spare tire. Defendant removed the case to this Court on January 22, 2019.

## II.   *DAUBERT* MOTIONS

The Court will address the *Daubert* motions before turning to FCA's motion for summary judgment because whether the parties' proposed experts will be allowed to testify relates to the summary judgment analysis. A party wishing to have a witness testify as an expert bears the burden of laying, by a preponderance of the evidence, a foundation for the admission of its expert's testimony. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)). Whether certain

opinions may be offered as expert testimony is determined by the standard set forth in Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As the Supreme Court clarified in *Daubert v. Merrell Dow Pharmaceuticals*, a trial court must act as a "gatekeeper" and test the reliability and relevancy of the proposed expert's opinions before determining whether they can be admitted as expert testimony. 509 U.S. 579, 589–93 (1993). The trial judge must undertake a "rigorous three-part inquiry" and decide whether: (1) a proposed expert is qualified to competently testify concerning his opinions; (2) his methodology is sufficiently reliable; and (3) his testimony would assist the jury, through the application of scientific, specialized, or technical expertise, to determine a fact in issue or understand the evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The Supreme Court has provided a non-exclusive list of factors that may be considered in weighing the reliability of an expert's theory or methodology, including "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4)

whether it is generally accepted in the field."[1] *United States v. Brown*, 415 F.3d 1257, 1267–68 (11th Cir. 2005). The reliability test is flexible, and not all of the factors are applicable in every case. *Id.*

### A. Pete Sullivan

Defendant filed a motion to exclude the testimony of Pete Sullivan ("Mr. Sullivan"), a senior technician of Sullivan's Advanced Fleet Service. Mr. Sullivan has worked with motor vehicle crashes, inspected, operated, diagnosed, and repaired thousands of motor vehicles, and has been in the industry for 39 years. Mr. Sullivan seeks to present testimony relating to Plaintiff's claim that the exhaust pipe was incorrectly installed due to a manufacturing defect. Defendant argues that Mr. Sullivan's methodology is not reliable, that he submitted untimely opinions, and that his opinions will not help a jury determine any issues in this case. Mr. Sullivan bases his opinions on extensive studies of an exemplar Dodge Caravan, in which he uses mathematics and testing to assess the height of the exhaust pipe under several different but possible vehicle conditions. He studied this exemplar vehicle, the depositions of other experts, and the various components of the spare

---

[1] The Advisory Committee's Notes on Rule 702 provide additional factors, including (1) whether the expert is testifying based on research that was conducted independently of litigation, (2) whether she is "unjustifiably extrapolat[ing] from an accepted premise to an unfounded conclusion," (3) whether she has accounted for "obvious alternative explanations," (4) whether she is being as careful in reaching her opinions as a hired expert as she would for her professional work outside of litigation, and (5) whether her purported area of expertise "is known to reach reliable results for the type of opinion the expert would give." (2000 Amendments).

tire system that accompanies the Dodge Grand Caravan. (*See generally* Doc. 88). Defendant also alleges that because Sullivan acknowledged during his testimony that the vehicle systems could sag over time, he has abandoned any opinion relating to a manufacturing defect. (Doc. 176 at p. 20).

The Court finds that Mr. Sullivan's methodology was reliable and that his opinions were not untimely. Therefore, Defendant's motion to exclude the testimony of Pete Sullivan is **DENIED**. (Doc. 70).

### B. Lila Laux

Defendant filed a motion to strike the testimony of Dr. Lila Laux ("Dr. Laux"), a human factors expert. Defendant argues that Dr. Laux's methodology is not reliable because she only spent 10 hours preparing for the case while Defendant's human factors expert spent over 77 hours preparing. Defendant asserts that Dr. Laux did not even review the deposition of the expert she was hired to rebut, and therefore her testimony is deficient. Further, Defendant believes that Dr. Laux's opinions are cumulative and should be excluded under Federal Rule of Evidence 403 because the probative value of her opinion is substantially outweighed by a danger of unfair prejudice because it is needlessly time consuming or repetitive.

The Court finds that the testimony of Lila Laux does rely on reasonable methodology and that the opinions are not needlessly time consuming for a jury. Therefore, Defendant's motion to exclude the testimony of Dr. Lila Laux is **DENIED**. (Doc. 71).

### III.    MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on Plaintiffs' warnings claims, arguing that they are barred (1) by the doctrine of product misuse; (2) because the danger was open and obvious; and (3) because Seanesee assumed the risk. Defendant argues that Plaintiffs' manufacture and design claims are barred because they fall outside the statute of repose and because there is a lack of reliable evidence on these claims. Further, Defendant states that Plaintiffs cannot satisfy all five elements of their manufacturing defect claim specifically related to the exhaust pipe. Finally, Defendant believes judgment as a matter of law is warranted with respect to claims regarding the design of the jack, the location of the spare tire, and claims for attorney's fees.

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery, and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and…the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. *Id.* at 254–55. The court may not, however, make credibility determinations or weigh the evidence. *Id.*

at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### B. Plaintiffs' Warnings Claims

"A manufacturer has a duty to exercise reasonable care in the manufacture . . . of its products 'so as to make products that are reasonably safe for intended or foreseeable uses.'" *Woods v. A.R.E. Accessories, LLC*, 345 Ga. App. 887, 889 (2018) (quoting *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1994)). A duty to warn of certain dangers arises when a manufacturer "knows or reasonably should know of a danger" arising from a use of the product. *Id.*; *see also Davis v. John Crane, Inc.*, 353 Ga. App. 243, 251 (2019) ("[A] negligent failure to warn claim generally rests on issues of foreseeability."). To satisfy the duty to warn, the manufacturer must provide adequate "warnings of nonobvious foreseeable dangers from the normal use of its products." *Woods*, 345 Ga. at 889. "The manufacturer can breach its duty to warn in two ways: (1) by failing 'to take adequate measures to communicate the warning to the ultimate user,' or (2) by failing 'to provide a warning that, if communicated, was adequate to apprise the user of the product's potential risks.'" *Henry v. Gen. Motors Corp.*, 60 F.3d 1545, 1548 (11th Cir. 1995). "Whether a duty to warn exists thus depends on the foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally . . . should be resolved by a trial in the ordinary matter," rather than on "summary adjudication." *Hunter v. Werner Co.*, 258 Ga. App. 379, 384 (2002).

### 1. Doctrine of Misuse

"A manufacturer is not liable for injuries resulting from abnormal use of the product." *Thornton v. E.I. Du Pont De Nemours & Co. Inc.*, 22 F.3d 284, 288 (11th Cir. 1994). To defeat Plaintiffs' duty to warn claims, FCA contends that Plaintiff misused the subject jack as it was intended. (Doc. 68-1, p. 9). According to FCA, Seanesee misused the jack when he raised the van with the jack and chose to crawl under the vehicle. (*Id.* at p. 10). FCA argues that the van comes with tools specifically designed to retrieve the tire—so that an individual would not have to crawl under the vehicle while using the jack—and the owner's manual provides instructions for using that equipment safely. (*Id.*).

A "manufacturer has no duty to . . . warn against harm caused by an unforeseeable misuse of its product, and a product that causes harm as a result of unforeseeable misuse is not defective." *Woods*, 245 Ga. App. at 891. In other words, when a manufacturer "has reason to anticipate that danger may result from a particular use, he may be required to give adequate warning of the danger, and a product sold without such warning is in a defective condition." *Moore v. ECI Mgmt.*, 246 Ga. App. 601, 606 (2000) (quoting *Yaeger v. Stith Equip. Co.*, 177 Ga. App. 835, 836 (1986)).

Sufficient evidence exists to present a question of fact regarding the foreseeability of Seanesee's use of the vehicle and jack. First, warnings in both the owner's manual and on the jack itself instruct users not to put their body beneath the vehicle. For example, the jack itself has a warning stating to "NEVER GET

BENEATH VEHICLE . . . WHEN IT IS SUPPORTED BY A JACK." (Doc. 68-2, p. 5). The owner's manual advises that "[g]etting under a jacked-up vehicle is dangerous. The vehicle could slip off the jack and fall and hurt you. You could be crushed. Never get any part of your body under a vehicle that is on a jack." (*Id.* at p. 6). FCA included these warnings despite the vehicle's intended design that permits retrieval of the spare tire without placing any part of the body beneath the vehicle. The fact that the warnings exist indicate that FCA anticipated users being unable to retrieve the tire using the spare tire hook.  Additionally, in the deposition of Doug Quigley, manager in charge of special vehicle builds for FCA and FCA's 30(b)(6) witness, he discusses the other car models FCA studied with tires stored on the undercarriage of the car, and states that they never want anyone to get under the car. (Doc. 89 at p. 106). Clearly, FCA anticipated users believing they could or should access the tire by reaching for the tire under the car and there is sufficient evidence to create a question of fact for the jury.

FCA argues that Seanesee violating the warnings is evidence of misuse. This argument misconstrues the case law. "Product misuse is defined as use of a product in a manner that could not reasonably be foreseen by the defendant. Misuse of a product may bar recovery against the manufacturer where misuse is the sole proximate cause of damage…[a] manufacturer is not liable for injuries resulting from abnormal use of the product." *Sanders v. Lull Intern., Inc.*, 411 F.3d 1266, 1270 (11th. Cir. 2005) (citing *Thornton*, 22 F.3d at 288). Misuse is a defense to failure to warn claims when the manufacturer *failed* to warn against the acts that

produced the injury. The manufacturer could not anticipate the improper use, and thus, the manufacturer had no duty to warn against such use.

Here, FCA clearly anticipated Seanesee's use and attempted to warn against it. Breach of the duty to warn considers whether the warnings present are adequate to prevent the harm that occurred. Then, violating the warnings is an issue of proximate cause. If the warnings are adequate, yet the plaintiff violated those warnings and sustained an injury, then the manufacturer has no liability. If inadequate warnings are present, then the manufacturer is in breach. But the proximate cause of the injury may be the plaintiff's violation of such warnings. For example, the warnings provided may be inadequate, and yet, additional warnings would not have altered the plaintiff's conduct in violation of the inadequate warnings.

### 2. Known Danger

Georgia's "open and obvious danger" rule provides that the manufacturer has "no duty to warn of an obvious danger or one that is generally known." *Ream Tool Co. v. Newton*, 209 Ga. App. 226, 228–29 (1993). The rule is a "complete defense to claims based upon…failure to warn." *Morris v. Clark Equipment Co.*, 904 F. Supp. 1379, 1382 (M.D. Ga. 1995) (quoting *Weatherby v. Honda Motor Co. Ltd.*, 195 Ga. App. 169 (1990), *overruled on other grounds by Ogletree v. Navistar Int'l Trans. Corp.*, 269 Ga. 443 (1998)). The plaintiff bears "the burden of proving that the peril-causing injury is latent, or not patent." *Weatherby*, 195 Ga. App. at 171. A manufacturer is entitled to summary judgment "in plain and palpable cases,"

11

however, "in many cases [a] defense based upon the obvious and common nature of the peril will be a question to be determined by a jury." *Id.* at p. 173.

Courts determine whether the danger is obvious using an "objective view of the product; the subjective perceptions of the user in this regard are irrelevant." *Id.* The plaintiff's actual knowledge is irrelevant to a failure to warn claim because a "warning of an obvious and known risk will generally not provide an effective additional measure of safety." *Morgan v. Dick's Sporting Goods, Inc.*, 359 F. Supp. 3d 1283, 1291 (N.D. Ga. 2019) (citing *Daniels v. Bucyrus-Erie Corp.*, 237 Ga. App. 848, 850 (1999) ("The warnings proposed by [Plaintiff's] experts would have provided the crane operator with no unknown information.")).

The peril here is the possibility of the vehicle slipping off the jack and falling onto the individual. Objectively speaking, the danger of the car falling off a jack is generally known. Plaintiffs contend, however, that when following the owner's manual—as Seanessee intended—an individual would not perceive an obvious danger of the car slipping off the jack. *See e.g., Neal v. Toyota Motor Corp.*, 823 F. Supp. 939, 942 (N.D. Ga. 1993) ("Georgia cases which espouse the open and obvious doctrine all concern injuries where a reasonable person viewing the accident in question could identify the exact propensity for danger involved."). Dr. Laux called the "retrieval of the tire" in the Stow N' Go vehicle "unique," "unusual[,] and unfamiliar." (Doc. 97). Her report states that the instructions for the spare tire hook "are confusing." (*Id.*). She further states that "[w]hen the vehicle has all four inflated tires…a user will believe they can safely reach in under the vehicle with

12

part of their body under the vehicle, and grab the tire even if it is jacked up." (*Id.*). She concluded that a latent defect exists in the ground clearance of the exhaust system. According to Dr. Laux, a user with four inflated tires would not understand the risk that the lower exhaust system "could trap and injure" the individual.

A question of fact exists as to how an objective individual would calculate the danger involved, and whether he or she would consider the danger obvious. Dr. Laux found that because the instructions for the spare tire hook are ambiguous, the location of the tire underneath the car created a likelihood that individuals will place their bodies under the vehicle.[2] In other words, an individual following ambiguous instructions would not have a choice but to reach beneath the vehicle. According to Dr. Laux, an individual would not perceive this action as obviously dangerous though because the visible ground clearance from the four inflated tires allows "a user [to] believe they can safely reach in under the vehicle." (Doc. 97). This presents a sufficient question of fact for a jury; therefore Plaintiffs' claims are not barred by the open and obvious rule.

## 2. Reliable Evidence

_____

[2] From Dr. Laux's Report:

> [T]he issue is not that when you ask someone 'Can a car fall off a jack?' and 'Can it hurt someone if they are under the car?' they answer 'yes.' The question is whether at the time the user is trying to retrieve a spare tire when using the jack and believes he/she can't accomplish that without placing part of his/her body under the vehicle, what can they reasonably be expected to do? Will he or she be able to follow the instructions to 'take it to a service center' as suggested in the WARNING! Regarding jacking and tire changing?

Defendant argues that Plaintiffs have no reliable evidence of a design or manufacturing defect claim because Defendant has moved to exclude the testimony of Plaintiffs' experts Pete Sullivan and Jerry Householder. "When faced with a summary judgment motion, plaintiffs 'have the burden to demonstrate a genuine issue of material fact that the product is defectively designed; to do this, they must produce evidence from an expert who is qualified to conduct the risk-utility analysis and to opine that the risks inherent in [the product's] design outweigh the utility or benefit derived from the product.'" *Bryant v. BHGA, Inc.*, 9 F. Supp. 3d 1374, 1383 (M.D. Ga. 2014); see also *In Re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig.*, 711 F. Supp. 2d 1348, 1365 (M.D. Ga. 2010). As previously discussed, Defendant's motions to exclude the testimony of Pete Sullivan is denied, and the motion to exclude the testimony of Jerry Householder was previously denied. Therefore, Plaintiffs have provided the expert testimony needed to prevail on summary judgment, and Defendant's motion for summary judgment is DENIED.

### 3. Assumption of the Risk

FCA argues that Seanesee assumed the risk of injury because he voluntarily crawled under the vehicle (or stuck his arm under the vehicle) while it was on the jack. He recognized the warnings on the owner's manual and the jack—advising not to put any body part under the vehicle—and still put himself at risk of the harm.

"The affirmative defense of assumption of the risk bars recovery when it is established that a plaintiff, 'without coercion of circumstances, chooses a course

of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not.'" *Thompkins v. Gonzalez-Nunez*, 355 Ga. App. 144, 145–46 (2020). To establish the defense of assumption of the risk in Georgia, a defendant must establish "that the plaintiff '(1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.'" *Id.* (citing *Watson v. Reg'l First Care, Inc.*, 335 Ga. App. 740, 741 (2016)). Knowledge is the "watchword of assumption of risk, and means both actual and subjective knowledge on the plaintiff's part." *Watson*, 335 Ga. App. at 741. "[W]hile assumption of the risk is ordinarily a jury question, 'in plain, palpable, and indisputable cases resolution of the issue by a jury is not required.'" *Thompkins*, 355 Ga. App. at 146; see also *Jekyll Island State Park Auth. v. Machurick*, 250 Ga. App. 700, 700–01 (2001) citing *Goodman v. City of Smyrna*, 230 Ga. App. 630, 631 (1998).

Seanesee's injuries have rendered him unable to testify on what he did or did not know before or during the incident. However, a plaintiff who is unable to testify about the incident can be found to have assumed the risk of the dangerous activity if the individual was given a warning about the dangers prior to the incident. *See Teems v. Bates*, 300 Ga. App. 70, 73 (2009) (Plaintiff was deemed to have assumed the risk of car surfing after a friend warned her that car surfing could be very dangerous, despite the fact that the plaintiff had no memory of the event because she suffered head injuries). Defendant contends that because Seanesee read the owner's manual, he was sufficiently warned about the dangers of placing

15

his body underneath the vehicle and therefore assumed the risk of the dangerous activity. However, as previously discussed, it is not clear that the warnings were adequate or plainly visible. Therefore, the fact that Plaintiff reached for the tire underneath the vehicle despite reading the owner's manual is not an indication that there was "plain palpable evidence" that Seanesee assumed the risk of his injuries, and therefore does not warrant summary judgment.

Defendant also argues that all people have a general understanding of gravity, which Georgia courts have repeatedly found qualifies as assumption of the risk. (Doc. 68-1 at p. 13). It is true, generally, that the inherent danger posed by gravity allows the defense of assumption of the risk to prevail. *See, e.g. Augusta Amusements, Inc. v. Powell*, 93 Ga. App. 752, 757 (1956) ("No danger is more commonly realized or risk appreciated, even by children, than that of falling; consciousness of the force of gravity results almost from animal instinct."); *O'Neal v. Sikes*, 271 Ga. App. 391, 392 (2005) (concluding that a nine-year-old child assumed the risk of falling from a tree, which the child climbed to use a rope swing after watching other children do the same); *Nunn v. Page*, 265 Ga. App. 484, 485(1) (2004) (concluding that a four-year-old child assumed the risk of falling from a trampoline while playing a game of chase on the trampoline); *Riley v. Brasunas*, 210 Ga. App. 865, 867(1) (1993) (concluding that a seven-year-old assumed the risk of falling when he participated in a game that involved jumping from a mini-trampoline to a chin bar attached to a door frame); *Kane v. Landscape Structures, Inc.*, 309 Ga. App. 14, 18–19 (2011) (concluding that a nine-year-old child

16

assumed the risk of falling from a structure he climbed that was not intended to be climbed).

The Court agrees that a sixteen-year-old child is likely old enough to appreciate the risks posed by gravity when a large vehicle is propped up on a potentially unstable surface. There is testimony that the Richardsons kept a concrete block on the property that had previously been used to prop the car up when it was on a jack and that Seanesee knew about the block but did not use it. However, looking at the interrelatedness of the issues in this matter, it cannot be said with complete certainty that a general knowledge of gravity made the danger so clear to Seanesee in the moment that "without coercion of circumstances, [he] chose a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not." *Thompkins*, 355 Ga. App. at 145–46. Further, based on Defendant's other assertions, this Court believes that genuine issues of material fact exist as to whether the danger was adequately explained such that Seanesee had full knowledge of the risks associated with the activity, whether or not he had an appreciation of the general risk imposed by gravity. Therefore, Plaintiffs' claims are not barred by the defense of assumption of the risk and summary judgment is DENIED.

### B.   Plaintiffs' Manufacture and Design Claims

#### 1. *Statute of Repose*

Georgia's statute of repose bars products liability claims brought "after ten years from the date of the first sale for use or consumption of the personal property

causing . . . the injury." O.C.G.A. § 51-1-11(b)(2). The statute of repose applies to both strict liability and negligence claims. "[B]eyond the period set forth in [the] statute of repose, the cause of action simply does not exist." *Campbell v. Altec Indus., Inc.*, 288 Ga. 535, 536 (2011). Here, the subject minivan was sold in 2006, and Seanesee's injury occurred on December 12, 2016. At a hearing on the motion for summary judgment, Plaintiffs conceded that the strict liability claim exceeded the statute of repose.[3] (Doc. 176 at p. 120:10-11). Plaintiffs' counsel admitted that the statute of repose bars their strict liability claim.[4] But Plaintiffs dispute whether the statute of repose bars their negligent manufacturing claim. Georgia's statute of repose has an exception for negligent actions "arising out of conduct which manifests a willful, reckless, or wanton disregard for life or property." O.C.G.A. § 51-1-11(c). Plaintiffs bear the burden of proving by a preponderance of the evidence that this exception applies. *Ivy v. Ford Motor Co.*, 646 F.3d 769, 773 (11th Cir. 2011).

Under § 51-1-11(c), conduct is reckless if the actor intended the harmful act, "although the actor does not intend to cause the harm which results from it." *Chrysler Grp., LLC v. Walden*, 339 Ga. App. 733, 737 (2016) (citation and

---

[3] When responding to the motion for summary judgment, Plaintiffs did not address FCA's statute of repose argument. Plaintiffs have abandoned the claim of strict liability. Plaintiffs' surreply did, however, contest the statute of repose bar to their negligent manufacturing claim.

[4] Georgia's statute of repose does not apply to claims for a manufacturer's failure to warn of a hazard. O.C.G.A. § 51-1-11(c).

quotation omitted). It is sufficient that the actor realize—or should realize based on the facts known to the actor—that "there is a strong probability that harm may result." *Id.* Such conduct is reckless "even though [the actor] hopes or even expects that his conduct may prove harmless." *Id.* "Willful conduct is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or charged with indifference to the consequences as to be the equivalent in spirit of actual intent." *Chrysler Corp.*, 264 Ga. at 726.

Plaintiffs contend that the exception to the statute of repose applies here because FCA knew about the manufacturing defect. During the deposition of Mr. Quigley, the manager in charge of special vehicle builds for FCA at the time the Dodge Caravan was designed, Mr. Quigley described the design process for the Grand Caravan, noting specifically the importance of ground clearance during the design process. (Doc. 89 at p. 62-72). Mr. Quigley stated that the lowest point identified in the Grand Caravan was the second-row tub for the Stow N' Go seats, and that during the design process, no other item on the undercarriage of the vehicle would have exceeded the lowest point identified, including the exhaust pipe.[5]

---

[5] "Now everything else that goes under the car has to live above that. It can be down to that, but it can't be below that or it becomes a new bogey. But...these two components…and now once I've established the tub and that complies with those components...I can start putting in things like an exhaust pipe and a gas line and so on, but they have to be above there. In this case in the minivan, the exhaust pipe was above that." Doc. 89; 68:13-21.

Mr. Quigley goes on to explain how the design process works, including the hand-off process for designing the location of the exhaust pipe and the spare tire location. From his testimony, it appears that FCA did explore alternate designs for the spare tire, as well as studied other cars that store the spare tire underneath the body of the car. Ultimately though, FCA designed the underbody of the car in a unique way to manage the demands of the Stow N' Go seats. (Doc. 89). Some designs were rejected because they were unsafe, while others were rejected because they would require significant alterations to the design of the car's structure.[6] The group that designed the jack and the winch to retrieve the tire were outside Mr. Quigley's design group, but he stated in his deposition that "we would never want anyone to ever get under a car for any reason and that says even if you have to reach under that's too much, so use the device." (Doc. 89, p. 106: 17-20). This statement suggests that FCA knew the risks associated with a person getting under the car while changing a tire and chose a design knowing that some people would be unable to use the tool provided to retrieve the tire.

In *Chrysler Grp., LLC*, the Court determined that evidence showing that Chrysler knew of the risks associated with placement of the fuel tank as well as the knowledge that an accident could occur that would crush the fuel tanks if they

---

[6] *See* Doc. 89, p. 119–20. "It was feasibility and maintaining the safe structural integrity of that seat with a person strapped into it in an impact because there's a lot of sheer (*sic*) on that type of environment." "And also, even if you did such a thing, posed two real issues that weren't solved, how do I get it out of that position, and I've destroyed and lost my walk pass-through from the front to the second row."

were placed in the back of the car was sufficient evidence from which "a jury might legitimately conclude that 'from facts which Chrysler knew, it should have realized that there was a strong probability that harm may result, even though it hoped or expected that its conduct may prove harmless." *Chrysler Grp., LLC*, 339 Ga. App. at 838 (citing *Arrington v. Trammell*, 83 Ga. App. 107, 112 (1950) (punctuation omitted)). This case presents the same issues of fact, and therefore, a jury is the proper party to decide whether Plaintiffs' claims for negligent design are precluded by the Georgia Statute of Repose. Defendant's motion for summary judgment is denied.

### 3. Exhaust Pipe Defect Claims

"The manufacturer of any personal property sold as new property directly or through a dealer…shall be liable in tort…to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended." O.C.G.A. § 51-1-11(b)(1). "A manufacturing defect generally 'results from an error specifically in the fabrication process, as distinct from an error in the design process.'" *Shelton v. GALCO Int'l. Ltd.*, No. 3:16-CV-00033-TCB, 2017 WL 3597497, at *3 (N.D. Ga. July 19, 2017). Defendant alleges that Plaintiffs cannot prove that the injury was proximately caused by a defect in the height of the exhaust pipe, or that the defect existed at the time the product left the manufacturer's control. For the following reasons, the Court believes this issue does not warrant summary judgment.

*i. Proximate Cause*

In order for liability to attach to a manufacturer under O.C.G.A. § 51-1-11(b)(1), "the injury must be the proximate result of a defect in the product which existed at the time sold." *Suzuki Motor of America, Inc. v. Johns*, 351 Ga. App. 186, 191 (2019) (citing *Hall v. Scott USA, Ltd.*, 198 Ga. App. 197, 200 (2) (1990)).

> The general rule is that if, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, but if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

*Suzuki*, 351 Ga. App. at 192 (citing *Tensar Earth Technologies v. City of Atlanta*, 267 Ga. App. 45, 49(2) (2004)).

Defendant's argument relies primarily on the fact that there is a dispute amongst the various witnesses as to whether or not Seanesee's body was impacted by the force of the exhaust pipe or a different part of the vehicle. (Doc. 86-1 at p. 17-19). That dispute, however, is not dispositive of the issue of proximate cause. Seanesee retrieved the spare tire from the passenger side of the vehicle, as recommended by the owner's manual. The exhaust pipe was also located on the passenger side of the vehicle. Plaintiffs' expert Pete Sullivan ran several tests on the Dodge Caravan to determine possible scenarios for how the incident occurred. In his report, Mr. Sullivan stated that the ground clearance of the exhaust

pipe was such that "the subject spare tire could not be removed from underneath the subject vehicle on the passenger side without raising the vehicle." (Doc. 88 at p. 33). This low clearance meant that an individual was required to jack the vehicle up higher than recommended to retrieve the tire from its place underneath the vehicle. (*Id.*). Further, this low installation did *not* conform to the "MINIMUM RUNNING GROUND CLEARANCE design dimension of 138.4 mm (or 5.5 inches)." (*Id.*). Mr. Sullivan states in his report that it is possible that this low ground clearance caused the exhaust pipe to hit Seanesee two inches sooner than if it had been installed in compliance with FCA's design specifications.[7]

Defendant also points to the deposition of Jerry Householder, Plaintiffs' expert, who stated that the exhaust pipe could have lowered over time, reducing the height of the underbody components. (Doc. 80 at p. 255–56). But that fact does not mean the cause is "too remote" from the injury as to sever the causal connection. In fact, it seems clear from Dr. Householder's testimony that this kind of compression is likely true for every vehicle ever made, and Mr. Sullivan agreed that the suspension in every vehicle compresses over time. While it may be that Defendant did not intend this compression, it seems clear that this is a "probable or natural consequence[] [that] could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer." Therefore, this does not

---

[7] Mr. Quigley stated in his deposition that "to the best of my knowledge, all the way through the production, the lowest point in the middle of the car has always been the tubs for the second row, not the exhaust." (Doc. 89 at p. 63).

sever the causal connection between the original manufactured height of the exhaust pipe and the 10-year compression of the suspension compression which supports the body of the car, including the exhaust pipe.[8]

### ii. Existence of the Defect at the Time of Sale

To prove that a manufacturing defect exists, Plaintiffs must be able to show that "a defect existed in the product at the time it was sold to him or otherwise came under his control." *Jenkins v. Gen. Motors Corp.*, 240 Ga. App. 636, 636–37 (1999). Summary judgment may be appropriate for manufacturing design claims when the plaintiffs "fail[] to provide even a scintilla of affirmative evidence" that the product is defective. *Shelton*, No. 3:16-CV-00033-TCB, 2017 WL 3597497 at *5. "The bare allegation that it is possible that the [product] was defectively manufactured is insufficient to survive summary judgment." *Id.* The mere fact of a broken product is not itself evidence of an original defect. *Jenkins*, 240 Ga. App. at 637. *See also Firestone Tire & Rubber Co. v. Jackson Transp. Co.*, 126 Ga. App. 471, 475 (1972) ("The mere fact of a tire blowout does not demonstrate the manufacturer's negligence, nor tend to establish that the tire was defective. Blowouts can be attributed to a myriad of causes."); *Bennett v.*

---

[8] *See* Doc. 80 at 259:17-24.

Q: And do you have a figure for an acceptable amount of suspension compression for a ten-year-old vehicle?
A: No, I do not.
Q: Do you have any measurements for the exhaust to ground height of a new 2006 Grand Caravan that just rolled off the line?
A: No, I do not.

*Bridgestone/Firestone, Inc.*, 208 Ga. App. 782, 783 (1993) (finding that a stipulation by both parties that the accident occurred when the brakes failed was not sufficient for judgment as a matter of law that the brakes failed due to the defendant's negligence).

The vehicle in question is 10 years old. Plaintiffs' experts both acknowledged that compression is normal as time wears on, but neither could speak with any certainty as to what the beginning height of the exhaust pipe would have been in 2006 when it was first manufactured. Further, Dr. Householder based his opinion on the deposition of Defendant's 30(b)(6) expert, Mr. Quigley, but the final exhaust pipe design was not in Mr. Quigley's purview.[9]

Here Plaintiffs rely on various tests done by Mr. Sullivan to provide evidence that Defendant intended the exhaust pipe height to be higher. Further, Plaintiffs' expert relies on testimony from a former FCA employee about what the design clearance height for the exhaust pipe should have been, without more evidence that the final design was in compliance with this witness's testimony. The opinions presented are purely speculative and based on tests done to the vehicle over 10

---

[9] Mr. Quigley stated in his deposition that there was an engineer in charge of the exhaust and a separate engineer in charge of the spare tire placement. He ran the packaging group, which gave a basic design concept to the other groups. Then the various groups would add in their pieces until it was completed. He testified "For instance, the exhaust guy will be there at that hand-off prove-out meeting and say: My exhaust stuff is all done, I've got the right size mufflers, clearances, heat shield, I'm good to go." (Doc. 89 at p. 88:11-14). Mr. Quigley goes on to articulate that he is in those prove-out meetings in case there is an issue with any of the design specifications that he and his group approved. (Doc. 89 at p. 88-89).

years after it left FCA's control. There is no evidence presented to establish that this car was manufactured out of compliance with the intended design of the vehicle because Plaintiffs have presented no evidence showing either (1) that the vehicle was manufactured out of compliance with the intended design; or (2) what the final intended height of the exhaust pipe actually was.

Plaintiffs fail to establish any affirmative evidence that FCA had control over the vehicle when this alleged defect occurred and cannot establish all the elements required for a manufacturing defect claim. Therefore, summary judgment as to Plaintiffs' manufacturing defect claim is GRANTED.

### D.   Other Claims

#### 1. Design of Jack

Defendant argues that summary judgment should be granted because Plaintiffs' experts have abandoned this claim in their testimony. Jerry Householder testified that he did not think the base size of the jack was a defect, and further that "[it's] probably within industry standards." (Doc. 80 at p. 243:10-18). Pete Sullivan concurred in his deposition that he was not going to allege that the base of the jack was defective. (Doc. 85 at p. 280:1-14). Because Plaintiffs have presented no evidence that the jack was improperly designed, summary judgment on this claim is GRANTED.

#### 2. Location of Spare Tire

Defendant also argues that Plaintiffs have abandoned the claim that there was a design defect with regard to the placement of the spare tire. Plaintiffs' expert

Pete Sullivan states in his deposition that he would not give an opinion that "in and of itself a mid-ship tire spare location on any given vehicle including but not limited to the subject vehicle is a defect in and of itself." (Doc. 85 at p. 279:3-6). Further, Jerry Householder also stated in his deposition that he didn't have any expertise to say it was an improper place to put it. (Doc. 80 at p. 244:4-11). Because Plaintiffs have presented no evidence that the location of the spare tire constituted a design defect, summary judgment on this claim is GRANTED.

### 3. Attorney's Fees

Defendant argues that Plaintiffs have not provided the requisite showing that Defendants were "stubbornly litigious" as required by O.C.G.A. § 13-6-11. However, because there are claims going forward to a jury, summary judgment for Plaintiffs' motion for attorney's fees is DENIED.

## IV. Motion to Seal

Plaintiffs filed a Motion to Seal proceedings based on a deposition that was marked subject to a protective order filed by this Court on October 8, 2019. Defendant does not oppose this motion. Plaintiffs' Motion to Seal is hereby **GRANTED**.

## V. Motion to Strike

Defendant filed a Motion to Strike related to an Amended Response to FCA's Statement of Material Facts that Plaintiffs filed in relation to the Motion for Summary Judgment. This motion is **DENIED**.

## VI. Motion for Leave to File an Amended Statement of Disputed Facts

Plaintiffs filed a motion for leave to file an amended and supplemental statement of disputed facts on July 13, 2021. Plaintiffs included the amended statement of disputed facts with the filing of the sur-reply brief. (Doc. 160-1). Local Rule 7.3.1(C) requires any party who wishes to file additional briefing after the filing of the movant's reply brief to "move in writing for permission to do so within fourteen (14) days of the filing of the brief to which reply is desired." Further, Plaintiffs requested leave to file a supplemental brief but did not move to file or amend any other documents. Therefore, Plaintiffs' Motion for Leave to File an Amended Statement of Disputed Facts is **DENIED**. (Doc. 170).

## CONCLUSION

In light of the foregoing, the Court sets this case for trial and orders the following:

1. Plaintiffs' Motion to Seal is **GRANTED**.

2. Plaintiffs' Motion for Leave to File an Amended Statement of Disputed Facts is **DENIED**.

3. Defendant's Motion to Strike and *Daubert* Motions are **DENIED**.

4. Summary judgment to Plaintiffs' strict liability design defect claim is **GRANTED**.

5. Summary judgment to Plaintiffs' claim for a design defect relating to the jack is **GRANTED**.

6. Summary judgment to Plaintiffs' manufacturing defect claim is **GRANTED**.

28

7. Summary judgment to Plaintiffs' design defect claim relating to the position of the spare tire is **GRANTED**.

8. Summary judgment for all other claims is **DENIED**.

**SO ORDERED,** this 7th day of April, 2022.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**